FILED

2022 Mar-30  PM 01:44
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| **TIMOTHY SCOTT BOYLE,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **vs.** | ) | **4:18-cv-1966-LSC** |
| | ) | |
| | ) | |
| **JEFFERSON DUNN,** | ) | |
| **Commissioner, Alabama** | ) | |
| **Department of Corrections,** *et al*. | ) | |
| | ) | |
| **Respondents.** | ) | |

## MEMORANDUM OF OPINION

This is a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 filed by Petitioner Timothy Scott Boyle ("Boyle"), a death row inmate at Holman Correctional Facility in Atmore, Alabama. Boyle challenges the validity of his 2010 convictions on one count of capital murder and one count of possession of a controlled substance and sentence of death in the Circuit Court of Etowah County, Alabama. Upon thorough consideration of the entire record and the briefs submitted by the parties, the Court finds that Boyle's petition for habeas relief is due to be denied.

## I.      FACTS OF THE CRIME

The Alabama Court of Criminal Appeals ("ACCA") summarized the facts of

this case in its opinion on direct appeal:

> The State's evidence tended to show that on October 26, 2005, at
> around 6:30 a.m. [Timothy Scott] Boyle brought Savannah [White] to
> the emergency room of the Riverview Regional Medical Center. She
> was nonresponsive, had bruises on her forehead, had what appeared to
> be a cigarette burn on her foot, and had red marks around the front of
> her neck. Dr. James Lauridson, the forensic pathologist who conducted
> the autopsy on Savannah, testified that Savannah died as a result of
> cerebral edema, or brain swelling, from blunt-force trauma to her head,
> that Savannah's head injuries spanned the entire circumference of her
> head and that her brain swelled to such a degree that part of it broke off
> and pushed down into her spinal cord.
>
> H.D.,[1] the nine-year-old sister of the victim, testified that she was five
> years old at the time of Savannah's death. [FN1: At the time of Boyle's
> trial the victim's sister had been adopted. To protect the anonymity of
> this child witness we are using her initials.] About a week before
> Savannah's death, H.D. said, Boyle hit Savannah's head against the car
> door when he was putting her in her car seat because he was mad at
> Savannah. On the night before Savannah's death H.D. was taking a bath
> and Boyle came in the bathroom, threw her against the wall, and told
> her to leave.[2] [FN2: On cross-examination, H.D. said that these events
> happened two nights before Savannah's death.] She peeked through the
> door, H.D. said, and saw Boyle throw Savannah against the wall in the
> bathtub and dunk her head under the water several times. That night,
> H.D. said, Savannah cried for a long time and threw up all over the bed
> that H.D. and Savannah shared. H.D. testified that Boyle would not
> leave Savannah alone and that he came into their room throughout the
> night and told Savannah to go to sleep and when she would not he would
> slap her. The next morning, H.D. said, she was unable to wake
> Savannah. H.D. further testified that she never saw anyone but Boyle
> hit Savannah in the head.
>
> Kim Parr testified that at the time of Savannah's death she lived next to
> the victim and her mother, Melissa White, at Rainbow Apartments in

Rainbow City. She said that before White met Boyle, about three months before Savannah's death, White was a good mother but that that changed after Boyle came into her life. Parr said that when Boyle was around, Savannah would scream and that on October 20, 2005, when she was babysitting, she noticed what appeared to be a cigarette burn on Savannah's foot and bruises on her forehead. She asked Boyle how Savannah had been burned, Parr said, and he told her that he was holding Savannah and smoking a cigarette and that he accidentally burned her ankle when Savannah turned her head. Parr photographed Savannah's injuries and reported the injuries to the Department of Human Resources ("DHR") a few days before Savannah's death. Parr said that she saw Savannah at around 9:00 p.m. on the night before her death and that she had a runny nose but otherwise seemed fine and did not appear to be injured. Parr further testified that early in the morning of October 26, 2005, Boyle telephoned her four times from the emergency room and asked her to remove drugs from the apartment— she declined to do so. The last time he telephoned, Parr said, Boyle was laughing because he told her the police were chasing him around the hospital. Parr testified that Boyle told her that he wanted her to remove the pills because he knew that DHR would investigate and he thought that White might lose her children.

Francina Lemons, a nurse at Riverview emergency room, testified that in the early morning hours of October 26, 2005, she observed Boyle outside the emergency room holding Savannah and pacing in front of the door. She said that she and a co-worker, Emily Millican, brought them into the emergency room. Lemons said that Savannah had red marks around the front of her neck, bruises on her forehead, and what appeared to be a cigarette burn on one of her feet. Lemons gave three accounts of what Boyle said about Savannah's injuries: First, Lemons said, Boyle told her that he could not get Savannah to wake up and he may have given her too much Tylenol brand pain reliever; second, Boyle said that he found Savannah hanging over her bed with a sheet wrapped around her neck and he had tried to revive her; and third, she overhead Boyle on the telephone saying that Savannah would not stop crying and he could not get her quiet.

Claude Burk, Savannah's maternal grandfather, testified that he and his wife frequently took care of Savannah and her sister on the weekends and that around a week before Savannah's death he noticed knots on the back of Savannah's head and a burn on her left foot. Burk said that he and his wife confronted Boyle about Savannah's injuries and he told them that he had accidentally hit Savannah's head on the roof of the car when he was putting her in her car seat and that he accidentally burned her foot with a cigarette when he was holding her and she turned.

Cathy Horton, a nurse at Riverview emergency room, testified that Savannah was not responsive when she was admitted, that she had marks on her hands and feet, that she had a bruise on her forehead, and that blood tests showed the presence of amphetamine in her system.

Sgt. Charles Clifton, with the Cherokee County Sheriff's office, testified that he searched the victim's residence after hospital personnel reported Savannah's injuries. He seized the sheets on Savannah's bed, he said, because they were stained with vomit. Sgt. Clifton also testified that he had been informed that Boyle had contacted a neighbor and asked her to remove some pills from the master bedroom, and as a result he seized various pills and a crack pipe from the apartment. Two pills were identified as oxycodone hydrochloride, a Schedule II controlled substance; 4 pills were identified as Clonazepam, a Schedule IV controlled substance; and 25 pills were identified as methylphenidate hydrochloride, a Schedule II controlled substance.

In his defense, Boyle presented the testimony of his cousin, Victoria Miller, who testified that she had been around Boyle and Savannah and that Savannah did not act like she was scared of Boyle. She also said that Boyle had been active in planning Savannah's birthday party just a few days before her death.

Steven Johnson, an Etowah County DHR caseworker, also testified for Boyle. Johnson said that he spoke with H.D. at the hospital immediately after Savannah was brought to the emergency room and that H.D. told him that Boyle threw Savannah in the bathtub and that he drowned her but she did not mention that Boyle had burned Savannah with a cigarette or that Boyle had slapped Savannah.

*Boyle v. State*, 154 So. 3d 171, 183–85 (Ala. Crim. App. 2013), overruled in separate part by *Towles v. State*, 263 So. 3d 1076 (Ala. Crim. App. 2018) (record citation omitted).

## II.    PROCEDURAL HISTORY

On December 20, 2006, Boyle was indicted on one count of capital murder for the death of Savannah White, a child less than fourteen years of age, a violation of section 13A-5-40(a)(15) of the Code of Alabama (1975), and one count of unlawful possession of a controlled substance, a violation of section 13A-12-212(a)(1).  He was initially represented by attorneys Mac Downs and Scott Stewart. Downs withdrew prior to trial, and Walt Buttram was appointed to replace him.

Boyle's trial began on November 5, 2009, in the circuit court of Etowah County, Alabama. The State's principal witnesses were H.D., Savannah's nine-year-old sister, who was five at the time of Savannah's death, and the State pathologist, Dr. James Lauridson, who had performed the autopsy on Savannah and attributed the cause of death to blunt force trauma from an unspecified number of open handed blows to the back and side of the head over an unspecified period of time, which he opined could not have been accidental. The State also showed a video taken by Boyle at Savannah's birthday party two days before her death, contending that the video showed that Savannah lived in terror of Boyle. Defense counsel showed a video

interview of H.D. taken at the Barrie Center for Children shortly after Savannah's death. On November 12, the jury convicted Boyle of both counts as charged. The penalty phase began the following day. Defense counsel called as witnesses for brief examination Boyle's sister, former high school coach, Boyle himself, and a psychologist, Dr. Allen Shealy. At the conclusion of the penalty phase on November 16, the jury unanimously recommended that Boyle be sentenced to death on his capital murder conviction and to ten years' imprisonment on his possession conviction. The jury returned a separate verdict form noting their unanimous finding that the State had proven the aggravating circumstance that the murder was especially heinous, atrocious, or cruel.

On December 7, 2009, Boyle sent the trial court a letter asking the court to uphold the jury's death recommendation. Boyle wrote:

> The State proved "without" a reasonable doubt that Im [sic] a cold blooded killer, is this not correct? They said Im [sic] "without a soul", I dont [sic] deserve to live. Well, lets [sic] not go against the grain here. The only sentence that would fit this crime would be the death penalty. Im [sic] pleading with you to uphold the jurors [sic] recommendation.

(Vol. 1 at C. 148.) Two weeks later, having apparently had a change of heart, Boyle filed a motion for new trial, which was deemed moot as untimely in January 2010. He filed a second motion for new trial in February, which was also deemed untimely.

The court held a sentencing hearing on March 12, 2010. Defense counsel introduced no evidence at the judicial sentencing hearing. The trial court adopted the jury's recommendation and sentenced Boyle to death. Again, Boyle moved for a new trial in April, and the motion was denied in May.

On direct appeal, Boyle was represented by counsel from the Equal Justice Initiative of Montgomery and by J. Morgan Cunningham of Gadsden. On March 29, 2013, the ACCA affirmed his convictions and death sentence. *Boyle*, 154 So. 3d 171. Rehearing was denied in September 2013, and the Alabama Supreme Court denied certiorari in April 2014. *Ex parte Boyle*, No. 1121544 (Ala. April 18, 2014). The United States Supreme Court denied certiorari on December 1, 2014. *Boyle v. Alabama*, 135 S. Ct. 712 (2014).

Through the Equal Justice Initiative, Boyle filed a "placeholder" petition for postconviction relief pursuant to Rule 32 of the Alabama Rules of Criminal Procedure in the Etowah County Circuit Court on April 10, 2015. In September 2016, Boyle's pro hac vice counsel moved for admission, and his previous counsel withdrew. Local counsel also entered an appearance in October. On January 4, 2017, Boyle filed an amended Rule 32 petition and exhibits. Boyle supported the Rule 32 Petition with affidavits from (1) Dr. Janice Ophoven, a forensic pediatric pathologist, refuting the testimony of Dr. Lauridson regarding the cause of death; (2) Dr. Stacy

Ikard, a child therapist, challenging the video interview of five-year-old H.D. and her trial testimony as a nine-year-old; (3) Kate Siska, a mitigation specialist, detailing her opinion that Boyle's trial counsel failed to investigate, prepare, and present a sufficient mitigation case; (4) Richard S. Jaffe, an experienced capital defense attorney, describing his opinion that trial counsel's conduct failed to meet an objective standard of reasonableness based upon prevailing professional norms; and (5) Billy Ware, a private investigator, describing an interview with Savannah's mother, Melissa Burk White, to support Boyle's argument that the State did not disclose exculpatory evidence. The State answered and moved to summarily dismiss the amended petition on February 2, 2017.  That day, the circuit court—which had also been Boyle's trial court—directed both parties to submit proposed orders. Boyle submitted a four-page Proposed Order and 29-page supporting Memorandum. The State filed an 80-page Proposed Order. On March 7, five days after the proposed orders were submitted, the circuit court largely adopted the State's proposed order and summarily dismissed Boyle's amended petition. Boyle objected to the court's near-verbatim adoption of the State's proposed order.

On March 20, 2017, Boyle appealed. The ACCA affirmed by an unpublished memorandum of opinion on December 8, 2017, *see* Vol. 37, Tab #R-61, and denied rehearing in February 2018.

Boyle filed a petition for certiorari in the Alabama Supreme Court on February 15, 2018. On May 3, he submitted a letter brief contending that the ACCA had overruled its direct appeal decision in Boyle's case in its April 27, 2018, decision in *Towles v. State*, 263 So. 3d 1076 (Ala. Crim. App. 2018). The State filed a response in opposition the next day. The Alabama Supreme Court denied certiorari on May 18. Boyle did not pursue his appeal in the United States Supreme Court.

Boyle filed the instant petition for a writ of habeas corpus on November 29, 2018. The petition is his first habeas petition, and it is timely.

## III.   STANDARDS OF FEDERAL HABEAS REVIEW

This action is governed by 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Guzman v. Sec'y, Dep't of Corr.*, 663 F.3d 1336, 1345 (11th Cir. 2011). Pursuant to § 2254(a), a federal district court is prohibited from entertaining a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court" unless the petition alleges "he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). In other words, this Court's review of habeas claims is limited to federal constitutional questions. Claims pertaining solely to "an alleged defect in a [state] collateral proceeding" or to a "state's interpretation of its own laws or rules" do not provide a basis for federal

habeas corpus relief under § 2254. *Alston v. Dep't of Corr., Fla.*, 610 F.3d 1318, 1325–26 (11th Cir. 2010) (quotation marks and citations omitted).

## A. Exhaustion of State Remedies and Procedural Default

Under § 2254(b) and (c), a federal court must limit its grant of habeas applications to cases where an applicant has exhausted all state remedies. *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011). This means that "'[s]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process,' including review by the state's last court of last resort, even if review in that court is discretionary." *Pruitt v. Jones*, 348 F.3d 1355, 1358–59 (11th Cir. 2003) (quoting *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999)). Alabama's discretionary direct review procedures bring Alabama prisoner habeas petitions within the scope of the rule. *Id*. The purpose of this requirement is to ensure that state courts are afforded the first opportunity to correct federal questions affecting the validity of state court convictions. *See Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998); *see also Smith v. Newsome*, 876 F.2d 1461, 1463 (11th Cir. 1989) ("Federal courts are not forums in which to relitigate state trials.") (citation omitted)).

Moreover, "to exhaust state remedies fully the petitioner must make the state court aware that the claims asserted present federal constitutional issues. 'It is not

enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was made.'" *Snowden*, 135 F.3d at 735 (quoting *Anderson v. Harless*, 459 U.S. 4, 5–6 (1982)).

"[A]n issue is exhausted if 'the reasonable reader would understand the claim's particular legal basis and specific factual foundation' to be the same as it was presented in state court." *Pope v. Sec'y for Dep't of Corr.*, 680 F.3d 1271, 1286 (11th Cir. 2012) (quoting *Kelley v. Sec'y for Dep't of Corr.*, 377 F.3d 1317, 1344–45 (11th Cir. 2004)) (brackets in original omitted). If a petitioner fails to raise his federal claim to the state court at the time and in the manner dictated by the state's procedural rules, the state court can decide the claim is not entitled to a review on the merits, i.e., "the petitioner will have procedurally defaulted on that claim." *Mason v. Allen*, 605 F.3d 1114, 1119 (11th Cir. 2010). Moreover, a "state court's rejection of a petitioner's constitutional claim on state procedural grounds will generally preclude any subsequent federal habeas review of that claim." *Ward v. Hall*, 592 F.3d 1144, 1156 (11th Cir. 2010) (quoting *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001)). "Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991).

Yet as the Eleventh Circuit has noted, a claim will only be procedurally defaulted in the following circumstance:

> [A] state court's rejection of a federal constitutional claim on procedural grounds may only preclude federal review if the state procedural ruling rests upon "adequate and independent" state grounds. *Marek v. Singletary*, 62 F.3d 1295, 1301 (11th Cir. 1995) (citation omitted).

> We have "established a three-part test to enable us to determine when a state court's procedural ruling constitutes an independent and adequate state rule of decision." *Judd*, 250 F.3d at 1313. "First, the last state court rendering a judgment in the case must clearly and expressly state that it is relying on state procedural rules to resolve the federal claim without reaching the merits of that claim." *Id.* Second, the state court's decision must rest entirely on state law grounds and not be intertwined with an interpretation of federal law. *See id.* Third, the state procedural rule must be adequate, i.e., firmly established and regularly followed and not applied "in an arbitrary or unprecedented fashion." *Id.*

*Ward*, 592 F.3d at 1156–57 (footnote omitted).

There are also instances where the doctrines of procedural default and exhaustion intertwine. For instance, if a petitioner's federal claim is unexhausted—i.e., the petitioner never presented the claim to the state court—a district court will traditionally dismiss it without prejudice or stay the cause of action to allow the petitioner to first avail himself of his state remedies. *See Rose v. Lundy*, 455 U.S. 509, 519–20 (1982). But "if it is clear from state law that any future attempts at exhaustion [in state court] would be futile" under the state's own procedural rules, a court can

simply find that the claim is "procedurally defaulted, even absent a state court determination to that effect." *Bailey v. Nagle*, 172 F.3d 1299, 1305 (11th Cir. 1999) (citation omitted).

## B.    Overcoming Procedural Default

"[A]n adequate and independent finding of procedural default will bar federal habeas review of the federal claim, unless the habeas petitioner can show cause for the default and prejudice attributable thereto, or demonstrate that failure to consider the federal claim will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 749–50 (1991) (citations and internal quotation marks omitted).

The "cause and prejudice" exception is framed in the conjunctive, and a petitioner must prove both cause and prejudice. *Id.* at 750. To show cause, a petitioner must prove that "some objective factor external to the defense impeded counsel's efforts" to raise the claim previously. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Examples of such objective factors include:

> . . . interference by officials that makes compliance with the State's procedural rule impracticable, and a showing that the factual or legal basis for a claim was not reasonably available to counsel. In addition, constitutionally ineffective assistance of counsel . . . is cause. Attorney error short of ineffective assistance of counsel, however, does not constitute cause and will not excuse a procedural default.

*McCleskey v. Zant*, 499 U.S. 467, 494 (1991) (internal quotation marks, brackets, and citations omitted). As for prejudice, a habeas petitioner must show "not merely that the errors . . . created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original).

Finally, a petitioner may also escape a procedural default bar if he "can demonstrate a sufficient probability that [the court's] failure to review his federal claim will result in a fundamental miscarriage of justice." *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000). To make such a showing, a petitioner must establish that either: (1) "a constitutional violation has probably resulted in the conviction of one who is actually innocent," *Smith v. Murray*, 477 U.S. 527, 537 (1986) (quoting *Carrier*, 477 U.S. at 496), or (2) the petitioner shows "by *clear and convincing* evidence that but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty." *Schlup v. Delo*, 513 U.S. 298, 323 (1995) (emphasis in original) (quoting *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992)).

## C.  AEDPA Review of State Court Decisions Under § 2254(d) and (e)

When a constitutional claim upon which a petitioner seeks relief under § 2254 is not procedurally defaulted but has instead been adjudicated on the merits in state courts, this Court is still restricted in its ability to grant relief on those claims by §

2254(d). The AEDPA "imposes a highly deferential standard for evaluating state-court rulings" and "demands that state-court decisions be given the benefit of the doubt." *Guzman*, 663 F.3d at 1345 (internal quotation marks and citation omitted). To grant habeas relief on a claim, this Court must not only find that the constitutional claims are meritorious, but also that the state court's resolution of those claims:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2); *see also Boyd v. Allen*, 592 F.3d 1274, 1292 (11th Cir. 2010) (quoting § 2254(d)). The burden of showing that an issue falls within § 2254(d)(1) or (d)(2) is upon the petitioner. *See Woodford v. Visciotti*, 537 U.S. 19, 25 (2002). Section 2254(d)(1)'s "contrary to" and "unreasonable application of" clauses have independent meanings. *See Alderman v. Terry*, 468 F.3d 775, 791 (11th Cir. 2006) ("[T]he 'contrary to' and 'unreasonable application' clauses are interpreted as independent statutory modes of analysis.") (citation omitted). A state court's decision is contrary to "clearly established precedents [of the Supreme Court of the United States] if it applies a rule that contradicts the governing law set forth in [the Court's] cases, or if it confronts a set of facts that is materially

indistinguishable from a decision of th[e] Court but reaches a different result."

*Brown v. Payton*, 544 U.S. 133, 141 (2005) (citation omitted). On the other hand, to

determine whether a state court's decision is an "unreasonable application" of

clearly established federal law, the Supreme Court has stated:

> The pivotal question is whether the state court's application of the
> [relevant constitutional] standard was unreasonable . . . For purposes of
> § 2254(d)(1), an *unreasonable* application of federal law is different from
> an *incorrect* application of federal law. A state court must be granted a
> deference and latitude that are not in operation when the case involves
> review under the [relevant constitutional] standard itself.
>
> A state court's determination that a claim lacks merit precludes federal
> habeas relief so long as fairminded jurists could disagree on the
> correctness of the state court's decision. And as the [Supreme Court]
> has explained, evaluating whether a rule application was unreasonable
> requires considering the rule's specificity. The more general the rule,
> the more leeway courts have in reaching outcomes in case-by-case
> determinations.

*Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citation and quotation marks omitted)

(emphasis in original); *see also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The

question under AEDPA is not whether a federal court believes the state court's

determination was incorrect but whether that determination was unreasonable—a

substantially higher threshold."); *Guzman*, 663 F.3d at 1346 ("Ultimately, before a

federal court may grant habeas relief under § 2254(d), 'a state prisoner must show

that the state court's ruling on the claim being presented in federal court was so

lacking in justification that there was an error well understood and comprehended in

existing law beyond any possibility for fairminded disagreement.'") (quoting *Harrington*, 562 U.S. at 103). As the Supreme Court has stated, "If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings." *Harrington*, 562 U.S. at 102.

Additionally, a state court's factual determination is entitled to a presumption of correctness under § 2254(e)(1). And commensurate with the deference accorded to a state court's factual findings, "the petitioner must rebut 'the presumption of correctness [of a state court's factual findings] by clear and convincing evidence.'" *Ward,* 592 F.3d at 1155–56 (alterations in original) (quoting § 2254(e)(1)).

### D. The Burden of Proof and Heightened Pleading Requirements for Habeas Petitions

Additionally, because habeas corpus review is limited to review of errors of constitutional dimension, a habeas corpus petition "must meet [the] heightened pleading requirements [of] 28 U.S.C. § 2254 Rule 2(c)." *McFarland v. Scott*, 512 U.S. 849, 856 (1994) (citation omitted). "[T]he petition must 'specify all the grounds for relief available to the petitioner' and 'state the facts supporting each ground.'" *Mayle v. Felix*, 545 U.S. 644, 655 (2005) (quoting Rule 2(c) of the Rules Governing § 2254 Cases in the U.S. District Courts). The burden of proof is on the habeas petitioner "to establish his right to habeas relief and he must prove all facts necessary

to show a constitutional violation." *Blankenship v. Hall*, 542 F.3d 1253, 1270 (11th Cir. 2008) (citation omitted); *see also Smith v. Wainwright*, 777 F.2d 609, 616 (11th Cir. 1985) (holding that a general allegation of ineffective assistance of counsel is insufficient; a petition must allege specific errors in counsel's performance and facts showing prejudice).

### E.   The General Standard for Ineffective Assistance of Counsel Claims

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established the following two-pronged standard for judging, under the Sixth Amendment, the effectiveness of attorneys who represent criminal defendants at trial or on direct appeal:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Id.* at 687.

Because *Strickland*'s preceding two-part test is clearly framed in the conjunctive, a petitioner bears the burden of proving both "deficient performance"

and "prejudice" by "a preponderance of competent evidence." *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc); *see also Holladay v. Haley*, 209 F.3d 1243, 1248 (11th Cir. 2000) ("Because both parts of the test must be satisfied in order to show a violation of the Sixth Amendment, the court need not address the performance prong if the defendant cannot meet the prejudice prong, [ ] or vice versa.").

In order to establish deficient performance, a habeas petitioner "must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. That reasonableness is judged against "prevailing professional norms." *Id*. Moreover, under *Strickland*, lower federal courts must be "highly deferential" in their scrutiny of counsel's performance. *Id*. at 689. As the *Strickland* Court outlined:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. There are

countless ways to provide effective assistance in any given case. Even
the best criminal defense attorneys would not defend a particular client
in the same way.

*Id.* (citations and quotation marks omitted).

Simply put, a habeas petitioner "must establish that no competent counsel
would have taken the action that his counsel did take" to overcome the presumption
that counsel's conduct fell within the wide range of reasonable professional
assistance. *Chandler*, 218 F.3d at 1315. The reasonableness of counsel's performance
is judged from the perspective of the attorney, at the time of the alleged error, and in
light of all the circumstances. *See, e.g.*, *Newland v. Hall*, 527 F.3d 1162, 1184 (11th
Cir. 2008) ("We review counsel's performance 'from counsel's perspective at the
time,' to avoid 'the distorting effects of hindsight.'") (quoting *Strickland*, 466 U.S.
at 689).

To satisfy the prejudice prong, a habeas petition "must show that there is a
reasonable probability that, but for counsel's unprofessional errors, the result of the
proceeding would have been different. A reasonable probability is a probability
sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.
Stated differently, "[a] finding of prejudice requires proof of unprofessional errors
so egregious that the trial was rendered unfair and the verdict rendered suspect."
*Johnson v. Alabama*, 256 F.3d 1156, 1177 (11th Cir. 2001) (citations and quotation

marks omitted). Further, the fact that counsel's "errors had some conceivable effect on the outcome of the proceeding" is insufficient to show prejudice. *Strickland*, 466 U.S. at 693. Therefore, "when a petitioner challenges a death sentence, 'the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" *Stewart v. Sec'y, Dep't of Corr.*, 476 F.3d 1193, 1209 (11th Cir. 2007) (quoting *Strickland*, 466 U.S. at 695).

Because *Strickland* and § 2254(d) both mandate standards that are "'highly deferential'", "when the two apply in tandem, review is 'doubly' so." *Harrington*, 562 U.S. at 105 (citations omitted). The inquiry is not then "whether counsel's actions were reasonable," but is instead "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* The court must determine "whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard." *Id.* at 101. This "[d]ouble deference is doubly difficult for a petitioner to overcome, and it will be a rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding." *Evans v. Sec'y, Fla. Dep't of Corr.*, 699 F.3d 1249, 1268 (11th Cir. 2012).

Finally, "[s]tate court findings of historical facts made in the course of evaluating an ineffectiveness claim are subject to a presumption of correctness under 28 U.S.C. § 2254(d)." *Thompson v. Haley*, 255 F.3d 1292, 1297 (11th Cir. 2001).

## IV.   DISCUSSION OF BOYLE'S CLAIMS

### A.   Boyle's claim that he was denied effective assistance of trial counsel during the guilt phase of his trial

Boyle divides this claim into five subclaims, and each is addressed in turn.

#### 1.   Boyle's subclaim that his trial counsel were ineffective for failing to know the applicable law concerning specific intent required for capital murder and to object to an erroneous jury instruction regarding intent

Boyle contends that his counsel were ineffective for failing to know the law concerning specific intent and for failing to object to an improper jury instruction concerning the intent required to convict Boyle of capital murder.

Boyle exhausted this claim on state postconviction review. Vol. 27, Tab #R-54, at C. 313–26; Vol. 35, Tab #R-57, at 16–32; Vol. 38, Tab #R-63, at 14–19. The ACCA, in its decision affirming the Rule 32 court's denial of Boyle's Rule 32 petition, explained in detail why Boyle was not entitled to relief:

> First, Boyle contends that the circuit court erred when it summarily dismissed his claim that his trial counsel were ineffective during the guilt phase for being "ignorant" of Alabama law concerning the specific-intent element of capital murder. According to Boyle, as a result of their ignorance, trial counsel allowed the circuit court to give an incorrect instruction to the jury on intent that, he says, was

designated exclusively for non-capital offenses.

. . .

Boyle was charged with capital murder under § 13A-5-40(a)(15), Ala. Code 1975. This statute prohibits the murder of a person less than 14 years of age. *See* § 13A-5-40(a)(15), Ala. Code 1975. According to § 13A-5-39, Ala. Code 1975, the definition of "murder," as it is used in the statute under which Boyle was charged, is found in § 13A-5-40(b), Ala. Code 1975. Section 13A-5-40(b), Ala. Code 1975, expressly states that the definition of murder found in § 13A-6-2(a)(1), Ala. Code 1975, is the definition that applies to capital murder offenses. Under § 13A-6-2(a)(1), Ala. Code 1975, a person commits the crime of murder under Alabama's capital offenses statutes if he or she, with the intent to cause the death of another person, causes the death of that person or of another person.

The record from the charge conference during Boyle's capital-murder trial reveals that the circuit court gave the following instructions to the jury on Boyle's capital-murder charge under § 13A-5-40(a)(15), Ala. Code 1975:

> Ladies and gentlemen, the defendant is charged in the indictment with capital murder. Section 13A-5-40(a)(15) of the Code of Alabama, 1975 states "Capital murder is murder when the victim is less than 14 years of age."

> In conjunction with this statute, murder is defined under Section 13A-6-2(a)(1). [Under that statute,] [a] person commits the crime of murder if he or she does the following: With the intent to cause the death of another person, he or she causes the death of another person.

> . . .

> Intent, being a state of mind, is rarely, if ever, susceptible of direct or positive proof and must usually be

inferred from the facts testified to by the witnesses and the circumstances as developed by the evidence.

Intent must be specific and real in a capital murder case. The defendant must act intentionally as opposed to negligently, accidently, or recklessly to cause the death of the deceased in order to convict the defendant of guilt of capital murder.

You act intentionally with respect to a result or conduct when you have the purpose to cause that result or to engage in that conduct. Intent is to be determined by the surrounding circumstances and by the actions, if any, of the defendant.

(Trial R. 2195-96, 2200-01.)

During deliberations, the jury requested that the court either give them a copy of the law or repeat the instruction for "intent." Following a lengthy discussion, the prosecution and defense counsel agreed on the contents of the instruction that the circuit court would repeat to the jury. This instruction read as follows:

A person acts intentionally with respect to a result or to conduct described by a statute defining an offense when his purpose is to cause that result or to engage in that conduct. Intent is to be determined by the surrounding attendant circumstances and by the actions, if any, of the defendant.

(Trial R. 2248.) The circuit court then asked if the attorneys were satisfied; both indicated that they were.

Boyle argues that, by defining the term "intent" as the "intent to engage in that conduct," the above-quoted charge "relieved the State of its burden of proving that he intended to cause Savannah's death." According to Boyle, because his trial counsel were unaware that Alabama law requires that the State prove that he had the specific intent

to kill, they failed to ensure that the jury was instructed on this requirement and this constituted ineffective assistance of counsel.

We reviewed the substance of this argument for plain error on direct appeal. *See Boyle v. State*, 154 So. 3d 171, 216–17 (Ala. Crim. App. 2013). In rendering our decision, we stated:

> Boyle specifically argues that the circuit court's instruction that "you act intentionally with respect to a result or conduct when you have the purpose to cause that result or to engage in that conduct" allowed the jury to convict without finding the specific intent to kill. This portion of the court's instruction is identical to the statutory definition of "intentional" contained in § 13A-2-2, Ala. Code 1975. Section 13A-2-2(1), Ala. Code 1975, states: "A person acts intentionally with respect to a result or to conduct described by a statute defining an offense, when his purpose is to cause that result or to engage in that conduct."

> The Alabama Supreme Court, in addressing a circuit court's use of a jury charge in a capital-murder case that contained the exact definition of "intentional" contained in § 13A-2-2(1), stated:

>> The trial court, in defining mental culpability, read Code 1975, § 13A-2-2, to the jury verbatim, thereby defining each mental state along the spectrum from "intentional" to "criminal negligence." Each definition was relevant to the various verdict options except "criminal negligence." The definition of "intentionally" was relevant to the court's instructions on the "intent to kill" element of the capital offense.

> *Ex parte Kennedy*, 472 So. 2d 1106, 1111 (Ala. 1985).

> This Court may find plain error in a jury instruction only if "there is a reasonable likelihood that the jury applied the instruction in an improper manner." *Williams v. State*, 710 So. 2d 1276, 1306 (Ala. Crim. App. 1996). *See also Pilley v. State*, 789 So. 2d 870, 882–83 (Ala. Crim. App. 1998). The jury was instructed that in order to convict Boyle of capital murder the jury had to find that Boyle had the specific intent to kill. There is no reasonable likelihood that the jurors applied the challenged instruction in an improper manner. There was no plain error in the circuit court's instructions on intent.

*Boyle*, 154 So. 3d at 216–17.

> While this holding does not automatically preclude consideration of Boyle's ineffective-assistance-of-counsel claim, *see Ex parte Taylor*, 10 So. 3d 1075, 1078–79 (Ala. 2005), Boyle has failed to plead any facts that would call the above decision into question. Specifically, Boyle has failed to demonstrate how the jury applied the above instruction in an improper manner or how that instruction was in any way a misapplication of Alabama law. Furthermore, Boyle has also failed to plead specific facts that, if true, would show that, but for his counsel's failure to object to the above instructions, there is a reasonable probability that the outcome of his trial would have been different. Thus, the circuit court properly dismissed this claim.

Vol. 37, Tab #R-61, at 13–17 (some record citations, quotation marks, and footnotes omitted).

As noted previously, on April 27, 2018, the ACCA released an opinion in *Towles v. State*, 263 So. 3d 1076. Boyle had filed his petition for a writ of certiorari in his state postconviction proceedings in the Alabama Supreme Court on February 15, 2018. On May 3, 2018, Boyle supplemented his then-pending petition for certiorari

with a letter brief contending that the ACCA had invalidated its previous holding with respect to this claim in his state postconviction proceedings—quoted above—with the release of *Towles*. Vol. 38, Tab #R-64. The State filed a response in opposition, and the Alabama Supreme Court denied certiorari in Boyle's Rule 32 proceedings on May 18.

Boyle contends that the *Towles* decision supports the issuance of the writ of habeas corpus in this case. However, a close examination of the decision reveals that not to be the case. In *Towles*, the defendant was convicted of capital murder of a child under 14. 263 So. 3d at 1078. One of his defenses was that he did not intend to kill the child but that the death was the accidental result of harsh punishment. *Id.* at 1084. The facts were that Towles struck the five-year-old child on the buttocks with a piece of lumber to punish him for receiving a poor conduct report at school. *Id.* at 1086. Although the child did not die during the attack; he later died from the injuries he received. *Id.* On appeal, Towles argued that the State, in closing argument, and later the court, in its jury instructions, improperly lessened the State's burden of proving the particularized intent-to-kill element of capital murder by informing the jury that it could establish that intent element by showing that Towles knew there was a reasonable likelihood that his actions would cause the child victim serious injury. *Id.* at 1084. In addressing this claim, the ACCA first noted that to be convicted of a

capital offense and sentenced to death in Alabama, a defendant must have had a particularized intent *to kill* and the jury must have been charged on the requirement of specific intent *to kill*. *Id.* at 1085. The ACCA then agreed with Towles, explaining:

> Although a capital-murder conviction requires proof of specific intent to kill, the prosecutor incorrectly told the jury that it could establish the element of intent by showing that Towles "reasonably knew that he was either going to cause [the child's] . . . death or serious physical injury." (R. 2805) (emphasis added). The prosecutor then erroneously explained to the jury that, "[i]f I do something to you and I know that it's a reasonable likelihood I'm either going to kill you or seriously injure you and you die, that's sufficient evidence of intent." *Id.* Later, the circuit court solidified the error by instructing the jury that "the severity of a defendant's action may be sufficient proof of knowledge of the probability of death or great bodily harm sufficient to constitute murder." (R. 2870.)

*Id.* at 1085. The State conceded on appeal that the court's jury instruction was erroneous but argued that the error was harmless because "the character of the assault on [the child] was so egregious that there is no probability that the jury could have drawn an inference that Towles only intended to cause great bodily harm." *Id.* at 1086. The ACCA disagreed, first noting the following:

> The erroneous jury instruction resulted from this Court's discussion in *Boyle v. State*, 154 So. 3d 171, 223 (Ala. Crim. App. 2013), of the sufficiency of the State's evidence to establish the intent element of capital murder. While discussing the sufficiency of the State's evidence, this Court stated:
>
>> "The severity of defendants' actions certainly gave them knowledge of the probability of death or great bodily harm, sufficient to constitute murder. The intent to kill may be

> inferred by the vicious character of an assault. *See People v. Allum*, (1967), 78 Ill. App. 2d 462, 223 N.E.2d 187, citing *People v. Winters*, (1963), 29 Ill. 2d 74, 193 N.E.2d 809."

> *Boyle*, 154 So. 3d at 223 (quoting *People v. Carter*, 168 Ill. App. 3d 237, 248–49, 118 Ill. Dec. 983, 522 N.E.2d 653, 660 (1988)). This Court's statement was not intended to imply that the State could establish capital murder without proving that the defendant specifically intended to kill. To the extent this Court's statement in *Boyle* could be so read, it is overruled.

*Id.* at 1085 n.3. The ACCA went on to find that the court's jury instruction was not harmless error because the evidence establishing Towles' intent was not overwhelming and the defense "reasonably urged the jury to find that the crime consisted of a punishment gone too far." *Id.* at 1086. The court continued, "The circuit court's instruction, however, allowed the jury to reject that defense. In other words, based on the trial court's instructions, the jury could have found [Towles] guilty of capital murder if he intended to [injure the child], but did not intend to kill [him]." *Id.* (quoting *Brown v. State*, 72 So. 3d 712, 720 (Ala. Crim. App. 2010)).

*Towles* does not overrule or invalidate the jury instructions given in Boyle's trial. Rather, *Towles* overruled that section of the ACCA's decision in *Boyle* that was discussing the sufficiency of the State's evidence in Boyle's trial and implied that a defendant could possess the particularized intent to kill merely by knowing that his actions would cause great bodily harm. *See Towles*, 263 So. 3d at 1085 n.3, overruling

*Boyle*, 154 So. 3d at 223 (quoting several Illinois cases). In other words, the crucial distinction here is that the language in Towles' jury instructions that was deemed erroneous was apparently taken from the Boyle *opinion* on direct appeal—it had nothing to do with the jury instructions at Boyle's trial. Indeed, the jury instructions given at Boyle's trial were completely different from the instructions given at Towles' trial. The improper instruction at Towles' trial was that "knowledge of the probability of death or great bodily harm is sufficient to constitute murder." *Towles*, 263 So. 3d at 1084. The instruction at Boyle's trial that Boyle claims was improper was that "[y]ou act intentionally with respect to a result or conduct when you have the purpose to cause that result or to engage in that conduct." TR. 2200-01. Yet, the court had already instructed the jury that in order to convict Boyle of capital murder, it had to find that he acted "[w]ith intent to cause the death of another person," TR. 2196, and that "[i]ntent must be specific and real in a capital murder case. The defendant must act intentionally as opposed to negligently, accidently or recklessly to cause the death of the deceased in order to convict the defendant of guilty of capital murder," TR. 2200. Thus, the jury had already been properly instructed on Alabama law's requirement concerning the particularized intent to kill required for capital murder. This is why the ACCA on direct appeal rejected Boyle's claim that the jury instruction was improper, concluding that "[t]here is no reasonable

likelihood that the jurors applied the challenged instruction in an improper manner." *Boyle*, 154 So. 3d at 217. *Towles* did nothing to change that result.

*Towles* aside, Boyle has not demonstrated that the ACCA's decision reviewing his Rule 32 appeal and rejecting his ineffective assistance of counsel claim is contrary to or an unreasonable application of clearly established federal law as determined by the Supreme Court or based upon an unreasonable determination of the facts. Boyle argues that his defense counsel performed deficiently by not objecting to the court's jury instruction, alleging that defense counsel did not object because they had not educated themselves on what level of intent is necessary to prove capital murder in Alabama. True, as Boyle recounts, "[a]n attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland*." *Hinton v. Alabama*, 134 S. Ct. 1081, 1089 (2014). But considering the foregoing discussion, Boyle has not established that his counsel did not know the applicable law, much less that the ACCA's rejection of his deficient performance allegation was unreasonable. As the ACCA noted in reviewing its discussion of the underlying substantive claim on direct appeal, Boyle did not demonstrate that the jury was erroneously instructed on Alabama law concerning the specific intent required for a capital murder conviction. Nor has Boyle demonstrated that had the erroneous

charge not been given, there is a reasonable probability that the outcome would have been different. *See Boyle*, 154 So. 3d at 216-17 ("There is no reasonable likelihood that the jurors applied the challenged instruction in an improper manner.").

Boyle is due no relief on his first claim.

> **2.** **Boyle's subclaim that his trial counsel were ineffective for moving for a continuance of the trial and for failing to object to the State's "vindictively" seeking the death penalty in retaliation for their obtaining a continuance**

Boyle claims that his trial counsel were ineffective because they moved for a continuance of the trial after having been told by the State that it would not seek the death penalty if the trial proceeded as scheduled. Boyle further claims that his counsel were ineffective for failing to object to the State's subsequent decision to pursue the death penalty, arguing that the State's decision was "vindictively" made.

Boyle exhausted this claim on state postconviction review. Vol. 27, Tab #R-54, at C. 255–64; Vol. 35, Tab #R-57, at 49–58; Vol. 38, Tab #R-63, at 29–40. The ACCA, in reviewing the Rule 32 court's rejection of the claim, explained why Boyle was due no relief:

> Boyle's next ineffective-assistance claim concerns his trial counsel's decision to move for a continuance and their subsequent failure to object [sic] the State's decision to pursue the death penalty. According to Boyle, the only reason his trial counsel moved for a continuance was because they were ill-prepared for trial. Additionally, Boyle notes that although the State had initially decided not to pursue the death penalty, it made clear that if the defense's motion for

continuance was granted, it would conduct an additional investigation to determine whether the death penalty was warranted in Boyle's case. The direct appeal record indicates that, shortly after the circuit court granted the defense's motion for a continuance, the State decided to pursue the death penalty. According to Boyle, this was a "vindictive decision" on the part of the State and his trial counsel were ineffective for failing to object to it.

In its order summarily dismissing Boyle's claim that his trial counsel were ineffective for moving for a continuance, the circuit court provided the following description of the events that led to Buttram and Stewart's decision to file that motion:

> Shortly before he was indicted in late 2005, Boyle was appointed two lawyers[—]Mac Downs and Scott Stewart. In August 2007, the State turned over 185 pages of discovery materials, but they noted that certain evidence remained in the custody of the Rainbow City Police Department and that counsel could make arrangements to view it. Shortly thereafter, Boyle moved for Mr. Downs to be removed from his case, and Walt Buttram, with the requisite prior capital litigation experience, was appointed to replace him in October 2007.

> This matter was set for trial in September 2008, then in March 2009. Less than two weeks before the March trial date, the defense moved for a continuance for three reasons: (1) the State had provided them with handwritten autopsy notes and a disc of photographs two days prior, (2) counsel had still been unable to view videos at the Rainbow City Police Department because of the absence of the lead investigator, and (3) counsel believed that not all of the physical evidence had yet been disclosed. At a hearing on March 2, the State informed the defense and this Court that they were not pursuing the death penalty, but that they might if a continuance were granted and they were able to conduct further investigation.

On March 4, at a follow-up hearing, the defense indicated that after reviewing the disc of autopsy photographs, they had consulted with a doctor who believed Savannah might have died from ketoacidosis instead of head trauma. They asked for a two-month continuance to seek review from a medical expert, explaining that even though the death penalty was not then an option, Boyle could still face life without parole if convicted.

This Court granted the continuance on March 5, pushing the trial to November 2009. In so doing, this Court noted that the defense had not had complete control over the evidentiary issues. At that hearing, the State indicated that they had decided to pursue the death penalty, and the defense did not object.

(C. 1439-40.) The circuit court dismissed this claim on the basis that it was insufficiently pleaded because Boyle could not "show that counsel's performance was deficient." Specifically, the circuit court stated:

[I]n this case, counsel received photographs less than two weeks before trial leading them to believe that Savannah might have died from diabetic complications instead of blunt-force trauma. Presented with the possible opportunity to exonerate Boyle, they reasonably asked for a brief continuance to pursue this new theory instead of proceed with the evidence available and face the State's strong case against their client. The fact that the State decided on the day that the continuance was granted to seek the death penalty is not proof of counsel's deficient performance.

(C. 1441.)

Generally, in order to show that trial counsel's performance was deficient, a petitioner must show that "'counsel made errors so serious

that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.'" *Clark v. State*, 196 So. 3d 285, 300–01 (Ala. Crim. App. 2015) (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). This standard is an objective one, meaning that we must determine whether Stewart and Buttram's assistance, "judged under prevailing norms, was reasonable considering all the circumstances." *Id.* Under the circumstances quoted above, we agree with the circuit court that Boyle has failed to plead facts showing that Buttram and Stewart made errors "so serious" that they were not functioning as the "counsel" guaranteed by the Sixth Amendment. In fact, we believe that the most reasonable thing they could have done under those circumstances was to file a motion for a continuance to ensure that they were providing Boyle with the most effective representation possible. Thus, Boyle is not entitled to relief on this claim.

Next, Boyle contends that his trial counsel compounded their ineffectiveness by failing to object to the State's decision to seek the death penalty shortly after the defense's motion to continue was granted. According to Boyle, "[t]here is no basis to conclude that the State's requesting the death penalty was motivated by anything other than spite over the continuance." We reviewed the substance of this claim for plain error on direct appeal and determined that it was without merit. *Boyle v. State*, 154 So. 3d 171, 228 (Ala. Crim. App. 2013). In rendering our decision, we noted the following:

> At a pretrial hearing, the State indicated that it knew of nothing at that time that would make this a death-eligible case. Later, the prosecutor indicated that after talking with the pathologist the State believed that it could prove one aggravating circumstance—that the murder was especially heinous, atrocious, or cruel as compared to other capital murders. In its formal notice of intent to seek the death penalty, the prosecutor stated:

>> Although this offense carries two possible punishments upon conviction, death or life without parole, counsel for the State

previously informed defense counsel that the prosecution would not seek the death penalty in this case. The State's position at that time was based upon the fact that there did not appear to be sufficient substantial evidence to support the applicability of any of the "aggravating circumstances" enumerated in Alabama Code Section 13A-5-49. In the wake of extensive trial preparation in the case however, including detailed discussions with witnesses in the case over the past few weeks, prosecutors for the State have reached the conclusion that there is a good faith basis for the applicability of at least one of the aggravating circumstances set out in Ala. Code Section 13A-5-49. Under the facts and circumstances of the case at bar, the offense as committed appears to be "especially heinous, atrocious, or cruel compared to other capital offenses," as that provision has been defined in applicable caselaw. For that reason, the State has reconsidered its decision to rule out the possibility of seeking the death penalty upon the conviction of the defendant for the charged offense, and to reserve the option of requesting the ultimate penalty in the event of a conviction.

. . . .

The State's decision to reserve the option of requesting the death penalty upon the defendant's conviction for capital murder is entirely unrelated to [Boyle's] request for a continuance of his trial date or the Court's granting of same. The decision is based solely upon the subsequent development of facts that support the grounds for imposition of the

> death penalty in this case, and the development of a good faith belief on the part of counsel that the interests of justice require the consideration of the death penalty in this case.

C.R. 57. Boyle did not argue in the circuit court that the prosecutor's decision to seek the death penalty was vindictive. Accordingly, we review this claim for plain error. *See* Rule 45A, Ala. R. App. P.

> In *Hunt v. State*, 642 So. 2d 999 (Ala. Crim. App. 1993), aff'd, 642 So. 2d 1060 (Ala. 1994), we recognized the concept of vindictive prosecution. "A prosecutor's use of the charging process may violate due process if it penalizes the exercise of constitutional or statutory rights." 642 So. 2d at 1030, quoting Daniel F. McInnis et al., *Project, Twenty-Second Annual Review of Criminal Procedure: United States Supreme Court and Courts of Appeals 1991-1992*, 81 Geo. L.J. 853, 1029-35 (1993).

*Turner v. State*, 924 So. 2d 737, 751 (Ala. Crim. App. 2002).

> In discussing the difficulties of establishing a vindictive-prosecution claim related to a pretrial issue, one federal court has stated:

> > In declining to apply a presumption of vindictiveness, the Court recognized that "additional" charges obtained by a prosecutor could not necessarily be characterized as an impermissible "penalty."

> Since charges brought in an original indictment may be abandoned by the prosecutor in the course of plea negotiation--in often what is clearly a "benefit" to the defendant--changes in the charging decision that occur in the context of plea negotiation are an inaccurate measure of improper prosecutorial "vindictiveness." An initial indictment--from which the prosecutor embarks on a course of plea negotiation--does not necessarily define the extent of the legitimate interest in prosecution. For just as a prosecutor may forgo legitimate charges already brought in an effort to save the time and expense of trial, a prosecutor may file additional charges if an initial expectation that a defendant would plead guilty to lesser charges proves unfounded.

*United States v. Goodwin*, 457 U.S. 368, 378-80, 102 S. Ct. 2485, 73 L. Ed. 2d 74 (1982) (footnotes omitted); *see United States v. Napue*, 834 F.2d 1311, 1330 (7th Cir. 1987) (noting "that vindictive prosecution claims are less likely to be successful, and a presumption of vindictiveness is unwarranted, in a pretrial setting" and "that the prosecutor must be allowed broad discretion in selecting the charges against the accused."). "A defendant seeking to prove

> > prosecutorial vindictiveness for a decision to indict must present objective evidence showing genuine vindictiveness." *United States v. O 'Hara*, 301 F.3d 563, 571 (7th Cir. 2002).
>
> > *Quilling v. United States*, 243 F. Supp. 2d 872, 878 (S.D. Ill. 2002).
>
> > There is nothing in the record that suggests vindictiveness on the part of the State in seeking the death penalty. Thus, we find no plain error in regard to this claim.

> *Boyle*, 154 So. 3d at 228–29.

> > While this holding does not automatically preclude consideration of Boyle's ineffective-assistance-of-counsel claim, *see Ex parte Taylor*, 10 So. 3d at 1078–79, Boyle has failed to plead any facts that would call the above decision into question. He has also failed to plead specific facts that, if true, would show that, but for his counsel's failure to object to the State's decision to pursue the death penalty, there is a reasonable probability that the outcome of his trial would have been different. Moreover, because we have already established that this claim is without merit, Buttram and Stewart cannot be deemed ineffective for not raising a meritless issue. *See Jackson v. State*, 133 So. 3d 420, 453 (Ala. Crim. App. 2009). Thus, the circuit court properly dismissed this claim.

Vol. 37, Tab #R-61, at 23–29 (some record citations, quotation marks, and citations omitted).

Boyle contends that the state courts' ruling was contrary to and an unreasonable application of clearly established Supreme Court precedent and was based on an unreasonable determination of the facts presented.

Boyle contends that his counsel's performance was deficient in three ways. First, he contends that counsel's failure to be ready for trial after three years had passed after having been appointed was constitutionally deficient. He argues that *Strickland* and *Williams v. Taylor* mandate that trial counsel's preparation for trial must be adequate and timely. *See Williams*, 529 U.S. 362, 396 (2000). Boyle also asserts that the state courts ignored evidence that autopsy photographs had been in existence since October 28, 2005, when they excused counsel's obtaining a continuance because of their only recently obtaining autopsy materials suggesting an alternative cause of Savannah's death. However, there is no indication in the record that the trial court ignored the fact that the autopsy evidence had been in existence for three years. To the contrary, the trial court specifically remarked on defense counsel's unreadiness, saying: "there are points and issues that could and should have been explored by now, they, nevertheless, to this point apparently have not been explored." Vol. 4, Tab #R-7, at TR. 133-34. The state courts found that Boyle's counsel asked for a continuance based upon being informed that Savannah might have died for a reason unrelated to Boyle, and Boyle has not rebutted the presumption of correctness of the state courts' factual findings by clear and convincing evidence. Perhaps counsel could have been more prepared earlier, but Boyle has also not demonstrated that the state courts were unreasonable in finding

that Buttram and Stewart did not make errors "so serious" that they were not functioning as the "counsel" guaranteed by the Sixth Amendment. Nor has he demonstrated that the state courts were unreasonable in noting that, considering that defense counsel had just been informed that Savannah's cause of death could have been due to diabetic complications, which might have exonerated their client, they appropriately asked for a brief continuance rather than proceed with the evidence as it stood and face the State's strong case against their client. It was not unreasonable for the state courts to find that counsel acted appropriately in an effort to provide Boyle with the most effective representation possible.

Second, Boyle contends that his counsel put their own interests above their client's in seeking a continuance, knowing that the State might seek the death penalty. Boyle cites various Supreme Court cases, without further explanation, for the rule that counsel must not place their own interests before those of the client, to whom they owe a duty of loyalty, or otherwise have a conflict of interest that adversely affects the adequacy of representation, regardless of whether the client can show prejudice. *See Mickens v. Taylor*, 535 U.S. 162, 171, 174-75 (2002); *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980); *Von Moltke v. Gillies*, 332 U.S. 708, 725-26 (1948). Boyle also takes issue with the state courts' failure to consider in his Rule 32 proceedings the affidavit he submitted of capital defense lawyer Richard Jaffe, who

stated that the failure of Boyle's counsel to prepare for trial and their requesting a continuance that subjected Boyle to the death penalty failed to meet an objective standard of reasonableness. Again, Boyle has not demonstrated that the state courts' rejection of this allegation was unreasonable. Counsel asked for a two-month continuance to seek review from a medical expert, explaining that even though the death penalty was not then an option, Boyle could still face life without parole if convicted, and they needed to pursue all defenses. Counsel's strategic choices are "virtually unchallengeable." *Strickland*, 466 U.S. at 690.

Third, Boyle contends that counsel's failure to object to the State's "vindictively" seeking the death penalty also fell below an objective standard of reasonableness. Boyle asserts that the Rule 32 court unreasonably determined the facts when it stated that nothing in the record suggested vindictiveness by the State. According to Boyle, the short window of time between the State stating that it might pursue the death penalty and the State's declaration that it would do so—three days—shows an improper animus informing the State's decision to seek the death penalty in retaliation for Boyle's counsel seeking the continuance. However, as the state courts noted, the State indicated that its recent discussions with a pathologist and several witnesses informed its decision that it could prove that the murder was especially heinous, atrocious, and cruel. The state courts explained why proving pre-

trial prosecutorial vindictiveness is a tough burden and that Boyle had not met that burden in this case, so it was not ineffective assistance for his counsel to fail to raise a meritless argument.

Because the state courts' decision was not unreasonable insofar as Boyle's deficient performance allegation was rejected, the Court need not consider Boyle's argument that he was prejudiced by counsel's conduct. Boyle is not entitled to relief on this claim.

> ### 3.     Boyle's subclaim that his trial counsel were ineffective for failing to retain a forensic pediatric pathologist to contest the testimony of Dr. Lauridson

Boyle's third sub-claim is that his trial counsel were ineffective for failing to hire a forensic pediatric pathologist to challenge the medical conclusions of Dr. Lauridson, the pediatric pathologist with the Alabama Department of Forensic Sciences who conducted the autopsy, regarding the cause of Savannah's death. Boyle suggests that counsel should have retained Dr. Ophoven, whom his postconviction counsel hired for the state postconviction proceedings.

Boyle exhausted this claim on state postconviction review. Vol. 27, Tab #R-54, at C. 267–70; Vol. 35, Tab #R-57, at 34–40; Vol. 38, Tab #R-63, at 20–24. The ACCA affirmed the Rule 32 court's rejection of the claim, explaining:

> First, Boyle contends that his trial counsel were ineffective for failing to retain a pediatric pathologist to challenge the testimony of the

State's pediatric pathologist, Dr. James Lauridson. Specifically, Boyle contends that his trial counsel should have retained an expert pediatric pathologist to challenge Dr. Lauridson's opinion that Savannah's death resulted from a series of openhanded slaps to the back of her head inflicted over a period of weeks or even months. As part of his Rule 32 petition, Boyle offered the affidavit of Dr. Janice Ophoven, an expert pediatric pathologist. After reviewing Dr. Lauridson's work and testimony, Dr. Ophoven determined that she could not agree with Dr. Lauridson's testimony that Savannah's death was caused by a series of open-handed slaps or that the cause of her death was intentional. Boyle argues that his trial counsel should have retained Dr. Ophoven or a similar expert to point out the errors in Dr. Laurdison's testimony and their failure to do so constitutes ineffective assistance of counsel.

The circuit court summarily dismissed this claim on the basis that it was insufficiently pleaded for three distinct reasons. First, the circuit court found that Boyle had failed to sufficiently plead that Dr. Ophoven would have been available to assist him during his trial because, at that time, Dr. Ophoven was a practicing forensic pathologist in Minnesota and an independent consultant. Second, the circuit court found that Dr. Ophoven's opinion was not final since she had not yet received a comprehensive case file to render a final opinion regarding the manner of Savannah's death. The circuit court further noted that, even if Dr. Ophoven's opinion was final, her preliminary conclusion that Savannah was killed by a single blow would not have necessarily excluded Boyle as a suspect. Third, the circuit court determined that Boyle had failed to plead facts showing that his trial counsel's decision not to hire a pediatric pathologist was unreasonable. Specifically, the circuit court stated:

> As discussed above, counsel had spoken with at least one independent medical expert by March 2009, who had opined that Savannah might have succumbed to ketoacidosis. The decision to pursue that line of inquiry instead of retain a different expert was not unreasonable. Nor was it unreasonable for counsel to use cross-examination to weaken Dr. Lauridson's testimony instead of retain a second pathologist. Counsel effectively pulled

from the witness that he could not state with certainty that Savannah's injuries were caused by slaps to the head and cigarette burns, he could not accurately age her bruises, and he found no typical signs of child abuse.

(C. 1442-43.) We agree with the circuit court's findings.

This Court has previously held that:

"how to deal with the presentation of an expert witness by the opposing side, including whether to present counter expert testimony, to rely upon cross-examination, to forgo cross-examination and/or to forgo development of certain expert opinions, is a matter of trial strategy which, if reasonable, cannot be the basis for a successful ineffective assistance of counsel claim."

*Marshall*, 182 So. 3d at 583 (quoting *Daniel v. State*, 86 So. 3d 405, 426 (Ala. Crim. App. 2011). This Court has further recognized that

"The decision not to call a particular witness is typically a question of trial strategy that [reviewing] courts are ill-suited to second-guess." *Greiner v. Wells*, 417 F.3d 305, 323 (2d Cir. 2005), quoting *United States v. Luciano*, 158 F.3d 655, 660 (2d Cir. 1998). "An attorney's decision whether to retain witnesses, including expert witnesses, is a matter of trial strategy." *People v. Payne*, 285 Mich. App. 181, 190, 774 N.W.2d 714, 722 (2009). "[I]n general, the 'decision not to hire experts falls within the realm of trial strategy.'" *State v. Denz*, 232 Ariz. 441, 445, 306 P.3d 98, 102 (2013), quoting *Yohey v. Collins*, 985 F.2d 222, 228 (5th Cir. 1993).

*Walker v. State*, 194 So. 3d 253, 296 (Ala. Crim. App. 2015).

An examination of the record on direct appeal supports the circuit court's findings. The record indicates that, during his cross-examination of Dr. Lauridson, Boyle's counsel, Walden M. Buttram,

explicitly questioned the pediatric pathologist about the results of his autopsy on Savannah's body. Specifically, during the course of his cross-examination, Buttram was able to get Dr. Lauridson to admit, among other things, that he could not say with "any degree of medical certainty" that Savannah's fatal injuries were caused by a slap to the back of her head, which was a key component to the State's theory of the case. Under these circumstances, trial counsels' decision not to call a defense expert but instead to rely on cross-examining the State's expert was a matter of trial strategy. Boyle has not pleaded facts demonstrating that this was unreasonable. Thus, Boyle is due no relief on this claim.

Vol. 37, Tab #R-61, at 18–21 (some record citations, quotation marks, and footnotes omitted).

Boyle contends that the ACCA's determination was contrary to and an unreasonable application of *Strickland* and was based on an unreasonable determination of the facts presented. Boyle asserts that, contrary to the statements of the state courts, his Rule 32 petition did in fact allege that Dr. Ophoven would have been available to testify at Boyle's trial, and that while Dr. Ophoven noted that she had not reviewed Boyle's entire case file, this was due to the circuit court's summary dismissal of Boyle's petition without granting his pending motions for discovery. These specific disputes about the ACCA's opinion do not render the decision an unreasonable determination of the facts sufficient for habeas relief. Boyle also quarrels with the state courts' finding that his counsel's strategic decision not to retain a second pathologist but instead to challenge Dr. Lauridson's testimony on

cross-examination was not deficient performance. However, failure to retain an expert is not *per se* deficient performance, and there are countless ways to effectively defend criminal charges. Boyle has not demonstrated that the state courts' decision is unreasonable. He is not entitled to relief on this claim.

### 4.   Boyle's subclaim that his trial counsel were ineffective for failing to retain an expert child therapist to aid them in dealing with H.D.'s testimony

Boyle's fourth subclaim is that his trial counsel were ineffective for failing to retain a forensic child therapist such as Dr. Ikard, whom his postconviction counsel hired for the state postconviction proceedings, to cast doubt upon the testimony of nine-year-old H.D. He claims that had such expert assistance been provided, it is reasonably probable that the jury would have found H.D.'s testimony unreliable, and the outcome of the trial would have been different.

Boyle exhausted this claim on State postconviction review. Vol. 27, Tab #R-54, at C. 299–306; Vol. 35, Tab #R-57, at 40–46; Vol. 38, Tab #R-63, at 24–28. The ACCA determined that Boyle was due no relief, explaining as follows:

> Next, Boyle argues that his trial counsel were ineffective for failing to retain an expert child therapist to challenge the reliability of the testimony of Savannah's sister, H.D. Specifically, Boyle contends that his trial counsel should have retained expert child therapist Dr. Stacy Ikard to discredit both H.D.'s trial testimony and her 2005 video-taped interview at the Barrie Center. According to Boyle, Dr. Ikard reviewed H.D.'s 2005 video-taped interview and concluded that the interview was both unreliable and procedurally defective in "numerous

respects." Boyle further noted that Dr. Ikard concluded that H.D.'s trial testimony was unreliable because, according to Dr. Ikard, H.D.'s testimony was inconsistent and appeared to be coached and rehearsed. Boyle contends that, had his trial counsel retained either Dr. Ikard or a similar expert, the jury would have found H.D.'s testimony unreliable, he never would have stipulated to the admission of H.D.'s 2005 interview into evidence, and the outcome of his trial would have been different.

In summarily dismissing this claim, the circuit court found that this claim was insufficiently pleaded for several reasons. First, the circuit court determined that Boyle's claim that Dr. Ikard would have been available to advise his counsel on this matter was unsubstantiated. The circuit court also determined that Boyle had failed to plead any facts demonstrating that, at the time of his trial, it was the common practice for defense counsel in Alabama to hire witnesses, like Dr. Ikard, to discredit child witnesses. The circuit court further found that nothing in Boyle's pleadings about H.D.'s testimony proved that she was lying or that he was innocent. Importantly, the circuit court determined that her testimony was consistent with the other evidence presented at trial, which, the court found, supported the overall reliability of her testimony. Finally, the circuit court determined that, even assuming Boyle's allegations were true, he pleaded nothing showing a reasonable probability that the outcome of his trial would have been different had Dr. Ikard testified. We agree with the circuit court's findings.

Once again, this Court has previously recognized that:

"The decision not to call a particular witness is typically a question of trial strategy that [reviewing] courts are ill-suited to second-guess." *Greiner v. Wells*, 417 F.3d 305, 323 (2d Cir. 2005), quoting *United States v. Luciano*, 158 F.3d 655, 660 (2d Cir. 1998). "An attorney's decision whether to retain witnesses, including expert witnesses, is a matter of trial strategy." *People v. Payne*, 285 Mich. App. 181, 190, 774 N.W.2d 714, 722 (2009). "[I]n general, the 'decision not to hire experts falls within the realm of trial

strategy.'" *State v. Denz*, 232 Ariz. 441, 445, 306 P.3d 98, 102 (2013), quoting *Yohey v. Collins*, 985 F.2d 222, 228 (5th Cir. 1993).

*Walker*, 194 So. 3d at 296. The mere fact a defendant can find, years after the fact, an expert who will testify favorably for him does not demonstrate that trial counsel was ineffective for failing to produce that expert at trial. *See Marshall v. State*, 182 So. 2d 573, 585–86 (Ala. Crim. App. 2014). Moreover, the question of a particular witness's reliability is a question within the exclusive province of the jury, which will not be disturbed by this Court. *See Boyle v. State*, 154 So. 3d at 200. Boyle has failed to plead facts demonstrating how his trial counsel were ineffective for failing to retain a child therapist to discredit H.D.'s testimony. Moreover, we will not re-evaluate H.D.'s credibility in order to give Boyle the result he desires. Thus, he is not entitled to relief on this claim.

Vol. 37, Tab #R-61, at 21–23 (some record citations, quotation marks, and footnotes omitted).

Boyle contends that, for several reasons, the ACCA's determination was contrary to and an unreasonable application of clearly established Supreme Court precedent and was based on an unreasonable determination of the facts presented. First, like the arguments Boyle made with regard to Dr. Ophoven as discussed in the previous section, Boyle contends that his Rule 32 petition in fact alleged that Dr. Ikard would have been available to testify at Boyle's trial, so the state courts' finding that Boyle had failed to allege that she would have been available was an unreasonable determination of the facts. However, the ACCA addressed this, stating in a footnote: "Indeed, at the most, Dr. Ikard only states in her affidavit what she would have

testified to had she been retained by counsel. She does not confirm whether or not she actually would have been available to advise Boyle's trial counsel around the time of his capital murder trial." (*Id.* at 22 n.6 (record citations omitted)). Regardless of this specific dispute, the state courts' factual determinations were not unreasonable.

Second, Boyle disagrees with the state courts' reasoning that Boyle did not show that it was common practice for defense counsel in Alabama in 2009 to hire witnesses to discredit child testimony, arguing that this was contrary to *Strickland*, which cautions that the reasonableness of counsel's performance should be determined in light of the facts of each particular case. Third, he argues that it could not have been reasonable trial strategy for his counsel to fail to seek guidance from an expert child therapist considering that the only direct evidence of Boyle's mistreatment of Savannah came from statements of a nine-year-old. However, it was not an unreasonable application of *Strickland* for the state courts to conclude, as they did, to the contrary. No doubt it is a difficult decision whether to attempt to discredit a young child's testimony through questioning or to bring in an outside child expert to do so. Each course of action could have potential negative ramifications for a defendant. Without a child expert, defense counsel was still able to argue to the jury that H.D. was coached in her testimony. The strategy ultimately chosen is not appropriately second guessed on federal habeas review.

Finally, Boyle argues that it was contrary to Supreme Court precedent for the ACCA to have affirmed the circuit court's finding that "nothing in Boyle's pleadings about H.D.'s testimony proves that she was lying or that he was innocent." Vol. 37, Tab #R-61, at 22. Boyle contends that this finding was contrary to Supreme Court cases establishing that a criminal defendant is not required to prove either that a key witness lied, or that he was innocent, to be acquitted. Boyle is obviously correct that it is the State's burden to prove each element of a criminal charge beyond a reasonable doubt. However, on state postconviction review, Boyle did bear the burden of establishing that his counsel's performance prejudiced him such that the outcome of the trial would have been different. The state courts reasonably ruled that he failed to meet this burden for several reasons, one of them being his failure to establish that H.D.'s testimony, had it been challenged in the way he suggests, would have altered the outcome of his trial. Having found that the state courts' decision is not unreasonable, Boyle is due no relief on this subclaim.

5. **Boyle's subclaim that his trial counsel were ineffective for failing to object to various statements made by the State in closing arguments**

Boyle's fifth subclaim alleges that the State made improper arguments during its guilt-phase closing—expressing personal beliefs about Boyle's guilt, vouching for H.D., referring to matters not in evidence, making arguments solely to inflame the

jury, and referring to Savannah's mother's charges—and that his trial counsel were ineffective for failing to object.

Boyle exhausted this claim on state postconviction review. Vol. 27, Tab #R-54, at C. 331–37; Vol. 35, Tab #R-57, at 58–64; Vol. 38, Tab #R-63, at 40–53. The ACCA extensively covered these comments in explaining why Boyle was due no relief, as follows:

> Finally, Boyle argues that his trial counsel were ineffective for failing to object to allegedly improper statements made by the State in its closing arguments during the guilt phase of his capital-murder trial. This Court has recently held that, generally,

>> "interruptions of arguments, either by opposing counsel or the presiding judge, are matters to be approached cautiously." *United States v. Young*, 470 U.S. 1, 13, 105 S. Ct. 1038, 84 L. Ed. 2d 1 (1985). "A decision not to object to a closing argument is a matter of trial strategy." *Drew v. Collins*, 964 F.2d 411, 423 (5th Cir. 1992). To constitute error a prosecutor's argument must have "so infected the trial with unfairness as to make the resulting [verdict] a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986).

> *Hutcherson v. State*, ____ So. 3d _____, _____ (Ala. Crim. App. 2017) (quoting *Benjamin v. State*, 156 So. 3d 424, 454 (Ala. Crim. App. 2013)) (emphasis added). "The failure to object to argument is generally considered to be 'within the "wide range" of assistance for which a strong presumption of sound judgment is due.'" *Clark v. State*, 196 So. 3d 285, 314 (Ala. Crim. App. 2015) (quoting *Thomas v. State*, 766 So. 2d 860, 929 (Ala. Crim. App. 1998)).

> When evaluating statements made by the State during its closing arguments, this Court has stated that, those statements "must be

viewed in the context of all of the evidence presented and in the context of the complete closing arguments to the jury." *Roberts v. State*, 735 So. 2d 1244, 1253 (Ala. Crim. App. 1997). "A prosecutor may argue in closing any evidence that was presented at trial. He may also present his impressions from the evidence. He may [even] argue every matter of legitimate inference and may examine, collate, sift, and treat the evidence in his own way." *Williams v. State*, 627 So. 2d 994, 995 (Ala. Crim. App. 1992). Finally, a prosecutor may comment on the lack of defense evidence, ask the jury to draw inferences from the evidence presented, and comment on the strength of the State's case. *McWhorter v. State*, 781 So. 2d 257, 321 (Ala. Crim. App. 1999).

In his postconviction petition and in his brief on appeal, Boyle identifies eight specific statements made by the State in its closing argument during the penalty phase that, he says, were improper. After reviewing each of those statements in the context of the State's complete closing arguments to the jury, the circuit court summarily dismissed his claim on the basis that it was insufficiently pleaded and that Boyle had failed to plead how his trial counsel's objections to those statements would have been sustained or, if they had been sustained, how the objections would have had any effect on his conviction. We address each of those statements and Boyle's respective arguments below.

First, Boyle contends that prosecutor Gary Phillips "improperly injected his personal beliefs and feelings, as well as facts not in the record" when he said:

> I've got a grandkid that's a little girl that's blonde headed and just turned two years old last July. So when I looked at the pictures and saw what happened to this child, it struck home, too.

(Trial R. 2172.) Contrary to Boyle's argument here, this was merely a side statement made by the prosecutor in connection with his comment that he had been thinking of his own family when he saw the evidence in this case. Because a prosecutor can present his own impressions that he develops based on the evidence, *see Williams v. State*, 627 So. 2d 994,

995 (Ala. Crim. App. 1992), Boyle's claim, as pleaded, fails to demonstrate how this statement "so infected the trial with unfairness as to make the resulting [verdict] a denial of due process," *see Hutcherson v. State*, 243 So. 3d 855 (Ala. Crim. App. 2017), and how trial counsel's failure to object to this statement constituted ineffective assistance.

Second, Boyle argues that Phillips "personally assured the jury" of Boyle's guilt when he made the following statement during closing argument:

> So when Scott [Stewart] gets up here and tells you—he keeps saying that [H.D.]'s saying what they want her to say. What they—I want to know who "they" is. I agree with Walt [Buttram] [on] one thing, nobody talked to her before she went to The Barrie Center. So who is the "they"? You know, is it supposed to be us or the State in some way? If that's the case, tell me how that makes sense. <u>Why in the world would I or these two [prosecutors] over here or these officers or anybody else want to convict the wrong person for doing this atrocious thing to this child? Why do we want to?</u>

(Trial R. 2172-73 (emphasis added)). When read in context in the State's closing argument to the jury, it is evident that Phillips was not assuring the jury of Boyle's guilt but was, instead, rebutting the defense's claim that H.D. was an unreliable witness and rebutting the defense's implication that the State had attempted to frame an innocent man. Because the prosecutor may rebut the defense's case during closing argument and may also comment on the strength of the State's case, *see McWhorter v. State*, 781 So. 2d 257, 321 (Ala. Crim. App. 1999), Boyle has failed to plead facts demonstrating how this statement "so infected the trial with unfairness as to make the resulting [verdict] a denial of due process," *see Hutcherson*, *supra*, and how his trial counsel's failure to object to this statement constituted ineffective assistance.

Third, Boyle contends that Phillips impermissibly injected evidence that was not in the record when it made the following statement about Melissa White, Savannah White's mother:

> And they're saying, well, the other person is the mother; we're ignoring her. Huh-uh, we're not ignoring her. Her day's coming. As God is my witness, her day's coming, if I live.
>
> Because no matter what he did, she was there. She allowed it to happen. She brought him into the home. Now, she may not be the one that struck the blows or anything like that, but she's—you know, it just boggles my mind. I can't explain it or understand it.

(Trial R. 2173 (emphasis added)). Contrary to Boyle's argument, here the prosecutor is simply making a comment relevant to the evidence presented, which showed that White brought Boyle into the home and did nothing to protect her children. Because a prosecutor may present his impressions from the evidence, *see Williams*, *supra*, Boyle has failed to plead facts demonstrating how this statement "so infected the trial with unfairness as to make the resulting [verdict] a denial of due process," *see Hutcherson*, *supra*, and how his trial counsel's failure to object to this statement constituted ineffective assistance.

Fourth, Boyle asserts that Phillips improperly discussed the "proper method of chastising a child" when the following statement was made:

> But getting back to what [H.D.] said or didn't say. I had in my notes from the interview that [H.D.] said, "Tim whipped Savannah. Tim has whipped Savannah with his hand and with a fly flap. Tim busted her head. She has a knot on her head. Hit her head twice on the car door. She cries when her head—cried when he[r] head was bumped on the door. Tim was mad when he banged her head because the—mama told him to stop whipping her."

What's significant about that to me, and it occurred to me, after you combine that with what the medical examiner said, how many folks—how many of y'all have ever hit a two-year-old child in the head? How many people would think to do that? Where would be the normal place--if you're going to punish a two-year-old child, if you're gonna strike them, where would you strike them? Would you strike them in the head or on the bottom?

You know, but did [H.D.] one time, one time say Tim is beating her, you know, he was just hitting her on the bottom or he hit her on her legs or she had stripes on her legs.

I remember when I was a kid, one time a neighbor told my mother I was running out in the street in front of cars and all. Only time in my life I ever carried stripes, but it doggone sure wasn't in the head. It was on my legs. And, you know, she told me and my father later that she sat down and cried the night she did that, but I never got out in the street any more and I'm here today probably because of that."

(Trial R. 2174-75.) Because the prosecutor may present his impressions from the evidence, *see Williams*, *supra*, Boyle's petition has fails to demonstrate how this statement "so infected the trial with unfairness as to make the resulting [verdict] a denial of due process," *see Hutcherson*, *supra*, and how his trial counsel's failure to object to this statement constituted ineffective assistance.

Fifth, Boyle argues that the prosecutor gave a "blatant appeal to passion and prejudice unrelated to the issues of the guilt phase" and "replete with his own personal feelings" when he stated:

And this wasn't a situation when we can come in here and say that this happened, you know just that one time he flew up and he hit her one time and she died as a result of it. This was an accumulation. This was a snowball effect.

This was where one, two, three, ten, twenty, over and over and over again until finally it was just too much. It was too much for a two-year-old's body to bear.

I guess what really, really gets to me—got to me about this case is when I heard this and seen it is when you try to think what that child went through, what she was thinking. What am I doing wrong? Why is this person or people that I live with, supposed to be taking care of me, doing this to me? What can I do to change it? You know, how can I—I'm two years old. How can I tell somebody something about it? What am I supposed to say? Have I done something wrong?

(Trial R. 2176-77 (emphasis added)). This is merely an appeal based on the evidence presented at trial which showed that Savannah, barely two years old, was repeatedly beaten by Boyle. Because this statement amounts to nothing more than a comment based on the evidence presented at trial, *see Williams*, *supra*, Boyle's petition fails to demonstrate how this statement "so infected the trial with unfairness as to make the resulting [verdict] a denial of due process," *see Hutcherson*, *supra*, and how his trial counsel's failure to object to this statement constituted ineffective assistance.

Sixth, Boyle argues that, using his personal experience, Phillips improperly told the jury what they should take from the video of Savannah's birthday party based on his own experience with two year olds, when he said:

Y'all were on this jury because we all believe y'all had the good, common sense to know what happened to this child once you heard this evidence. Y'all have heard it. This child can't come back and stand here and tell us what happened to her and what he did to her. But the closest thing we've got, I submit to you, is that video for the party.

And they say they want you to look at it. I want you to look at it, too, because evidently we're seeing two

different things. I'm around a two-year old. I know how they act when they've got presents coming and people are making over them and people are—you know, how happy and all that. Did you see her one time get excited about her presents? One time? Did you see her one time—or will you see her—look at it again. Did you see her one time smile or have any excitement or oohs and aahs? Did you see her reach out for him when he's telling her "smile"? You know, did you see her smile?

And those eyes will haunt me till I go to my grave, that child's eyes. If they weren't pleading and looking for help—y'all look at 'em. I may be wrong. I don't—but like I said, there's been a lot of ones in my family. And I don't have a lot of experience, except for my one little grandchild. And I better not ever see that in her eyes, because somebody's gonna answer some questions.

(Trial R. 2178-79 (emphasis added)). When placed in the context of the State's entire closing argument, Phillips's statements here are, once again, statements made based on his impressions of the evidence presented at trial. Because such statements are proper, *see Williams*, *supra*, Boyle's petition fails to demonstrate how this statement "so infected the trial with unfairness as to make the resulting [verdict] a denial of due process," *see Hutcherson*, *supra*, and how his trial counsel's failure to object to this statement constituted ineffective assistance.

Seventh, Boyle argues that prosecutor Marcus Reid improperly vouched for the credibility of H.D., the prosecutor's office, and the police when he made the following statement:

These gentlemen [defense counsel] have got up here and they've done their jobs. They've got up here and talked about [H.D.] They've nitpicked around her testimony, trying to find she didn't say this, she didn't say that, she could have added this, she could have added that. And you've heard enough about what a person can say about

what a five-year-old or a nine-year-old would remember or say at a certain time.

But what they're trying to get you to believe is that [H.D.]'s lying to protect somebody or to get somebody; that she's lying. And somebody in this office or somebody with the State or somebody with law enforcement put her up to lying. And that's not true.

How in the world—how in the world could we plant those things in that five-year-old's mind when she's at The Barrie Center the same day her sister's in the hospital, clinging to life, clinging to what little bit of life she's got left?

And two days later when she says those things and when she says it to her granddaddy. She's lying.

(Trial R. 2181-82 (emphasis added)). Contrary to Boyle's argument, Reid's statement was a response to a defense argument about H.D.'s reliability as a witness and, thus, was not improper vouching. Boyle's petition fails to demonstrate how this statement "so infected the trial with unfairness as to make the resulting [verdict] a denial of due process," *see Hutcherson*, *supra*, and how his trial counsel's failure to object to this statement constituted ineffective assistance.

Finally, Boyle contends that Reid followed the above statement with an "ad hominem" attack on him that, he says, was intended to inflame the jury's passion and prejudice, and finished by personally vouching for his guilt. Specifically, Reid stated:

One of you—I'm not saying one of you on this panel, but one of the jurors filled out a questionnaire, when asked what is reasonable doubt said "when you know that you know."

"When you know that you know." You know who did this. And you know that you know who did this. A man

who's so low. What snake crawling on its belly is lower than a man who would put a cigarette to a child and burn her, to leave those burns over and over again?

What snake crawling on its belly is lower than a man who would hit a little girl who barely comes to his knee over and over again?

And talk about intent? The last face she probably remembers—maybe she remembers [H.D.] I hope to God she does—this man over here, this man who has control over her, this man her mother won't even protect her from. That might right there (indicating).

Ladies and gentlemen, why did he lie if he didn't do it? Why did he lie if he didn't do it? We don't want you to convict the wrong man. We charged and we proved our case against the right man, the man who did this."

(Trial R. 2185-86 (emphasis added)). This was nothing more than an argument drawn from the evidence presented. Because a prosecutor is permitted to argue "every matter of legitimate inference and may examine, collate, sift, and treat the evidence in his own way," *Williams*, *supra*, Boyle's petition fails to demonstrate how this statement "so infected the trial with unfairness as to make the resulting [verdict] a denial of due process," *see Hutcherson*, *supra*, and how his trial counsel's failure to object to this statement constituted ineffective assistance.

Vol. 37, Tab #R-61, at 30–38 (some record citations and footnote omitted and emphases added by ACCA).

Boyle contends that the ACCA's determination was contrary to and an unreasonable application of clearly established Supreme Court precedent and was based on an unreasonable determination of the facts presented. He argues that the

ACCA's opinion is contrary to clearly established Supreme Court law forbidding (1) prosecutors from expressing personal opinions vouching for the guilt of the defendant, *see United States v. Young*, 470 U.S. 1, 7-8 (1985); (2) discussing or expressing opinions on matters not in evidence, *see Brooks v. Kemp*, 762 F.2d 1383, 1403 n.29 (11th Cir. 1985); (3) describing personal, emotional reactions to the case, *see Darden v. Wainwright*, 477 U.S. 168, 180 (1986); or (4) appealing to the passions and prejudices of the jury, *Viereck v. United States*, 318 U.S. 236, 247 (1943). Yet Boyle has failed to demonstrate that the ACCA either addressed a set of facts nearly identical to those in one of these cases and reached an opposite conclusion or unreasonably applied a rule from these cases. To the contrary, the ACCA thoroughly recounted each of the prosecutors' statements in its context and explained why each was actually a proper comment on or impression of the existing trial evidence. It was not unreasonable to so find and thus to further find that Boyle's counsel did not perform deficiently in failing to object. *See Brooks*, 762 F.2d at 1403 ("The[] guidelines for reviewing the effect of prosecutorial argument only come into play when an improper argument has been made. A permissible argument, no matter how 'prejudicial' or 'persuasive,' can never be unconstitutional.").

Boyle also argues that the ACCA made an unreasonable determination of the facts when it concluded that his defense counsel's failure to object to the above-

quoted statements by prosecutors did not "so infect[] the trial with unfairness as to make the resulting [verdict] a denial of due process." *See* Vol. 37, Tab #R-61, at 36. Boyle contends that, had counsel successfully objected to the first allegedly improper statement, this could have deterred prosecutors from making further statements. He cites *Berger v. United* States, wherein the Supreme Court noted that the cumulative effect of continuing misconduct by a prosecutor "cannot be disregarded as inconsequential." 295 U.S. 78, 89 (1935). He argues that the cumulative effect of the statements made his trial constitutionally unfair. But the prosecutors in this case did not engage in the same level of misconduct as the prosecutor in *Berger*. In *Berger*, the Supreme Court reversed a conviction where the prosecutor had made "improper suggestions, insinuations, and . . . assertions of personal knowledge" about evidence not before the jury. *Id.* at 88. The Court found that the prosecutor:

> was guilty of misstating the facts in his cross-examination of witnesses; of putting into the mouths of such witnesses things which they had not said; of suggesting by his questions that statements had been made to him personally out of court, in respect of which no proof was offered; of pretending to understand that a witness had said something which he had not said and persistently cross-examining the witness upon that basis; of assuming prejudicial facts not in evidence; of bullying and arguing with witnesses; and, in general, of conducting himself in a thoroughly indecorous and improper manner.

*Id.* at 84. As Boyle has not demonstrated any unreasonableness in the state courts' decision, he is due no relief on this subclaim.

**B.    Boyle's claim that he was denied effective assistance of trial counsel during the penalty phase of his trial**

Boyle divides this claim into five subclaims, but since the first three are interrelated, they will be discussed together, and the remaining two in turn.

**1.    Boyle's subclaim that his trial counsel were ineffective for failing to retain an effective mitigation specialist, conduct an adequate mitigation investigation, and present an adequate mitigation case**

Boyle contends that his trial counsel presented an ineffective mitigation case because they relied on psychologist Dr. Allen Shealy, who Boyle argues did not conduct a sufficient investigation. He claims that counsel should have retained Kate Siska, a mitigation specialist whom he retained during his state postconviction proceedings, and he alleges that she would have been available to present mitigation evidence from more than 120 witnesses. Boyle also contends that his counsel were ineffective for failing to conduct a mitigation investigation in line with that contemplated by the American Bar Association's Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases. Specifically, Boyle contends that counsel did not adequately interview Boyle's mother, father, and sister, and failed to interview members of Boyle's extended family, foster care siblings, and DHR case worker of 18 years.

Boyle exhausted these claims on state postconviction review. Vol. 27, Tab #R-54, at C. 361–80; Vol. 35, Tab #R-57, at 47–49, 70–82; Vol. 38, Tab #R-63, at 53–71. The ACCA first reviewed the federal case law concerning ineffective assistance of counsel claims premised on the alleged failure to conduct an adequate mitigation investigation, which the Court will not repeat here. The ACCA then explained why Boyle's claims were correctly dismissed by the Rule 32 court, as follows:

> Although not a model of clarity, as best we can discern, Boyle contends that the mitigation case put on by his trial counsel was "woefully inadequate and ineffective, falling far short of even the minimum [requirements] suggested by the [American Bar Association] Supplementary Guidelines" in at least three distinct ways.

> First, Boyle contends that his trial counsel were ineffective for relying primarily on the assistance of psychologist Dr. Allen Shealy in developing Boyle's mitigation defense because, Boyle says, Dr. Shealy's assistance was, at best, "shoddy." Specifically, Boyle argues that Dr. Shealy's assistance was inadequate because, he says, in the ten weeks leading up to Boyle's trial, Dr. Shealy only spent "four hours with [Boyle] (30 to 45 minutes of which were used administering tests), had only a 30-minute interview with [his sister] and a brief conversation with [Boyle's] high school football coach, and made a cursory review of [his] DHR records which were not offered in evidence or shown to the jury." Citing Siska's affidavit in support of his argument, Boyle contends that "'[p]re-trial mitigation work [should] ideally be allotted 600 to 800 hours of work performed over the course of 12 to 18 months.'"

> The circuit court disagreed with Boyle's assessment of Dr. Shealy's performance and held:

>> "Hiring a mitigation specialist in a capital case is not a requirement of effective assistance of counsel." *Daniel v.*

*State*, 86 So. 3d 405, 437 (Ala. Crim. App. 2011) (quoting *Phillips v. Bradshaw*, 607 F.3d 199, 207–08 (6th Cir. 2010)). While Siska suggests that a competent mitigation investigation requires six hundred to eight hundred hours of pretrial work of a period of twelve to eighteen months, Boyle failed to plead that this is either standard or routine, let alone required for competent assistance in a capital case.

(C. 1472-73.) We agree with the circuit court's findings here[ b]ecause Boyle has failed to plead facts demonstrating how his trial counsel's decision to retain and use Dr. Shealy fell below the reasonable standard of representation or that he was, in fact, prejudiced by their decision. Thus, he is not entitled to relief on this claim.

In addition to attacking Dr. Shealy's credibility, Boyle also contends that Siska's affidavit provides the names of at least 120 mitigation witnesses and additional experts[,] all of whom, Boyle says, had important knowledge that his trial counsel could have presented had they conducted an adequate investigation[,] and that he should have been allowed to present Siska's findings at an evidentiary hearing. The circuit court found that this claim was insufficiently pleaded. Specifically, the circuit court found that:

> Boyle has not sufficiently pleaded what else his mitigation witnesses could have stated that would have changed the balance of aggravation and mitigation in this case, instead, Siska suggests that counsel should have interviewed "more than 120 mitigation witnesses," some of whom were not identified by name in her report. Neither Boyle nor Siska stated that these witnesses were willing and available to be interviewed and testify on his behalf. Moreover, three of the witnesses Siska names, Elizabeth McDuffie, Tony Osborne, and Kim Parr, were interviewed and testified, while Melissa White, a fourth named witness, was clearly unwilling to do so. Boyle also failed to plead what testimony these witnesses would have provided that would have resulted in a sentence less than

> death. As for Siska's contention that trial counsel should have retained several experts, neither she nor Boyle identified any by name.

*Id.* We agree with the circuit court's finding here because, in Alabama, it is well settled that "even if alternate witnesses could provide more detailed testimony, trial counsel is not ineffective for failing to present cumulative evidence." *Washington v. State*, 95 So. 3d 26, 52 (Ala. Crim. App. 2012).

Finally, Boyle also provides a brief summary of the evidence demonstrating the challenges he has faced throughout his lifetime that, he says, should have been presented to the jury during the penalty phase of his capital murder trial. According to Boyle, this [omitted] evidence "tells a powerful story that would have humanized [him] and would have likely led to a decision to spare his life." After reviewing the information contained in his appellate brief and his amended petition, we believe that the core of this information was addressed in the witness testimony provided during the penalty phase of Boyle's trial. Accordingly, the circuit court did not err when it summarily dismissed this claim on the basis that it

> considered Boyle's difficult childhood and family background, including his abuse and neglect, his absence of a stable home environment, and his history of polysubstance abuse to be mitigating. The fact remains, however, that regardless of the deprivations of Boyle's childhood, he beat a helpless two-year-old to death.

(C. 1473-74.) When the same judge presides over both the original trial and the postconviction proceeding—as is the case here—and finds that, under the second prong of [*Strickland*], trial counsel's errors would not have resulted in prejudice, "[w]e afford the experienced judge's ruling 'considerable weight.'" *Washington*, 95 So. 3d at 53 (emphasis added) (affirming the circuit court's denial of Washington's postconviction ineffective-assistance-of-counsel claim applying the "considerable weight" standard). Under these circumstances, Boyle has failed to plead facts demonstrating how his mitigation case was so deficiently

constructed as to entitle him to relief under *Strickland*, *supra*. Thus, Boyle is not entitled to relief on his claim.

Vol. 37, Tab #R-61, at 55–58 (some record citations omitted).

Boyle contends that the state courts' decision is unreasonable for several reasons. Boyle first argues that it was an unreasonable determination of the facts for the ACCA to have ruled that his counsel's decision to use Dr. Shealy was reasonable and within professional norms. In short, Boyle contends that Dr. Shealy's investigation, report, and testimony was not thorough enough. Boyle also argues that it was an unreasonable determination of the facts for the ACCA to have ruled that the mitigation evidence described by Boyle on state postconviction review would have been cumulative of what was presented at trial. Boyle specifies the following details that he says should have been more fully investigated and brought out in mitigation by his trial counsel: (1) the inability of Boyle's mother to parent her children adequately as a result of her own traumatic upbringing, drug addiction, youth, and mental illness; (2) Boyle's repeated removal from his mother's custody and forced stays in the foster care system beginning when he was three years old, leaving him without a regular home and family stability; (3) the abuse suffered by Boyle in the foster care system; (4) the physical abuse, neglect, and violence experienced by Boyle during the times he was home with his family; (5) Boyle's genetic predisposition to mental illness and chemical dependency, which was

reinforced by parents and adults who regularly modeled drug abuse; (6) Boyle's being forced to consume drugs and alcohol as a child and his teenage drug use with his parents and other adult relatives; (7) Boyle's use of drugs to self-medicate depression and suicidal ideations; (8) Boyle's drug use with Melissa Burk White, Savannah's mother, during the months preceding Savannah's death, as well as the night before Savannah's death; and (9) Boyle's history of gentleness with children.

However, Boyle has not established that, had his attorneys investigated and proffered the aforementioned information, the result of his proceeding would have been different. The Court begins with the standard that effective representation of counsel in a capital case requires counsel to investigate and present mitigation evidence for the penalty phase of trial. *Wiggins v. Smith*, 539 U.S. 510, 525 (2003); *Williams*, 529 U.S. at 396; *Rompilla v. Beard*, 545 U.S. 374, 385-90 (2005). "[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable than defendants who have no such excuse." *Williams*, 529 U.S. at 396. Because a sentence of death must be based on an individualized sentencing determination, the jury must consider all mitigating evidence related to a defendant's character and background. *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (trial court and the jury must consider "any

aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death"). However, the ABA Guidelines are not the standard by which effective assistance is measured. As the Supreme Court made clear in *Strickland*, ABA standards "are guides to determining what is reasonable, but they are only guides. No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." 466 U.S. at 688-89. Rather, the Supreme Court has held that defense counsel has "a duty to make reasonable investigations" of potential mitigating evidence or "to make a reasonable decision that makes particular investigations unnecessary." *Wiggins*, 539 U.S. at 521 (quoting *Strickland*, 466 U.S. at 691). In any ineffectiveness case, an attorney's "decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* at 521-22 (quoting *Strickland*, 466 U.S. at 691). However, counsel's duty to investigate "does not necessarily require counsel to investigate every evidentiary lead." *Williams v. Allen*, 542 F.3d 1326, 1337 (11th Cir. 2008). "Under *Strickland*, strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.*

(quotation marks and citations omitted). *Compare Strickland*, 466 U.S. at 699 (stating that counsel's "decision not to seek more character or psychological evidence than was already in hand was . . . reasonable"), *with Porter v. McCollum*, 558 U.S. 30, 39-40 (2009) (noting that counsel "failed to uncover and present any evidence of Porter's mental health or mental impairment, his family background, or his military service," and "[t]he decision not to investigate did not reflect reasonable professional judgment"). With regard to assessing prejudice flowing from counsel's performance, courts are required to "evaluate the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—in re-weighing it against the evidence in aggravation." *Williams*, 529 U.S. at 397-98. "That same standard applies—and will necessarily require a court to 'speculate' as to the effect of the new evidence—regardless of how much or how little mitigation evidence was presented during the initial penalty phase." *Sears v. Upton*, 561 U.S. 945, 955 (2010). Again, where a petitioner challenges a death sentence, "the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695.

Here, Boyle's counsel did not fail to investigate for mitigation purposes, but in fact retained a mitigation specialist, Dr. Shealy, several months before trial.

Counsel also had Boyle's sister and a coach testify at Boyle's penalty phase, as well as Boyle himself. Each witness either expressly or impliedly acknowledged that Boyle's circumstances in life were difficult. Boyle's former high school football coach recounted that Boyle attended the Big Oak Ranch, a home for children in need, and said that Boyle was a hard worker, a good football player, respectful, not aggressive, that he was concerned about his family while he was in jail awaiting trial, and that he had reached out to him several times stating that he wanted to turn his life around. Vol. 16 at 2417-67. Boyle's sister stated that they went from home to home as children because their mother was addicted to drugs and depressed and could not care for them, that their mother had boyfriends who were abusive to them, that they also spent time in foster homes and at the Big Oak Ranch during childhood, that Boyle was protective and loving towards her and that she never knew him to physically hurt her or any children. *Id.* at 2529-69. Boyle himself testified that he was physically abused and that his mother wasn't able to care for him properly when he was a child. *Id.* at 2589-2620. In sum, there is no reasonable probability that the jury would have recommended, or that the judge would have imposed, a non-death sentence if they had been confronted with some of the other examples of Boyle's difficult upbringing that Boyle asserts his counsel should have discovered and introduced. *See Robinson v. Moore*, 300 F.3d 1320, 1347 (11th Cir. 2002) ("While the

additional mitigation witnesses procured by Robinson's [post-conviction] counsel could have presented the resentencing jury and trial judge with more details, or different examples, of these aspects of Robinson's life, these aspects of his life were nonetheless known to the resentencing jury and trial judge."); *Grayson v. Thompson*, 257 F.3d 1194, 1227-28 (11th Cir. 2001) ("Although the graphic picture of Grayson's home life painted at the state habeas proceedings was not presented at trial, the judge did not wholly disregard Grayson's unfortunate background in sentencing him to death. In light of the horrendous nature of this crime, we find no reasonable probability that the sentence would have been different if the judge and jury had possessed detailed information regarding Grayson's history.").

Boyle also specifically contends that the ACCA's determination was contrary to and an unreasonable application of clearly established Supreme Court precedent, either discussing or mentioning in passing the cases of *Wiggins*, 539 U.S. at 523-25; *Williams*, 529 U.S. at 396; *Rompilla*, 545 U.S. at 391-92; *Cooper v. Sec'y, Dep't of Corr.*, 646 F.3d 1328, 1342-46 (11th Cir. 2011); *Johnson v. Sec'y, Dep't of Corr.*, 643 F.3d 907, 932-33 (11th Cir. 2011); and *Ferrell v. Hall*, 640 F.3d, 1199, 1203 (11th Cir. 2011). However, the evidence of abuse in those cases was far more significant than that which was allegedly present here. In *Rompilla* particularly, defense lawyers failed

to examine a file on Rompilla's prior conviction for use in mitigation. The Supreme

Court discussed what the file would have shown, as follows:

> If the defense lawyers had looked in the file on Rompilla's prior conviction, it is uncontested they would have found a range of mitigation leads that no other source had opened up. In the same file with the transcript of the prior trial were the records of Rompilla's imprisonment on the earlier conviction, App. 508, 571, 631, which defense counsel testified she had never seen, *id.*, at 508. The prison files pictured Rompilla's childhood and mental health very differently from anything defense counsel had seen or heard. An evaluation by a corrections counselor states that Rompilla was "reared in the slum environment of Allentown, Pa. vicinity. He early came to [the] attention of juvenile authorities, quit school at 16, [and] started a series of incarcerations in and out Penna. often of assaultive nature and commonly related to over-indulgence in alcoholic beverages." Lodging 40. The same file discloses test results that the defense's mental health experts would have viewed as pointing to schizophrenia and other disorders, and test scores showing a third grade level of cognition after nine years of schooling. *Id.*, at 32–35.

> The accumulated entries would have destroyed the benign conception of Rompilla's upbringing and mental capacity defense counsel had formed from talking with Rompilla himself and some of his family members, and from the reports of the mental health experts. With this information, counsel would have become skeptical of the impression given by the five family members and would unquestionably have gone further to build a mitigation case. Further effort would presumably have unearthed much of the material postconviction counsel found, including testimony from several members of Rompilla's family, whom trial counsel did not interview. Judge Sloviter summarized this evidence:

> > Rompilla's parents were both severe alcoholics who drank constantly. His mother drank during her pregnancy with Rompilla, and he and his brothers eventually developed serious drinking problems. His father, who had a vicious

temper, frequently beat Rompilla's mother, leaving her bruised and black-eyed, and bragged about his cheating on her. His parents fought violently, and on at least one occasion his mother stabbed his father. He was abused by his father who beat him when he was young with his hands, fists, leather straps, belts and sticks. All of the children lived in terror. There were no expressions of parental love, affection or approval. Instead, he was subjected to yelling and verbal abuse. His father locked Rompilla and his brother Richard in a small wire mesh dog pen that was filthy and excrement filled. He had an isolated background, and was not allowed to visit other children or to speak to anyone on the phone. They had no indoor plumbing in the house, he slept in the attic with no heat, and the children were not given clothes and attended school in rags. . . .

The jury never heard any of this and neither did the mental health experts who examined Rompilla before trial. While they found "nothing helpful to [Rompilla's] case," *Rompilla*, 554 Pa., at 385, 721 A.2d, at 790, their postconviction counterparts, alerted by information from school, medical, and prison records that trial counsel never saw, found plenty of "'red flags'" pointing up a need to test further. 355 F.3d, at 279 (Sloviter, J., dissenting). When they tested, they found that Rompilla "suffers from organic brain damage, an extreme mental disturbance significantly impairing several of his cognitive functions." "Rompilla's problems relate back to his childhood, and were likely caused by fetal alcohol syndrome [and that] Rompilla's capacity to appreciate the criminality of his conduct or to conform his conduct to the law was substantially impaired at the time of the offense."

These findings in turn would probably have prompted a look at school and juvenile records, all of them easy to get, showing, for example, that when Rompilla was 16 his mother "was missing from home frequently for a period of one or several weeks at a time." Lodging 44. The same report noted that his mother "has been reported . . . frequently under the influence of alcoholic beverages, with the result that the children have always been poorly kept and on the filthy side

> which was also the condition of the home at all times." *Ibid*. School records showed Rompilla's IQ was in the mentally retarded range. *Id*., at 11, 13, 15.

545 U.S. at 390–91. *See also Wiggins*, 539 U.S. at 534–35 (noting "powerful" abuse

evidence including that Wiggins "experienced severe privation and abuse in the first

six years of his life while in the custody of his alcoholic, absentee mother, . . . suffered

physical torment, sexual molestation, and repeated rape during his subsequent years

in foster care, . . . spent [time] homeless, [and had] diminished mental capacities").

Boyle compares his case to *Wiggins*, stating that in both, counsel failed to uncover

evidence that the defendant's mother abused substances. This assertion is belied by

the record because Boyle's sister testified at length that their mother abused drugs

and did not care for them properly. This case is not *Wiggins* or *Rompilla*, or

substantially similar to any of the other cases mentioned by Boyle. For the

aforementioned reasons, Boyle is due no relief on this subclaim.

> **2.    Boyle's subclaim that his trial counsel were ineffective for failing to object to the State's penalty-phase closing argument**

As with his guilt-phase claim above, section IV. A. 5., *supra*, Boyle alleges that

the State made improper arguments during its penalty-phase closing argument—

injecting personal opinion, making statements to inflame the jurors, and vouching

for the propriety of the death penalty—and that trial counsel were ineffective for

failing to object.

Boyle exhausted this claim on state postconviction review. Vol. 27, Tab #R-54, at C. 337–42; Vol. 35, Tab #R-57, at 64–70; Vol. 38, Tab #R-63, at 40–53. The ACCA extensively covered these comments in explaining why Boyle was due no relief, as follows:

> Boyle argues that his trial counsel were ineffective for failing to object to five allegedly improper statements made by the State in its closing arguments during the penalty phase of his capital-murder trial. In analyzing these claims, we apply the same principles of law that we applied to Boyle's claim that his trial counsel failed to object to improper statements made by the State during the guilt phase.

> First, Boyle argues that Phillips launched a "prolonged appeal to passion and prejudice, reinforced by his own personal opinions" when he said:

>> So let's start with the first one; the first step, so to speak. I submit to you that the heinous, atrocious and cruel part of your decision is a no-brainer. You know, as [I] told you earlier, <u>I came to this case late. Some of the evidence y'all heard the same time I heard [it] for the first time. But I know how it's affected me and I know how—when I look at those photographs and I've heard what happened to that child and I'm thinking about what possible scenario, what situation could I think about, could I dream about in my wildest imagination that I, myself, could find myself in a situation like that where you're so hopeless, so dependent on somebody else; the very person or people that you depend on, rely on, have to feed you, clothe you, protect you, see about you are doing this to you.</u>

>> And you can't even—you can't even—you can't dial 911. You can't call a cop. You can't—you don't even have the verbal skills to tell the other members of your

family you may have contact with that this is what's happening to me. Can you stop it? Can you stop it?

I can't imagine. The closest thing I could come to is maybe a prisoner of war setting. But even then, you're an adult. You know why you're there. You know that the people that's doing this to you, you know, they don't like you. And it's not for something you've done necessarily, but you know.

But to be a child, a two-year-old child, and every time you walk through the room, no matter what you do or haven't done, whether you've been good or bad, you risk upside the head by him.

And then everything else that she went through. And I'll talk some more about that later.

The judge is gonna tell you that torture—part of the cruel and unusual stuff is not only the physical but the mental.

Can you imagine, just imagine what this child was trying to think, how her world had changed, why she was—you know, what do you do? How can I change this? I'm hurting. You know, my head hurts. It hurts bad. Totally helpless.

And the only person, only person that she had to help her was a five-year-old child that was pretty much in the same situation she was.

Is that cruel? Is that atrocious, heinous? I can't think of anything any worse. I can't imagine. So, yeah, what happened to that child was atrocious, cruel. And that should be a no-brainer.

(Trial R. 2632-35 (emphasis added).) In context, Phillips is doing nothing more than presenting his impressions from the evidence that was presented at trial that showed the existence of an aggravating circumstance, namely that this crime was particularly heinous, atrocious, or cruel. Since this type of statement is permitted under Alabama caselaw, *see Williams*, *supra*, the failure of Boyle's trial counsel to object to this statement was not ineffective assistance.

Second, Boyle contends that Phillips then urged the jury to consider the death penalty by stating the following:

> Then we come to the hard part. And to say that I and Marcus and Carol [Griffith] have not struggled with this would be a lie. And I try hard not to lie. Real hard. Because what goes through each and every one of our minds—I know mine. I can't speak necessarily for these [people]. I know how much they've thought about it. But I can't speak for their personal thoughts.

> But for mine, you wonder what goes through your mind is, you know, it's hard like I told you to start with. Capital cases are hard, probably the hardest kind of case that can come before the Court. And that's good. They ought to be.

> Every one—every time the State or an individual is going to make a decision as to whether or not someone—another human being should lose their life, it needs to be hard and it needs to be well thought out and it needs to be reasoned and it needs to be the right thing to do. That's the bottom line. The right thing to do.

> And I'm sitting here thinking, or have been over the last week or so, especially since y'all's first verdict, what right do I have to get up and ask for y'all to impose the death penalty on this young man sitting over here?

Because it—you know, not only the State has all these stops and procedures and things to make sure we get it right, but we, individually—and this is what occurred to me: Each and every one of us; me, Marcus, Carol, folks in our office—and I know y'all; every good, decent, thinking human being with a conscience on the face of this earth would think hard and long before you would take another human life. There's nothing good about it. Nothing. Got to.

And then it occurred to me about 4:00 o'clock in the morning one day last week. That's exactly why—that's the reason why he deserves the death penalty, because he doesn't have those stop gaps, those things of thinking about why should I do this. He doesn't have them.

Y'all have seen all the photographs. And we introduced them. And y'all are gonna see them again. And the bruising to the head was terrible. And you know that baby had to be hurting.

But for some reason—for some reason those cigarette burns got to me more than anything else. I couldn't imagine. But one thing I know—I got a two-year-old grandchild that was at my house yesterday. I know that if that—when that child was being burned, when that cigarette was being shoved into her flesh on her hand, her little ankle, she was screaming. She was jerking around. She was moving. She had to be. I would. Y'all would. He would.

That child—he had to hold that child in place to get that cigarette so exact. He had to hold her. That's a conscious decision. How could anybody with a conscience do that to anybody, much less a two-year-old child? Can you imagine? Can you imagine the screams? God help me. I hear it every time I go to sleep, and I never met her.

> So all the stops, all the [conscience], all the reasons
> that we all have for being so hard to do something, to hurt
> another human being or kill another human being, he ain't
> got.

(Trial R. 2635-39 (emphasis added)). Once again, Phillips's statement is nothing more than his impression of the evidence presented at trial. Because this is permissible, *see Williams*, *supra*, the failure of Boyle's trial counsel to object to this statement was not ineffective assistance.

Third, Boyle argued that prosecutor Reid injected his "personal feelings and experiences" in his rebuttal closing argument by stating:

> Those of us at that table who live with this case, and I'm
> sure these folks—for some reason—we've prayed about it,
> we've thought about it. For some reason, this case—I've
> been doing this—I['ve] been a lawyer twenty-seven years.
> For some reason this case and this little girl, we haven't
> been able to leave it at the office.

This statement was brief and appears to be nothing more than Reid stating that the case stuck with him and the other members of the prosecution. Boyle fails to cite to any Alabama caselaw holding that such comments are improper. Thus, Boyle has failed to demonstrate how his trial counsel's failure to object to this statement constituted ineffective assistance.

Fourth, Boyle argues that the above statement was then followed up by another "appeal to passion and prejudice having nothing to do with the issues of the penalty phase":

> If it's true that [Boyle] suffered all that abuse as a child, if
> it's true that it was that bad in his household growing up,
> if it's true that he was, himself, drowned—almost
> drowned, abused and beaten, suffered, knew what it was to
> be helpless, unable to cry out, unable to save himself.

If all that's true, only two other things are possible. Either Timothy Boyle has no conscience, no soul, no ability, no feelings, no thoughts, no concerns for what he was putting that little girl through or he knew every bit of what he was putting her through.

Every time she needed to cry and had nobody to go to, he knew what it felt like. Every time she was looking at the person who was supposed to be taking care of her and wouldn't, that person wouldn't, he knew what it felt like.

Every time—and think about this, just think about the image of the man who did it to her carrying her to the hospital. No mother. No grandmother. No little sister—big sister who protected her. Just her and him in that car, going to the hospital And what's the word that she said, according to that nurse? "Did she say anything to you on the way?" Remember that Cathy Horton said? She said "Mama."

Mama. That two-year-old child in the car with a man who has killed her, calling for her mother, the mother she'd never see or recognize again, the mother who didn't protect her. But still, she's mother.

Either no conscience, no soul. Evil. Well, you know what? Either way you look at it, it's evil. If you know what you're doing, it's evil. And if you're incapable of knowing what you're doing, it's evil. That's why the death penalty is appropriate in this case.

(Trial R. 2642-44) (emphasis added)). While the State should not encourage the jury to impose the death penalty out of sympathy for the victims, this Court has previously held that such comments do not necessarily "so infect the [proceedings] with unfairness" so as to deny the defendant due process. *See Thompson v. State*, 153 So. 3d 84, 171 (Ala. Crim. App. 2012). Thus, Boyle has failed to plead facts demonstrating how this statement infected the proceedings with

unfairness, *see Thompson*, *supra*, and how his trial counsel's failure to object to this statement constituted ineffective assistance.

Finally, Boyle argues that Reid improperly compared Boyle's rights with those of the victim when Reid said:

> He made choices in his life. He made choices that he didn't leave to Savannah. She never got a chance to decide whether she wanted to go to the military. She never got a chance to decide if she want[ed] to finish high school. She never got a chance to decide if she wanted to go to college. She never got a chance to have a wedding, to fall in love, to get married, to not get married, to be with her sister, [H.D.] And you look at that videotape. You've looked at it. You saw how close they were. She never got those chances.

(Trial R. 2644-45.) Although this Court has frequently noted that a prosecutor should not compare the rights of a victim with those of the defendant, we have held that such arguments are generally "valued by the jury at their true worth, as having been uttered in the heat of debate and [are] not expected to become factors in the formation of the verdict." *Thompson*, 153 So. 3d at 171. Here, Boyle has failed to plead facts demonstrating anything to the contrary. As such, he has failed to plead how his trial counsel's failure to object to this statement constituted ineffective assistance.

Because Boyle has failed to plead facts showing how any of the above statements made by the prosecution in its closing arguments during the penalty phase of his capital-murder trial, he has not pleaded claims demonstrating that his trial counsel were ineffective for failing to object to those statements. Thus, he is not entitled to any relief on this claim.

Vol. 37, Tab #R-61, at 38–44 (some record citations omitted).

Boyle contends that the state courts' decision is unreasonable. With regard to his argument that federal law prohibits the State from expressing personal, emotional reactions to the case, appealing to the passions and prejudices of the jury, and discussing or opining on matters not in evidence, this Court rejects the argument for the same reasons discussed in section IV. A. 5., *supra*.

Boyle also contends that in capital cases, the prosecution may not inform the jury that "the prosecutor's office had already made the careful judgment that this case, above most other murder cases, warranted the death penalty." *Brooks*, 762 F.2d at 1410. The Eleventh Circuit has declared such an argument "clearly improper because: 'The remark is, at the least, an effort to lead the jury to believe that the whole governmental establishment had already determined the appellant to be guilty on evidence not before them.'" *Id.* (quoting *Hall v. United States*, 419 F.2d 582, 587 (5th Cir. 1969)). The Eleventh Circuit added that "it is wrong for the prosecutor to undermine that discretion by implying that he, or another high authority, has already made the careful decision required." *Id.* Contrary to Boyle's contention, the ACCA was not unreasonable in determining that, because that did not happen here, defense counsel was not ineffective in failing to object. The ACCA reasonably found that the particular comments were permissible statements of the prosecutor's "impressions from the evidence" (Vol. 37, Tab #R-61, at 39-40, 41-42); "brief" comments,

"nothing more than . . . stating that the case stuck with . . . members of the prosecution" (*id.* at 42); and even if improper, nevertheless harmless as not affecting the outcome (*id.* at 43, 44). The ACCA also found that the State's comments did "not necessarily 'so infect the [proceedings] with unfairness' so as to deny the defendant due process." *Id.* at 43. *Brooks* is distinguishable in that the prosecutor explicitly discussed that his office had only sought the death penalty in a few cases during the past years. 762 F.2d at 1410. The same is true for *Tucker v. Kemp*, also cited by Boyle. 762 F.2d 1496, 1505 (11th Cir. 1985) (prosecutor stated: "There are not many times that I come before a trial jury and make the request that I will be making of you in this case. In effect, I think this is the seventh time in seven years that I've stood in the same position, so I do not take this lightly.").

Finally, Boyle contends that in urging a jury to impose the death penalty, the prosecutor also must not inject religion into argument by stating or implying that the deity requires or approves of a verdict of death, relying upon *Romine v. Head*, 253 F.3d 1349, 1366-68 (11th Cir. 2001), and *Farina v. Sec'y, Fla. Dep't of Corr.*, 536 F. App'x 966, 983-84 (11th Cir. 2013). Again, the ACCA was not unreasonable in concluding that, because that did not happen here, defense counsel was not ineffective in failing to object. *Romine* is distinguishable insofar as the prosecutor relied extensively on "anti-mercy scripture" which "permeated virtually every

aspect of the . . . trial." 253 F.3d at 1368. The error in *Farina* was possibly more egregious, insofar as the prosecutor "preached the superiority of the prosecutor as a Godly-ordained authority and asked a defense mitigation witness, Rev. Davis, on cross-examination, to read verbatim from Bible verses which proclaimed the superiority of and necessity for divine judgment;" repeatedly instructed potential jurors during voir dire not to "abandon deeply held religious . . . beliefs" even at the expense of contradicting instructions from the judge; questioned potential jurors regarding salvation while making an explicit differentiation between "Man's law versus God's law;" and, while "elevating his own station as divinely-ordained authority, . . . made clear that the death penalty was the sole acceptable punishment under divine law, noting how Christ himself refused to grant a felon forgiveness from the death penalty." 536 F.3d at 981.

Because the state courts' determination was neither contrary to nor an unreasonable application of clearly established federal law, nor an unreasonable determination of the facts, Boyle is due no relief on this subclaim.

### 3. Boyle's subclaim that his trial counsel were ineffective for failing to object to the trial court's instruction that the jury's penalty-phase verdict was advisory

Citing *Caldwell v. Mississippi*, 472 U.S. 320 (1985), Boyle claims that trial counsel were ineffective for failing to object to the trial court's instruction that the

jury's penalty-phase verdict was advisory. With the exception of Paragraph 156 of his petition,[1] Boyle exhausted this claim on state postconviction review. Vol. 27, Tab #R-54, at C. 379–80; Vol. 35, Tab #R-57, at 82–84; Vol. 38, Tab #R-63, at 72–80. In affirming the Rule 32 court's denial of relief, the ACCA explained:

> Finally, Boyle argues that his trial counsel were ineffective for failing to object to the circuit court's jury instructions during the penalty phase of his capital-murder trial. Specifically, Boyle argues that the circuit court diminished the role of the jury during that time by referring to the jury's verdict as an "advisory verdict," which, Boyle claims, runs afoul of the United States Supreme Court's decision in *Caldwell v. Mississippi*, 472 U.S. 320 (1985). Although Boyle acknowledges that this Court has repeatedly upheld such instructions because they accurately explain the respective functions of the judge and jury, he contends that the circuit court's instructions violated *Caldwell* because they "impermissibly conveyed to the jury that the responsibility for determining the appropriateness of the defendant's death" rested elsewhere. According to Boyle, had his trial counsel objected to those instructions and requested proper ones, there is a reasonable probability that he would not have received a death sentence.

> In summarily dismissing this claim, the circuit court found that this claim was without merit and that Boyle's trial counsel were not ineffective. We agree.

> In *Caldwell v. Mississippi*, *supra*, the United States Supreme Court held that "[i]t is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of

---

[1] Paragraph 156, which faults counsel for informing the venire during voir dire that its penalty-phase verdict would be advisory, was not presented to the Rule 32 court, *see* Vol. 37 at 58 n.9, and therefore, this portion of the claim is not exhausted, is defaulted, and cannot be reviewed by this Court unless Boyle makes a showing of cause and prejudice or a fundamental miscarriage of justice, which he has not done.

the defendant's death rests elsewhere." 472 U.S. at 328. When faced with this claim, this Court has previously held, however, that:

> a trial court does not diminish the jury's role by stating that its verdict in the penalty phase is a recommendation or an advisory verdict.

*Doster v. State*, 72 So. 3d 50, 104 (Ala. Crim. App. 2010).

On appeal, Boyle cites to a few excerpts from the trial transcript that, he says, demonstrate the instances in which the circuit court impermissibly diminished the role of the jury during that time by referring to the jury's verdict as an "advisory verdict." In one excerpt, the circuit court refers to jury's role in rendering a verdict as follows:

> THE COURT: Ladies and gentlemen of the jury, it is now your duty to advise the Court as to what punishment should be imposed upon the defendant for the crime of murder.

(Trial R. 2675-78.) In the remaining excerpts cited by Boyle, the circuit court explains to the jury its role in determining and weighing the aggravating and mitigating circumstances in Boyle's case but does not expressly refer to its verdict as an "advisory verdict."

Contrary to Boyle's claim, these instructions do not "impermissibly convey to the jury that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Doster*, 72 So. 3d at 104. Instead, these instructions accurately explain the respective functions of the judge and jury.

Vol. 37, Tab #R-61, at 58–60 (some record citations, case citations, and footnotes omitted or edited).

Boyle makes no showing that this decision is contrary to or an unreasonable application of federal law or an unreasonable determination of the facts. Indeed, the

Supreme Court supports the state courts' position. Nine years after *Caldwell*, in *Romano v. Oklahoma*, 512 U.S. 1 (1994), the Court considered the *Caldwell* rule in a different context and stated:

> [W]e have since read *Caldwell* as "relevant only to certain types of comment—those that mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision." *Darden v. Wainwright*, 477 U.S. 168, 184 n.15 (1986). Thus, "[t]o establish a *Caldwell* violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law." *Dugger v. Adams*, 489 U.S. 401, 407 (1989); *see also Sawyer v. Smith*, 497 U.S. 227, 233 (1990).

*Id.* at 9 (citations omitted). Following *Caldwell*, *Dugger*, and *Romano*, the Eleventh Circuit Court of Appeals has held that "references to and descriptions of the jury's sentencing verdict . . . as an advisory one, as a recommendation to the judge, and of the judge as the final sentencing authority are not error under *Caldwell*" when they "accurately characterize the jury's and judge's sentencing roles under [state] law." *Davis v. Singletary*, 119 F.3d 1471, 1482 (11th Cir. 1997). Thus, the state courts' determination was neither contrary to nor an unreasonable application of clearly established federal law, nor an unreasonable determination of the facts, and Boyle is due no relief.[2]

---

[2]     Alabama changed its capital sentencing statutes by legislation in April 2017. *See* Ala. Laws Act 2017-131. The current sentencing scheme is found in ALA. CODE §§ 13A-5-45, -46, -47 (1975) and provides that the jury will make the ultimate determination as to sentence in capital cases. This

**C.**  **Boyle's claim that the trial court's intent instruction—that the jury could convict Boyle of capital murder if it found that Boyle intentionally engaged in the conduct that resulted in Savannah's death—violated his Eighth and Fourteenth Amendment rights to due process**

Next, Boyle alleges that the trial court gave an improper instruction on specific intent, thus allowing the jury to convict him of capital murder even if it did not believe that he had the specific intent to kill Savannah. This Court addressed Boyle's claim that his trial counsel was ineffective for failing to make this argument at trial in section IV. A. 1., *supra*.

Boyle exhausted this substantive claim on direct appeal. Vol. 21, Tab #R-43, at 22–31; Vol. 24, Tab #R-48, at 18–26. The ACCA explained why Boyle was due no relief:

> Boyle next challenges several of the circuit court's jury's instructions in the guilt phase.

>> A trial court has broad discretion when formulating its jury instructions. *See Williams v. State*, 611 So. 2d 1119, 1123 (Ala. Cr. App. 1992). When reviewing a trial court's instructions, "the court's charge must be taken as a whole, and the portions challenged are not to be isolated therefrom or taken out of context, but rather considered together." *Self v. State*, 620 So. 2d 110, 113 (Ala. Cr. App. 1992) (quoting *Porter v. State*, 520 So. 2d 235, 237 (Ala. Cr. App. 1987)); *see also Beard v. State*, 612 So. 2d 1335 (Ala.

---

legislation is, by its own terms, only prospective in application, and thus, it provides no relief to Boyle.

Cr. App. 1992); *Alexander v. State*, 601 So. 2d 1130 (Ala. Cr. App. 1992)."

*Williams v. State*, 795 So. 2d 753, 780 (Ala. Crim. App. 1999). "'The language of a charge must be given a reasonable construction, and not a strained and unreasonable one.' *Harris v. State*, 394 So. 2d 96, 100 (Ala. Cr. App. 1981)." *Kennedy v. State*, 472 So. 2d 1092, 1103 (Ala. Crim. App. 1984). Last, "The absence of an objection in a case involving the death penalty does not preclude review of the issue; however, the defendant's failure to object does weigh against his claim of prejudice." *Ex parte Boyd*, 715 So. 2d 852, 855 (Ala. 1998).

With these principles in mind we review the challenged jury instructions raised by Boyle in this brief to this Court.

## A.

First, Boyle argues that the circuit court's instructions on intent were erroneous because, he says, the instruction allowed the jury to convict Boyle if it believed that Boyle intended to engage in certain conduct but did not have the intent to kill.

The circuit court gave the following instruction on intent:

Intent, being a state or condition of the mind, is rarely, if ever, susceptible of direct or positive proof and must usually be inferred from the facts testified to by the witnesses and the circumstances as developed by the evidence.

Intent must be specific and real in a capital murder case. The defendant must act intentionally as opposed to negligently, accidently or recklessly to cause the death of the deceased in order to convict the defendant of guilty of capital murder.

You act intentionally with respect to a result or conduct when you have the purpose to cause that result or

to engage in that conduct. Intent is to be determined by the surrounding attendant circumstances and by the actions, if any, of the defendant.

(R. 2200–01.)

During deliberations, the jury requested that the court either give them a copy of the law or repeat its instruction on "intent." A lengthy discussion ensued, after which both the prosecution and defense counsel agreed on the contents of the instruction the circuit court would repeat to the jury. The court then instructed:

A person acts intentionally with respect to a result or to conduct described by a statute defining an offense when his purpose is to cause that result or to engage in that conduct. Intent is to be determined by the surrounding attendant circumstances and by the actions, if any, of the defendant.

(R. 2248.) The circuit court then asked if the attorneys were satisfied; both indicated that they were.

During the charge conference, when the circuit court said that it intended to read the definition of "intentional" contained in § 13A–2–2(1), Ala. Code 1975, Boyle had no objection. Also, at the conclusion of the jury instructions, the circuit court specifically asked if the attorneys had any objections, and defense counsel stated that he had no objections. Accordingly, we review this claim for plain error. *See* Rule 45A, Ala. R. App. P.

Boyle specifically argues that the circuit court's instruction that "you act intentionally with respect to a result or conduct when you have the purpose to cause that result or to engage in that conduct" allowed the jury to convict without finding the specific intent to kill. This portion of the court's instruction is identical to the statutory definition of "intentional" contained in § 13A–2–2, Ala. Code 1975. Section 13A–2–2(1), Ala. Code 1975, states: "A person acts intentionally with respect to a result or to conduct described by a statute defining an

91

offense, when his purpose is to cause that result or to engage in that conduct."

The Alabama Supreme Court, in addressing a circuit court's use of a jury charge in a capital-murder case that contained the exact definition of "intentional" contained in § 13A–2–2(1), stated:

> The trial court, in defining mental culpability, read Code 1975, § 13A–2–2, to the jury verbatim, thereby defining each mental state along the spectrum from "intentional" to "criminal negligence." Each definition was relevant to the various verdict options except "criminal negligence." The definition of "intentionally" was relevant to the court's instructions on the 'intent to kill' element of the capital offense.

*Ex parte Kennedy*, 472 So. 2d 1106, 1111 (Ala. 1985).

This Court may find plain error in a jury instruction only if "there is a reasonable likelihood that the jury applied the instruction in an improper manner." *Williams v. State*, 710 So. 2d 1276, 1306 (Ala. Crim. App. 1996). *See also Pilley v. State*, 789 So. 2d 870, 882–83 (Ala. Crim. App. 1998). The jury was instructed that in order to convict Boyle of capital murder the jury had to find that Boyle had the specific intent to kill. There is no reasonable likelihood that the jurors applied the challenged instruction in an improper manner. There was no plain error in the circuit court's instructions on intent.

*Boyle*, 154 So. 3d at 215-17 (some record citations omitted or edited).

Boyle must demonstrate that the state courts' decision was contrary to or an unreasonable application of clearly established federal law, or an unreasonable determination of the facts. To do this, Boyle again relies upon the 2018 *Towles* decision, claiming that the ACCA invalidated its previous decision in his case. The

Court has already explained why it does not read *Towles* as Boyle does and will not repeat the same discussion here. *See* section IV. A. 1, *supra*.

Boyle has not established that the state courts' determination was contrary to or an unreasonable application of clearly established federal law, or an unreasonable determination of the facts, and Boyle is due no relief.

### D.     Boyle's claim that the State violated his Fourteenth and Eighth Amendment rights in "vindictively" seeking the death penalty

Here, Boyle contends that the State wrongly sought the death penalty in retaliation for defense counsel seeking a continuance of trial. This Court addressed Boyle's claim that his defense counsel was ineffective in failing to make this argument before trial in section IV. A. 2., *supra*.

Boyle exhausted this substantive claim on direct appeal. Vol. 21, Tab #R-43, at 76–78; Vol. 24, Tab #R-48, at 63–65. The ACCA found no plain error, explaining:

> Boyle next argues that the State sought the death penalty in retaliation, he says, for his request for a continuance of his trial.

> At a pretrial hearing, the State indicated that it knew of nothing at that time that would make this a death-eligible case. Later, the prosecutor indicated that after talking with the pathologist the State believed that it could prove one aggravating circumstance—that the murder was especially heinous, atrocious, or cruel as compared to other capital murders. In its formal notice of intent to seek the death penalty, the prosecutor stated:

>> Although this offense carries two possible punishments upon conviction, death or life without parole, counsel for

the State previously informed defense counsel that the prosecution would not seek the death penalty in this case. The State's position at that time was based upon the fact that there did not appear to be sufficient substantial evidence to support the applicability of any of the "aggravating circumstances" enumerated in Alabama Code Section 13A-5-49. In the wake of extensive trial preparation in the case however, including detailed discussions with witnesses in the case over the past few weeks, prosecutors for the State have reached the conclusion that there is a good faith basis for the applicability of at least one of the aggravating circumstances set out in Ala. Code Section 13A-5-49. Under the facts and circumstances of the case at bar, the offense as committed appears to be "especially heinous, atrocious, or cruel compared to other capital offenses," as that provision has been defined in applicable caselaw. For that reason, the State has reconsidered its decision to rule out the possibility of seeking the death penalty upon the conviction of the defendant for the charged offense, and to reserve the option of requesting the ultimate penalty in the event of a conviction.

. . . .

The State's decision to reserve the option of requesting the death penalty upon the defendant's conviction for capital murder is entirely unrelated to [Boyle's] request for a continuance of his trial date or the Court's granting of same. The decision is based solely upon the subsequent development of facts that support the grounds for imposition of the death penalty in this case, and the development of a good faith belief on the part of counsel that the interests of justice require the consideration of the death penalty in this case.

C.R. 57. Boyle did not argue in the circuit court that the prosecutor's decision to seek the death penalty was vindictive. Accordingly, we review this claim for plain error. *See* Rule 45A, Ala. R. App. P.

> In *Hunt v. State*, 642 So. 2d 999 (Ala. Crim. App. 1993), aff'd, 642 So. 2d 1060 (Ala. 1994), we recognized the concept of vindictive prosecution. "A prosecutor's use of the charging process may violate due process if it penalizes the exercise of constitutional or statutory rights." 642 So. 2d at 1030, quoting Daniel F. McInnis et al., *Project, Twenty-Second Annual Review of Criminal Procedure: United States Supreme Court and Courts of Appeals 1991-1992*, 81 Geo. L.J. 853, 1029-35 (1993).

*Turner v. State*, 924 So. 2d 737, 751 (Ala. Crim. App. 2002).

In discussing the difficulties of establishing a vindictive-prosecution claim related to a pretrial issue, one federal court has stated:

> In declining to apply a presumption of vindictiveness, the Court recognized that "additional" charges obtained by a prosecutor could not necessarily be characterized as an impermissible "penalty." Since charges brought in an original indictment may be abandoned by the prosecutor in the course of plea negotiation--in often what is clearly a "benefit" to the defendant--changes in the charging decision that occur in the context of plea negotiation are an inaccurate measure of improper prosecutorial "vindictiveness." An initial indictment--from which the prosecutor embarks on a course of plea negotiation--does not necessarily define the extent of the legitimate interest in prosecution. For just as a prosecutor may forgo legitimate charges

> already brought in an effort to save the time
> and expense of trial, a prosecutor may file
> additional charges if an initial expectation
> that a defendant would plead guilty to lesser
> charges proves unfounded.
>
> *United States v. Goodwin*, 457 U.S. 368, 378-80, 102 S. Ct.
> 2485, 73 L. Ed. 2d 74 (1982) (footnotes omitted); *see
> United States v. Napue*, 834 F.2d 1311, 1330 (7th Cir. 1987)
> (noting "that vindictive prosecution claims are less likely
> to be successful, and a presumption of vindictiveness is
> unwarranted, in a pretrial setting" and "that the
> prosecutor must be allowed broad discretion in selecting
> the charges against the accused."). "A defendant seeking
> to prove prosecutorial vindictiveness for a decision to
> indict must present objective evidence showing genuine
> vindictiveness." *United States v. O 'Hara*, 301 F.3d 563,
> 571 (7th Cir. 2002).

*Quilling v. United States*, 243 F. Supp. 2d 872, 878 (S.D. Ill. 2002).

> There is nothing in the record that suggests vindictiveness on the
> part of the State in seeking the death penalty. Thus, we find no plain
> error in regard to this claim.

*Boyle*, 154 So. 3d at 228–29.

Boyle contends that the decisions of the state courts are unreasonable. Boyle

cites various Supreme Court precedents for the proposition that "[t]o punish a

person because he has done what the law plainly allows him to do is a due process

violation of the most basic sort." *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978);

*see also United States v. Goodwin*, 457 U.S. 368, 372 (1982); *Blackledge v. Perry*, 417

U.S. 21, 27-29 (1974); *Hartman v. Moore*, 547 U.S. 250, 265 (2006). The court has

examined these opinions and finds that none deals with facts similar to those present here.

Boyle also relies upon the Eleventh Circuit's holding in *United States v. Jones*, that "the government may not, 'without explanation, increase the number of or severity of th[e] charges in circumstances which suggest that the increase is retaliation for the defendant's assertion of statutory or constitutional rights.'" 601 F.3d 1247, 1260 (11th Cir. 2010) (quoting *Hardwick v. Doolittle*, 558 F.2d 292, 301 (5th Cir. 1977)). In that case, however, the prosecution added charges to an indictment after a defendant's successful appeal, a circumstance that the court deemed "gives rise to a presumption of vindictiveness." *Id.* The court required the prosecution to come forward with evidence to refute the presumption, which the prosecution successfully did by demonstrating that "it was impossible to proceed on the more serious charge at the outset." *Id.* (quoting *Goodwin*, 457 U.S at 376 n.8). The court ultimately declined to dismiss the indictment on grounds of prosecutorial vindictiveness because the defendant could not show that the prosecution's justification was pretextual. *Id.* This case is distinguishable on its facts from *Jones*. According to Boyle, the short window of time between the State stating that it might pursue the death penalty and the State's declaration that it would do so—three days—shows an improper animus informing the State's decision to seek the death

penalty in retaliation for Boyle's counsel seeking the continuance. However, as the state courts noted, the State indicated that its recent discussions with a pathologist and several witnesses informed its decision that it could prove that the murder was especially heinous, atrocious, and cruel. The state courts explained why proving pre-trial prosecutorial vindictiveness is a tough burden and that Boyle had not met that burden in this case. The state courts' determination was neither contrary to nor an unreasonable application of clearly established federal law, nor an unreasonable determination of the facts, and Boyle is due no relief.

### E.   Boyle's claim that the trial court violated his Fourteenth and Sixth Amendment rights when it denied Boyle's motion for new trial on the basis of juror misconduct

Boyle argues that the trial court should have granted his motion for new trial because the jury foreman, K.B., did not disclose during voir dire that he knew Savannah's mother, Melissa Burk White.

Boyle exhausted this claim on direct appeal. Vol. 21, Tab #R-43, at 8–22; Vol. 24, Tab #R-48, at 9–18. The ACCA found no abuse of discretion in the denial of Boyle's motion for new trial:

> Boyle next argues that the jury foreman, K.B., failed to disclose during voir dire that he knew Savannah's mother and that this failure deprived him of his constitutional right to be tried by an impartial jury.

> The record reflects that Boyle filed a *pro se* motion for a new trial arguing, in part, that K.B. failed to disclose during voir dire that he had

known Savannah's mother and had counseled her in the program Community Intensive Treatment for Youth ("C.I.T.Y."). He asserted that the failure to disclose this information resulted in prejudice to him. An extensive hearing was held on the motion, at which time C.I.T.Y. records were admitted and juror K.B. testified. The circuit court issued a detailed order denying the motion. The order stated, in part:

> The Court heard testimony from the juror identified as K.B. K.B. testified that he never realized during voir dire the juror questionnaire and jury selection process that he was at one time acquainted with any person involved in the facts before the case at bar. He stated that during the testimony of Claude Burk, Melissa Burk White's father, the name Burk sounded familiar.

> Then upon seeing Melissa White in the background of a scene on a DVD while the jury was reviewing evidence during the deliberation process, he remembered that he had been a counselor/teacher of Melissa White, then Melissa Burk, in his position with the C.I.T.Y. Program nearly a decade earlier.

> K.B. testified that once he realized this, he did not share this information with any other juror, and it played absolutely no part in his deliberations in this matter.

> . . .

> A review of the voir dire of K.B., discussed at length on the record in the hearings on this matter, reveals there is no indication he deliberately answered any question untruthfully, nor that he demonstrated a willfulness to intentionally provide inaccurate information. The oral questions during voir dire referred to Melissa White, not Melissa Burk. At no point during the trial itself was Melissa White referred to as Melissa Burk[] or even Melissa Burk[] White in the presence of the jury.

. . .

It is critical to point out that Melissa White was neither a party nor even a witness in this action. At no time did she appear in Court while the jury was present. The juror was never presented with an opportunity to apply any temporally remote knowledge he may have of her to the issues he was called upon to decide. Being a non-party, never appearing in Court before the jury, and not testifying, her credibility was never an issue before the jury.

. . .

These circumstances simply do not lend themselves to any reasonable conclusion that probable prejudice against [Boyle] has been established by [Boyle].

(C.R. 159–60.)

K.B. said that during Claude Burk's testimony he realized that the victim's mother might have been a student he had counseled in the C.I.T.Y. program. K.B. testified:

It's been almost eleven years since I've spoken or seen Melissa. That's why it was such a hard time, you know, recalling anything about her. Because eleven years, that's almost three hundred and fifty students I've seen between her and now.

(R. 2735.) He stated that he recognized Melissa's face from a videotape that was shown during Claude Burk's testimony but that he did not remember anything about her background until the day before the hearing on Boyle's motion for a new trial. K.B. further testified that his previous contact with Melissa had no impact on his decision in this case.

"[T]he failure of a juror to make a proper response to a question regarding his qualifications to serve as a juror, regardless of the situation

or circumstances, does not automatically entitle one to a new trial." *Radney v. State*, 342 So. 2d 942, 946 (Ala. Crim. App. 1976).

> [T]he proper standard to apply in determining whether a party is entitled to a new trial in this circumstance is "whether the defendant might have been prejudiced by a veniremember's failure to make a proper response." *Ex parte Stewart*, 659 So. 2d [122] at 124 [(Ala. 1993)]. Further, the determination of whether a party might have been prejudiced, i.e., whether there was probable prejudice, is a matter within the trial court's discretion. *Eaton v. Horton*, 565 So. 2d 183 (Ala. 1990); *Land & Assocs., Inc. v. Simmons*, 562 So. 2d 140 (Ala. 1989) (Houston, J., concurring specially).

*Ex parte Dobyne*, 805 So. 2d 763, 771–72 (Ala. 2001).

In discussing the "might have been prejudiced" standard, the Alabama Supreme Court in *Ex parte Apicella*, 809 So. 2d 865 (Ala. 2001), stated:

> Apicella argues that when a court is determining whether a juror's conduct has caused actual prejudice the standard applied is whether the extraneous material "might have influenced that juror and others with whom he deliberated," *Roan v. State*, 225 Ala. 428, 435, 143 So. 454, 460 (1932). Apicella relies heavily upon this statement in *Roan*:

>> The test of vitiating influence is not that it did influence a member of the jury to act without the evidence, but that it might have unlawfully influenced that juror and others with whom he deliberated, and might have unlawfully influenced its verdict rendered.

> 225 Ala. at 435, 143 So. at 460.

On its face, this standard would require nothing more than that the defendant establish that juror misconduct occurred. As Apicella argues, the word "might" encompasses the entire realm of possibility and the court cannot rule out all possible scenarios in which the jury's verdict might have been affected.

However, as other Alabama cases establish, more is required of the defendant. *In Reed v. State*, 547 So. 2d 596, 598 (Ala. 1989), this Court addressed a similar case of juror misconduct:

> We begin by noting that no single fact or circumstance will determine whether the verdict rendered in a given case might have been unlawfully influenced by a juror's [misconduct]. Rather, it is a case's own peculiar set of circumstances that will decide the issue. In this case, it is undisputed that the juror told none of the other members of the jury of her experiment until after the verdict had been reached. While the question of whether she might have been unlawfully influenced by the experiment still remains, the juror testified at the post-trial hearing on the defendant's motion for a new trial that her vote had not been affected by the [misconduct].

It is clear, then, that the question whether the jury's decision might have been affected is answered not by a bare showing of juror misconduct, but rather by an examination of the circumstances particular to the case.

809 So. 2d at 870–71.

Although the factors upon which the trial court's determination of prejudice is made must necessarily vary

> from case to case, some of the factors which other courts have considered pertinent are: temporal remoteness of the matter inquired about, the ambiguity of the question propounded, the prospective juror's inadvertence or willfulness in falsifying or failing to answer, the failure of the jurors to recollect, and the materiality of the matter inquired about.

*Freeman v. Hall*, 238 So. 2d 330, 336 (Ala. 1970).

Here, during voir dire the prospective jurors were asked only if they knew "Melissa White" and not "Melissa Burk." The juror questionnaire does ask whether the jurors knew a "Melissa Burk White," and K.B. indicated that he did not know Melissa Burk White. K.B. testified that he did not recognize this name and that he knew her as "Melissa Burk" and not "Melissa White."

> All parties are entitled to truthful answers from prospective jurors on examination of the venire and concealment of facts by silence by such a prospective juror denies the parties their right to advisedly exercise peremptory strikes, but it is permissible for a juror to remain silent until a question applies to him in a manner demanding a response.

*Thomas v. State*, 338 So. 2d 1045, 1047 (Ala. Crim. App. 1976). We agree with the circuit court that nothing here suggests that K.B. deliberately withheld information during voir dire examination. "There is no evidence to justify a finding of concealment on the juror's behalf." *Pugh v. State*, 355 So. 2d 386, 392 (Ala. Crim. App. 1977).

This Court in *Smithson v. State*, 50 Ala. App. 318, 278 So. 2d 766 (Ala. Crim. App. 1973), affirmed the circuit court's denial of Smithson's motion for a new trial after it was discovered that the jury foreman was related to the State's main witness, and the juror had failed to disclose that fact during voir dire examination. This Court stated:

It is clear from the findings of the trial court that the witness Royer and the juror Royer were distantly related, and that neither was certain of their relationship. Further, they had not seen each other for several years and had never discussed the case at bar. It is also clear that the juror Royer did not recognize the witness Royer until he was actually seated in the witness stand, and this was why he did not respond at the time the question was asked, "Did he know." We are of the opinion that the finding by the trial judge in the case at bar properly applies the standard of *Freeman v. Hall*, [286 Ala. 161, 238 So. 2d 330 (1970)], and that such finding is supported by the evidence in this cause. We therefore hold that there was no abuse of discretion by the trial court in denying appellant's motion for new trial on the basis of the failure to answer on the part of the juror, Raymond T. Royer. *Cooper v. Magic City Trucking Service, Inc.*, 288 Ala. 585, 264 So. 2d 146 [(1972)]; *Bruno's Food Stores, Inc. v. Burnett*, 288 Ala. 222, 259 So. 2d 250 [(1972)]; *Harris v. Whitehead*, 46 Ala. App. 516, 244 So. 2d 603 [(1971)]; *Edwards v. State*, 28 Ala. App. 409, 186 So. 582 [(1939)].

50 Ala. App. at 320, 278 So. 2d at 768.

In relation to the factors cited above, more than 10 years had passed since K.B. had seen Melissa, K.B. was not asked during the oral voir dire if he knew "Melissa *Burk*" but only "Melissa *White*," and there is no indication that K.B. deliberately withheld information. After carefully examining the record in this case, we find that the circuit court did not abuse its discretion in denying Boyle's motion for a new trial based on K.B.'s failure to respond to a question on voir dire examination.

*Boyle*, 154 So. 3d at 224–27 (some record citations omitted).

Boyle argues that the state courts' determination is unreasonable for several reasons. He emphasizes certain facts taken from subpoenaed C.I.T.Y. program

records and K.B.'s testimony during the March 10, 2010, hearing on Boyle's motion for new trial, including the following: K.B. knew Ms. White from April 1999 to March 2000, during which time he took Ms. White to get a pregnancy test, set up a family session to help her tell her mother that she was pregnant, assisted her in finding needed social services, kept in contact with her family, had regular meetings with her, and visited her in the hospital when H.D. was born. Vol. 17, Tab #R-36, at TR. 2709-13, 2732-39. Presumably Boyle is suggesting either that K.B. should have or did in fact know Ms. White better than he claimed to during the hearing. However, the trial court heard this evidence in the first instance and reasonably determined that a new trial was not warranted on the ground of juror misconduct. The trial court, and the ACCA on direct appeal, reasonably took into account that K.B.'s relationship with Ms. White occurred eleven years before the trial; that K.B., through his profession, had counseled up to 350 teens since Ms. White; that the oral voir dire prior to trial asked only if anyone knew a Melissa White, not a Melissa Burk; that there was no indication that K.B. deliberately withheld information; and importantly, that Ms. White was at no time a witness or even present in the courtroom during Boyle's trial. Boyle has not rebutted the presumption of correctness of the state courts' factual findings by clear and convincing evidence. Additionally, the Court's own examination of K.B.'s hearing testimony reveals that

he also stated that it was not uncommon for the female students whom he counseled to become pregnant over the years, estimating that he had at least two to three per year become pregnant, and that it was also not uncommon for him to visit a female student in the hospital after the birth of her baby. Vol. 17, Tab #R-37, at TR. 2739. The state courts more than reasonably determined the facts presented to them in denying Boyle's claim.

As for clearly established Supreme Court precedent, Boyle cites in passing *Morgan v. Illinois*, 504 U.S. 719, 727 (1992); *Turner v. State of Louisiana*, 379 U.S. 466, 471-72 (1965), and *Dennis v. United States*, 339 U.S. 162, 168 (1950). These cases stand for the general proposition that a criminal defendant has a right to a trial by an impartial jury. Boyle also discusses *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 556 (1984), in which the Supreme Court held that in order to obtain a new trial based on a juror's incorrect response to a question on voir dire, a party "must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause." *Id.* at 556. *Greenwood* actually supports the state courts' ruling rather than contradicts it, insofar as the Supreme Court held, "To invalidate the results of a three-week trial because of a juror's *mistaken, though honest* response to a question, is to insist on something closer to perfection than our judicial

system can be expected to give." *Id.* at 555 (emphasis added). Here, the state courts found that K.B. honestly believed that he did not know a Melissa White when asked during oral voir dire, not realizing that he did know her until much later in the trial. Boyle argues that the trial court probably would have disqualified K.B. had he revealed the connection he had to Ms. White, based upon the fact that the trial court dismissed for cause during the trial another juror, C.E., who realized merely that she sold cigarettes to Boyle's sister at Walgreens. Vol. 12, Tab #R-19, at TR. 1798-801, 1803-04; Vol. 17, Tab #R-37, at TR. 2755-57. Nonetheless, the Court finds that Boyle has not demonstrated that the state courts' ruling violates federal law. Boyle is due no relief on this claim.

**F. Boyle's claim that the trial court violated his Fifth, Sixth, Eighth, and Fourteenth Amendment rights to an impartial trial by excusing a veniremember for cause based on her views regarding the death penalty**

Boyle argues that the trial court erred by excusing veniremember C.S. for cause because she could not fairly consider imposing the death penalty.

Boyle exhausted this claim on direct appeal. Vol. 21, Tab #R-43, at 115–17; Vol. 24, Tab #R-48, at 100–02. The ACCA found no error, explaining as follows:

> Boyle argues that the circuit court erred in granting the State's motion to remove juror C.S. for cause based on her views on the death penalty. During voir dire, the circuit court asked the venire if any juror was opposed to the death penalty and if the jurors could consider the death penalty even if they had religious or moral objections to the death

penalty. Juror C.S. answered in the affirmative. Later, during questioning, C.S. said that she did not know if she could vote for the death penalty and that "[s]itting here today, you know, I've always thought I could not do it." The following occurred:

> The Court:   [C.S.], even though you may have a religious, moral or conscientious or some other objection to the death penalty, if you are selected as a juror in this case, would you, nevertheless be able to follow my instructions as the judge and fairly consider the imposition of the sentence of death, if appropriate in this case?
>
> [C.S.]:      Fairly consider?
>
> The Court:   Yes.
>
> [C.S.]:      I feel since it would be the first time in my life I had faced that experience that—you know, I guess I feel that, you know, you have these thoughts that you believe. And until you actually experience it, you don't know what you're going to do till you're faced with that experience.
>
>              So yes. When I say yes, I would fairly consider it, gosh, I'm sure—I mean, I'm not sure of how—I feel I would be fairly considering it, but I would still have my— because I would have gone through a trial of hearing something I'd never experienced before, you know, I would never have experienced hearing that myself personally. But I can't—I don't know how that would affect how I feel about the death penalty now.
>
> . . . .

[C.S.]:       Well, that's why I asked—I said I have been through experiences in my life where I didn't think you know—and until you're placed in a situation, I mean, I just don't think there's ever a hundred percent.

                So when I stand before the judge and say today on this day I pledge that I will be fair—

. . . .

[C.S.]:       I don't know, because life has dealt me lots of curves and switches.

(R. 1162–67.) The State moved to dismiss C.S. for cause based on her responses to questions concerning the death penalty, the length of time it took her to answer questions concerning the death penalty, her answers to questions on the juror questionnaire, and the fact that she "visibly agonized" over every answer. In granting the State's motion to excuse C.S. for cause, the circuit court stated: "So because she did not come down firmly on the issue of putting aside her beliefs and her thoughts and her judgment and following the Court's instructions if it came down to that, I will grant the State's challenge for cause on [C.S.]." Boyle objected to the removal of C.S.

> A trial judge's finding on whether or not a particular juror is biased "is based upon determination of demeanor and credibility that are peculiarly within a trial judge's province." [*Wainwright v.*] *Witt*, 469 U.S. [412,] 429 [(1985)]. That finding must be accorded proper deference on appeal. *Id.* "A trial court's rulings on challenges for cause based on bias [are] entitled to great weight and will not be disturbed on appeal unless clearly shown to be an abuse of discretion." *Nobis v. State*, 401 So. 2d 191, 198 (Ala. Crim. App.), cert. denied, *Ex parte Nobis*, 401 So. 2d 204 (Ala. 1981).

*Martin v. State*, 548 So. 2d 488, 490–91 (Ala. Crim. App. 1988).

> "In a capital case, a prospective juror may not be excluded for cause unless the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath." *Drew v. Collins*, 964 F.2d 411, 416 (5th Cir. 1992), cert. denied, 509 U.S. 925 (1993) (quotations omitted). "[T]his standard likewise does not require that a juror's bias be proved with unmistakable clarity. This is because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism." *Wainwright*, 469 U.S. at 425–26.

*Parr v. Thaler*, 481 F. App'x 872, 876 (5th Cir. 2012).

> The above-quoted dialogue clearly showed that juror C.S. had reservations about her ability to vote for the death penalty. The circuit court did not abuse its considerable discretion in granting the State's motion to excuse C.S. for cause. We find no error in regard to this claim.

*Boyle*, 154 So. 3d at 195-97 (some citations omitted or edited).

Boyle contends that the state courts' decision is unreasonable. Boyle cites the following cases for his argument that a juror's mere reservations and uncertainty about the death penalty are not enough for disqualification: *Witherspoon v. State of Illinois*, 391 U.S. 510, 522 (1968) ("[W]e hold that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction."); *Adams v. Texas*, 448 U.S. 38, 45 (1980) ("a juror may not be challenged for cause

based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath"); *Wainwright v. Witt*, 469 U.S. 412, 419-21, 424 (1985); and *Hance v. Zant*, 696 F.2d 940, 954-56 (11th Cir. 1983), overruled in part on other grounds by *Kemp*, 762 F.2d 1383. Based upon these precedents, Boyle argues that C.S. should not have been disqualified because she did not it make unmistakably clear that she would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before her, or that her attitude toward the death penalty would prevent her from making an impartial decision as to Boyle's guilt or innocence.

Boyle has not demonstrated that the state courts' decision contradicts these cases or unreasonably applied them. First, *Witherspoon* and *Adams* are not analogous. In *Witherspoon*, an Illinois statute allowed the prosecution in a murder trial unlimited challenges for cause in order to exclude jurors who "might hesitate to return a verdict inflicting death." 391 U.S. at 512-13. This procedure allowed the prosecutor to successfully challenge for cause 47 veniremen "[i]n rapid succession." *Id.* at 514. Similarly in *Adams*, a Texas statute applied to exclude prospective jurors who merely said that they would be "affected" by the possibility of the death penalty, meaning "only that the potentially lethal consequences of their decision would invest their

deliberations with greater seriousness and gravity or would involve them emotionally," not that they were unwilling or unable to follow the law or obey their oaths. 448 U.S. at 49.

Second, *Witt* supports, rather than undermines, the state courts' decision. There, the Supreme Court rejected the court of appeals' conclusion that the colloquy between the prosecutor and the potential juror was too ambiguous to support the trial court's decision to excuse her due to her views on the death penalty. *Id.* at 430-31. The Court noted that on four separate occasions the prospective juror affirmed that her beliefs would "interfere" with her sitting as a juror, and that the trial court was "aided . . . undoubtedly . . . by its assessment of [her] demeanor." *Id.* at 434. In short, the Court refused to require juror bias to be proved with "unmistakable clarity." *Id.* at 424. Similarly, here, the trial court and counsel asked C.S. several times if she could put aside her beliefs about capital punishment and give fair consideration to it. Vo. 9 at 1161-68. Although she appeared to have affirmed once, she expressed severe reservations several other times. *See id.* And as the ACCA noted, the trial court also considered the length of time it took C.S. to answer the questions and that she "visibly agonized" over them. The state courts' ruling was entirely in line with *Witt*.

Finally, Boyle cites *Zant* in support of his claim of error. In *Zant*, the Eleventh Circuit held that the trial court erred in excluding prospective jurors where their death penalty views did not prevent them from imposing a death sentence under all conceivable circumstances. 696 F.2d at 955. The Eleventh Circuit based its holding on *Witherspoon*'s footnote 21, *see* 391 U.S. at 522–23 n. 21, which suggested that a juror is rendered unqualified for service based on his or her death penalty views only when such views result in an automatic and unequivocal sentencing result. 696 F.2d at 955. However*, Zant* predated *Witt*, where the Supreme Court rejected footnote 21 of *Witherspoon* as *dicta*. *Witt*, 469 U.S. at 421–22. *Witt* clarified that jurors may be excused even if they are not unmistakably clear. Since *Witt*, the Supreme Court has deferred to the trial court's finding of substantial impairment, even in situations where the challenged juror at times expressed a willingness to impose a sentence of death. *See, e.g., Uttecht v. Brown*, 551 U.S. 1, 18 (2007) ("Juror Z's assurances that he would consider imposing the death penalty and would follow the law do not overcome the reasonable inference from his other statements that in fact he would be substantially impaired in this case. . . ."). As such, Boyle's reliance on *Zant* is misplaced.

As the state courts' determination was neither contrary to nor an unreasonable application of clearly established federal law, nor an unreasonable determination of the facts, Boyle is due no relief.

### G. Boyle's claim that the trial court violated Boyle's right to present a defense by precluding him from calling Melissa Burk White, Savannah's mother, as a witness

Boyle contends that he was unable to present a defense because the trial court prohibited him from calling as a witness Savannah's mother, Melissa Burk White, who intended to invoke her Fifth Amendment privilege against self-incrimination.

With the exception of paragraph 230 of his petition, Boyle exhausted this claim on direct appeal. Vol. 21, Tab #R-43, at 31–37; Vol. 24, Tab #R-48, at 26–31.[3] The ACCA found no abuse of discretion by the trial court, explaining as follows:

> Boyle next argues that the circuit court erred in not allowing him to call Melissa White, the victim's mother, to testify. Specifically, Boyle argues that before White could invoke her Fifth Amendment privilege against self-incrimination she was required to take the witness stand and invoke that right in the presence of the jury.
>
> The record reflects that during trial the State notified the court that it had examined Boyle's subpoena list and discovered White's name was on the list. The prosecutor said that White intended to invoke

---

[3]     Paragraph 230 of Boyle's petition states as follows: "As Boyle learned long afterwards (*see infra*), the State concealed from both the court and the jury that it had procured Ms. White's silence by threats of prosecuting her for the capital murder of Savannah if she provided evidence helpful to Boyle." Doc. 1, p. 89. Paragraphs 369-84 of Boyle's petition set forth the specific facts surrounding Boyle's claim that the State concealed and withheld exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). *Id.* at 137-42. Boyle's *Brady* claim will be discussed in section IV. T., *infra*.

her Fifth Amendment right not to testify. White's attorney, who was in court at this hearing, informed the circuit court that White had been charged with aggravated child abuse and possession of a controlled substance arising out of this incident, that she also had new charges, and that White intended to invoke her privilege not to testify if called to the witness stand. White's attorney said: "She's not going to get up there and potentially perjure herself and/or harm herself with whatever testimony she may give at all. So she absolutely will take the Fifth. And we're asking that neither party be allowed to call her as a witness and put her in that position." (R. 1814–15.)

Boyle objected and argued that he had a right to call any witness he desired. The State asserted that the circuit court could not allow a codefendant to testify knowing that the codefendant fully intended to invoke the Fifth Amendment right not to testify. The circuit court held that it was not necessary to make White appear in court because it was clear she intended to invoke her Fifth Amendment right not to testify. (R. 1834.)

The record reflects that sometime later White appeared in the judge's chambers and was questioned under oath. At this hearing, Boyle argued that White should have been called to testify in the presence of the jury. The State asserted that according to Rule 512(b), Ala. R. Evid., the preferred practice was to conduct the hearing outside the presence of the jury. White informed the circuit court that if called to testify she fully intended to invoke her Fifth Amendment privilege against self-incrimination, that that decision was voluntary after consulting with her attorney, and that it was her sole decision not to testify. (R.2046–48.)

> States generally have followed the federal court's approach when confronted with the question of whether a defendant can force a witness to "take the Fifth" in the presence of the jury. The majority of courts have held that a witness cannot be forced to the stand just to have her "take the Fifth" in front of the jury. The minority of courts allow the judge to use his discretion in determining whether the witness should take the stand.

Terrence Kerwin, *Compulsory Process and the Right to Present a Defense: Why a Criminal Defendant Should Have the Ability to Force a Witness Who Will 'Take the Fifth' to do so in Front of the Jury*, 112 Penn. St. L. Rev. 659, 669–70 (2007). *See Martin v. United States*, 756 A.2d 901, 905 (D.C. 2000) ("A witness should be questioned outside the presence of the jury when it is clear that the witness will refuse to testify on the basis of any privilege or reason."). The above-cited article characterizes Alabama as a minority jurisdiction that allows the trial court to use its discretion in determining whether the witness invoking his or her Fifth Amendment right should be questioned in the presence of the jury. Rule 512(b), Ala. R. Evid., clearly supports this interpretation. Rule 512(b) provides: "In jury cases, proceedings shall be conducted, to the extent practicable, so as to facilitate the making of claims of privilege without the knowledge of the jury."

This Court has held that it is error for the State to call a codefendant knowing that the codefendant will invoke his or her Fifth Amendment right against self-incrimination. *See Thomas v. State*, 473 So. 2d 627 (Ala. Crim. App. 1985). In *Thomas*, we stated:

> "It is error for the prosecution to call an accomplice or another witness to testify for the state if he knows the witness will invoke the Fifth Amendment." N. Chiarkas, *Alabama Criminal Trial Practice* 219 (1981). *See Busby v. State*, 412 So. 2d 837 (Ala. Cr. App. 1982); *Shockley v. State*, 335 So. 2d 659 (Ala. Cr. App. 1975), affirmed, 335 So. 2d 663 (Ala. 1976); *Allison v. State*, 331 So. 2d 748 (Ala. Cr. App.), cert. denied, 331 So. 2d 751 (Ala. 1976).

The general rule is stated in Annot., 19 A.L.R. 4th 368, 373 (1983):

> [I]t is improper for the prosecution to call as a witness one whom it knows will certainly invoke the privilege against testifying on the ground of self-incrimination, with the sole purpose or design of having the jury observe that invocation. Obviously, it is difficult to

> demonstrate that the prosecution had this sole purpose or design, and it would be necessary, in any event, to demonstrate prejudice to the accused in order to effect the reversal of a conviction.

473 So. 2d at 629–30. This rationale has been applied to defense counsel as well as the prosecution.

> [I]t was improper for defense counsel to call [the accomplice] as a witness, knowing that [the accomplice] planned to invoke the Fifth Amendment. This was an apparent attempt to have the jury infer [the accomplice's] guilt from his assertion of rights.

*Robinson v. State*, 728 So. 2d 650, 655 (Ala. Crim. App. 1997).

> The tactic of defense counsel was to in effect have the jury draw an inference of guilt from Alexander's exercise of the right against self-incrimination. Alexander's testimony was properly excluded in that it "would have had no bearing on the case" nor would it have "enlightened the jury as to any material aspect in the case." *Hurst* [*v. State*,] 397 So. 2d [203] at 207 [ (Ala. Crim. App. 1981)]. The trial court's exclusion of this witness's testimony was, therefore, proper.

*Garner v. State*, 606 So. 2d 177, 181 (Ala. Crim. App. 1992).

> "When an alleged accomplice invokes the privilege in the presence of the jury, prejudice arises from the human tendency to treat the claim of privilege as a confession of crime, creating an adverse inference which an accused is powerless to combat by cross-examination." *State v. Allen*, 224 N.W.2d 237, 241 (Iowa 1974).

*People v. Giacalone*, 399 Mich. 642, 645, 250 N.W.2d 492 (1977) (footnotes omitted). *See also* Annot., Wanda Ellen Wakefield, *Propriety*

*and Prejudicial Effect of Prosecution's Calling as Witness, to Extract Claim of Self-incrimination Privilege, One Involved in Offense Charged Against Accused*, 19 A.L.R. 4th 358 (1983).

Based on the record in this case, we cannot say that the circuit court abused its discretion in not calling White in the jury's presence, knowing that she fully intended to invoke her Fifth Amendment privilege against self-incrimination.

*Boyle*, 154 So. 3d at 204-06 (footnote omitted).

Boyle argues that the state courts' decision is unreasonable. He cites the following cases for the general rule that due process provides every defendant the right to present a defense: *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006); *Washington v. Texas*, 388 U.S. 14, 19 (1967); *Taylor v. Illinois*, 484 U.S. 400, 409 (1988); *Williams*, 529 U.S. at 412-13; and *Taylor v. Singletary*, 122 F.3d 1390, 1394 (11th Cir. 1997) ("It is well-established that defendants have a Fifth and Sixth Amendment right to present witnesses that are 'both material and favorable' to their defense."). However, Boyle has not demonstrated that the state courts' ruling was contrary to these decisions. To the contrary, the ACCA thoroughly discussed that Alabama's evidence rules discourage the practice of requiring a witness who intends to invoke her Fifth Amendment right not to testify to invoke that right in the presence of the jury. Boyle argues that nothing in the record suggests that implying Ms. White's guilt was his counsel's reason for calling her to testify. He contends that without incriminating herself, Ms. White could have been asked about how often

Boyle stayed at her apartment, positive observations of Boyle's interactions with her daughters, the absence of any abuse of her children by Boyle, and accidental explanations for Savannah's injuries. This contention falls far short of meeting Boyle's burden that the state courts' decision is an unreasonable application of federal law. Boyle is due no relief on this claim.

### H. Boyle's claim that his capital murder and drug possession charges were improperly joined in violation of his rights to a fair trial and due process under the Fourteenth Amendment

Boyle alleges that the trial court improperly joined his capital murder charge and his unlawful possession charge in the same indictment, claiming that the offenses were unrelated.

Boyle exhausted this claim on direct appeal. Vol. 21, Tab #R-43, at 37–42; Vol. 24, Tab #R-48, at 31–35. The ACCA found no plain error, explaining as follows:

> Boyle argues that the circuit court erred in allowing the capital-murder charge and the possession-of-a-controlled-substance charge to be joined in a single indictment. Specifically, he asserts that according to the Supreme Court's decision in *Ex parte Tisdale*, 990 So. 2d 280 (Ala. 2007), the offenses were separate and unrelated and it was reversible error to join the offenses.

> The indictment charged Boyle with two separate counts: Count I charged Boyle with violating § 13A–5–40(a)(15), Ala. Code 1975, by murdering a child under the age of 14. Count II charged Boyle with violating § 13A–12–212(a)(1), by possessing a controlled substance— oxycodone and/or Clonazepam.

The only discussion in the record concerning this issue occurred at a pretrial hearing:

> The Court: And there's an unlawful possession of controlled substance charge and the capital murder—and also—is that tried with it or separate?
>
> [Prosecutor]: Right. It arises from the same set of facts, Your Honor. I believe the controlled substances were found during the search of the residence after the death of the child.
>
> The Court: Is that y'all's understanding that [it] will also be tried along with the capital murder case?
>
> [Defense counsel]: Like you say, Your Honor, it's not necessarily the thrust of our case. So we understand it exists. And if the Court wants it consolidated, we would understand that being the case. But we have no preference one way or the other.

(R. 24). Not only did Boyle not object to the joinder of the offenses, but he specifically said that he had no preference one way or the other. Thus, if any error did occur it was invited by Boyle's actions. Invited error applies in death-penalty cases and operates to waive the error unless the error rises to the level of plain error. *See Williams v. State*, 710 So. 2d 1276, 1316 (Ala. Crim. App. 1996).

The case relied on by Boyle, *Ex parte Tisdale*, is readily distinguishable. In *Tisdale* the defendant was charged with two separate offenses that had occurred on two separate dates a month a part—a charge of speeding based on an incident in July and a charge of reckless driving based on an incident in August of that same year. On appeal, Tisdale argued that the circuit court erred in consolidating the two charges because, she said, the offenses were separate and unrelated. The Alabama Supreme Court, in reversing Tisdale's convictions, stated:

> Because evidence of each of the incidents would not be admissible in a trial of the other incident, the trial court could not have properly consolidated the offenses for trial under the "same or similar character" basis for consolidation. As previously noted, the other bases for consolidation set out in Rule 13.3, Ala. R. Crim. P., are not applicable in this case. As a result, the trial court erred when it consolidated the offenses arising from the two incidents.

990 So. 2d at 285.

> Rule 13.3(a), Ala. R. Crim. P., provides, in pertinent part:

> (a) Offenses. Two or more offenses may be joined in an indictment, information, or complaint, if they:

>> (1) Are of the same or similar character; or

>> (2) Are based on the same conduct or are otherwise connected in their commission; or

>> (3) Are alleged to have been part of a common scheme or plan.

Rule 13, Ala. R. Crim. P., is patterned after Rule 8(a) of the Federal Rules of Criminal Procedure. Thus,

> [i]n deciding consolidation claims under Rule 13.3, Ala. R. Crim. P., this Court has followed the case law interpreting Federal Rule 8. *See, e.g., Hinton v. State*, 548 So. 2d 547, 554 (Ala. Crim. App. 1988), affirmed, *Ex parte Hinton*, 548 So. 2d 562, 566 (Ala. 1989), cert. denied, 493 U.S. 969, 110 S. Ct. 419, 107 L. Ed. 2d 383 (1989); *Langham v. State*, 494 So. 2d 910, 915 (Ala. Crim. App. 1986).

*Kennedy v. State*, 640 So. 2d 22, 28 (Ala. Crim. App. 1993). The federal rule has been liberally construed in favor of joinder to facilitate judicial

economy. *See United States v. Bryan*, 843 F.2d 1339, 1342 (11th Cir. 1988).

"Rule 13.3 does not exclude the consolidation of a capital offense with another lesser offense." *Williams v. State*, 710 So. 2d 1276, 1321 (Ala. Crim. App. 1996). In fact, the consolidation of two separate capital-murder offenses has specifically been upheld. *See Ex parte Hinton*, 548 So. 2d 562 (Ala. 1989). We have upheld consolidation of offenses when the facts of each case overlap or are connected in some way. *See Williams*, 710 So. 2d at 1321. The most important consideration is typically whether evidence of one crime would be admissible in the trial of the other crime. *See Ex parte Tisdale*, *supra*.

Moreover,

[i]t is only the most compelling prejudice that will be sufficient to show the court abused its discretion in not granting a severance. *United States v. Perez*, 489 F.2d 51, 65 (5th Cir. 1973), cert. denied, 417 U.S. 945, 94 S. Ct. 3067, 41 L. Ed. 2d 664 (1974). A mere showing of some prejudice is not enough. *United States v. Wilson*, 657 F.2d 755, 765 (5th Cir. 1981), cert. denied, 455 U.S. 951, 102 S. Ct. 1456, 71 L. Ed. 2d 667 (1982); *Perez*, 489 F.2d at 65. Hinton can show no prejudice here, because the evidence of both crimes could have been presented with or without consolidation. No prejudice results where, as here, the jury could easily have kept separate the evidence of the separate crimes. *Crawford v. State*, 485 So. 2d 391, 394–95 (Ala. Crim. App.), cert. denied, 485 So. 2d 391 (Ala. 1986).

548 So. 2d at 566.

The possession charge was part of the res gestae of the capital-murder charge. Boyle's neighbor testified that on the morning of October 25, 2005, Boyle telephoned her from the hospital four times and asked her to remove some pills from the master bedroom in the apartment because Boyle said he knew that DHR would investigate and

that White might lose her children. These pills formed the basis of the possession charge.

In discussing the res gestae exception to the general exclusionary rule, this Court in *Doster v. State*, 72 So. 3d 50 (Ala. Crim. App. 2010), stated:

> [One such] "special circumstance" where evidence of other crimes may be relevant and admissible is where such evidence was part of the chain or sequence of events which became part of the history of the case and formed part of the natural development of the facts. This special circumstance, sometimes referred to as the "res gestae" exception to the general proscription against evidence of other crimes, is also known as the complete story rationale, i.e., evidence of other criminal acts is admissible "to complete the story of the crime on trial by proving its immediate context of happenings near in time and place."
>
> *Commonwealth v. Lark*, 543 A.2d 491, 497 (1988). Evidence of a defendant's criminal actions during the course of a crime spree is admissible. . . .

72 So. 3d at 87–89.

"The appellant . . . failed to demonstrate the 'actual and compelling' prejudice necessary to outweigh the benefits of judicial economy resulting from consolidation." *Williams*, 710 So. 2d at 1321. The circuit court committed no plain error in allowing the joinder of the capital-murder charge and the possession charge.

*Boyle*, 154 So. 3d at 190 (some citations omitted or edited).

Boyle contends that the state courts' decision was contrary to the Supreme Court's decision in *McElroy v. United States*, that joinder is improper "where the offenses are in no wise parts of the same transaction, and must depend upon evidence of a different state of facts as to each or some of them." 164 U.S. 76, 81 (1896). The *McElroy* Court explained that "[i]n cases of felony the multiplication of distinct charges has been considered so objectionable as tending to confound the accused in his defense, or to prejudice him as to his challenges, in the matter of being held out to be habitually criminal, in the distraction of the attention of the jury or otherwise." *Id*. at 80. However, *McElroy* is not controlling. *McElroy* involved multiple defendants being tried in a joint trial and held that misjoinder is inherently prejudicial and requires automatic reversal. *Id.* The Supreme Court subsequently rejected *McElroy* to the extent that it stands for the proposition that misjoinder of claims "is inherently prejudicial" and requires "automatic reversal," noting that the case was decided "long before" the adoption of Federal Rules of Criminal Procedure 8 and 52, and the enactment of the harmless-error statute, 28 U.S.C. § 2111." *United State v. Lane*, 474 U.S. 438, 444 (1986). The *Lane* Court noted that "improper joinder does not, in itself, violate the Constitution. Rather, misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial." *Id*. at 446, n.8. In rejecting the *per se* rule,

the Court held that "an error involving misjoinder 'affects the substantial rights' and requires reversal only if the misjoinder results in actual prejudice because it 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Id.* at 449.

Here, it was entirely reasonable for the state courts to have concluded that Boyle's drug possession and capital murder charges were based on facts that were connected. Boyle called his neighbor shortly after taking Savannah to the hospital to ask her to remove pills from the apartment in hopes that Ms. White's children would not be taken away. Evidence in support of both charges was admissible at trial to establish the complete story of the crimes on trial by proving their context, or the events that happened immediately before and after each. The state courts' determination was neither contrary to nor an unreasonable application of clearly established federal law, nor an unreasonable determination of the facts, and Boyle is due no relief.

### I.     Boyle's claim that the trial court violated his Sixth, Eighth, and Fourteenth Amendment rights by allowing a fatal variance between the indictment and the State's proof at trial

Boyle alleges that there was a fatal variance between the indictment and the State's proof offered at trial. While the indictment states that Savannah died of

blunt-force injuries, Boyle claims that the State only proved that she died from being

beaten with an open hand.

Boyle exhausted this claim on direct appeal. Vol. 21, Tab #R-43, at 85–92; Vol.

24, Tab #R-48, at 74–77. The ACCA found no error, explaining as follows:

> Boyle next argues that there was a fatal variance between the indictment and the proof at trial because, he says, the indictment charged that the victim died of blunt-force injuries but, he says, the State proved at trial that the victim died from being beaten with "an open hand on and around her head." In his brief to this Court, Boyle asserts that "the prosecution presented proof of the same crime under a different set of facts as those alleged in the indictment, thus creating a fatal variance between the indictment and the proof at trial."

> Boyle moved for a judgment of acquittal and argued that there was a variance between the charges in the indictment and the proof that the State had presented at trial. In Boyle's written motion, he stated:

>> The indictment in this case alleges that [Boyle] intentionally murdered [Savannah] "by striking her head against a blunt object and/or causing her head to strike a blunt object. . . ."

>> That the impression one forms from the language in the indictment is a picture of the child's head being forced or rammed into a blunt object. The testimony at trial from the one witness who claims to have seen the incident has been that [Boyle] "slapped and beat the child upon the face and head."

> (C.R.132.) The prosecutor countered Boyle's argument by stating:

>> Judge, part of the proof in this case is that there was a bathtub incident. Part of the proof also is that there was—there were blows inflicted with an open hand, or

with his hand. So, I mean, one doesn't necessarily exclude the other.

You know, we're not responsible for what the defense believes or what they understand or what their impressions may be. You know, we have evidence in this case. The evidence was available. If they only looked at [H.D.'s] videotape at The Barrie Center [for Children]. It talks about all the proof we've put in.

They're completely on notice of what our allegations have been from the beginning. There was a bathtub incident. We're not backing off on that. And that bathtub incident probably very well contributed to her death as well.

And there was also a beating incident, or more than one beating incident; a number of beating incidents over a period of probably at least several weeks where this child's head was injured or brain was injured to the point it finally killed her.

(R. 1843–44.) The circuit court stated that Boyle had access to the autopsy report and the photographic evidence; thus, it said, Boyle had to have knowledge of the severity of the victim's injuries. The circuit court denied Boyle's motion for a judgment of acquittal.

The indictment charged that Boyle

did intentionally cause the death of another person, to wit: Savannah White, who was less than fourteen years of age, by striking her head against a blunt object and/or causing her head to strike a blunt object, in violation of the provisions of Title 13A, § 13A–5–40(a)(15), Code of Alabama 1975 contrary to the law and against the peace and dignity of the State of Alabama.

(C.R.17.)

> One of the functions of an indictment is to adequately inform the accused of the crime charged so that a defense may be prepared. *Ex parte Washington*, 448 So. 2d 404, 407 (Ala. 1984). A variance in the form of the offense charged in the indictment and the proof presented at trial is fatal if the proof offered by the State is of a different crime, or of the same crime, but under a set of facts different from those set out in the indictment. *Ex parte Hightower*, 443 So. 2d 1272, 1274 (Ala. 1983).

*Ex parte Hamm*, 564 So. 2d 469, 471 (Ala. 1990).

"A fatal variance exist[s] only where the State fails to adduce any proof of a material allegation of the indictment or where the only proof adduced is contrary to a material allegation in the indictment." *Johnson v. State*, 584 So. 2d 881, 884 (Ala. Crim. App. 1991).

> "The policy behind the variance rule is that the accused should have sufficient notice to enable him to defend himself at trial on the crime for which he has been indicted and proof of a different crime or the same crime under a different set of facts deprives him of that notice to which he is constitutionally entitled." *House* [*v. State*], 380 So. 2d [940] at 942 [ (Ala. Crim. App. 1989)]. "Not every variance is fatal. *Berger v. United States*, 295 U.S. 78, 55 S. Ct. 629, 79 L. Ed. 1314 (1935). Reviewing a claim of variance requires use of a two step analysis: (1) was there in fact a variance between the indictment and proof, and (2) was the variance prejudicial." *United States v. McCrary*, 699 F.2d 1308, 1310 (11th Cir. 1983). "The true inquiry, therefore, is not whether there has been a variance in proof, but whether there has been such a variance as to 'affect the substantial rights' of the accused." *Berger*, 295 U.S. at 82, 55 S. Ct. at 630. "Variance from the indictment is not always prejudicial nor is prejudice assumed." *United States v. Womack*, 654 F.2d 1034, 1041 (5th Cir. 1981), cert. denied, 454 U.S. 1156, 102 S. Ct. 1029, 71 L. Ed. 2d 314

(1982). The determination of whether a variance affects the defense will have to be made based upon the facts of each case. *United States v. Pearson*, 667 F.2d 12, 15 (5th Cir. 1982).

*Smith v. State*, 551 So. 2d 1161, 1168–69 (Ala. Crim. App. 1989).

When discussing variances in an indictment as they relate to the manner of death this Court in *Thompson v. State*, 542 So. 2d 1286 (Ala. Crim. App. 1988), stated:

> "The great particularity required by the common law in setting forth the manner of death and the means or instrument by which it was inflicted frequently has resulted in miscarriage of justice due to variances between allegations and proof." 26 Am. Jur. Homicide § 266. "[M]odern tendencies, as manifested by both legislative and judicial action, are toward a relaxation of the technicalities of the earlier rules." 40 Am. Jur. 2d Homicide § 229. "The law does not require precise conformity in every particular where the weapon is alleged but rather substantial proof of the means by which the offense was committed. *Matthews v. State*, 51 Ala. App. 417, 286 So. 2d 91 (1973); *Threatt v. State*, 32 Ala. App. 416, 26 So. 2d 530 (1946)." *Trest v. State*, 409 So. 2d 906, 909 (Ala. Cr. App. 1981).

>             . . .

> "Every constituent of murder was averred in the indictment under consideration and 'it is sufficient, if the substance of the charge be proved, without regard to the precise instrument used. Though the indictment charges a particular weapon, the averment is substantially proved, if it be shown that some other instrument was employed, which occasions a wound of the same kind as the

> instrument charged, and the same consequences naturally follow.' *Hull v. State*, 79 Ala. 32, 33 [ (Ala. 1885)]."

*Wesson v. State*, 251 Ala. 33, 34, 36 So. 2d 361, 362 (Ala. 1948). *See Farris v. State*, 432 So. 2d 538, 541 (Ala. Cr. App. 1983) (no material variance between the indictment describing a glass bottle and proof showing a plastic bottle); *Stevenson v. State*, 404 So. 2d 111, 113 (Ala. Cr. App. 1981), cert. quashed, 404 So. 2d 114 (Ala. 1981) (no material variance where indictment charged killing with a pistol and the State proved killing with a shotgun, because the weapons inflict the same type of injury); *Weaver v. State*, 407 So. 2d 568, 569 (Ala. Cr. App. 1981) (no variance where the indictment charged killing with a rifle but the proof showed killing with a pistol, because they "both inflict the same character of wound"); *Trammell v. State*, 298 So. 2d 666, 668 (Ala. Cr. App. 1974) (no material variance where indictment charged killing with a bayonet but testimony showed killing with a knife). *See also Arnold v. State*, 686 S.W.2d 291, 293–94 (Tex. Dist. Ct. App. 1985), affirmed, 742 S.W.2d 10 (Tex. Cr. App. 1987) (no variance where indictment charged murder by stabbing or firearm and medical examiner testified that the fatal wound was inflicted by "cutting"); *Phifer v. State*, 651 S.W.2d 774, 781–82 (Tex. Cr. App. 1983) (no variance where indictment alleged "choking" but the medical examiner testified that the victim was not "choked" in the medical sense of cutting off the air supply to the lungs, rather death was from asphyxiation by "strangulation," which the examiner defined as cutting off the blood flow to or from the brain).

. . .

> It would be dealing in abstruse legal metaphysics, amounting almost to an absurdity, to hold that one guilty of a crime,

> such as indicated in the opinion of the Court
> of Appeals, should go free because the State
> was unable to prove that life was extinct
> before the deceased was stomped or because
> the State was unable to establish that the
> beating with the fists or the stomping with
> feet, one or the other or both, was the cause
> of death. The essence of the charge was
> proven    when    either    of    the    means,
> substantially similar in nature, was shown to
> have produced the result.

> *Wesson v. State, supra*, 251 Ala. [33] at 35, 36 So. 2d [361]
> at 363 [ (Ala. 1948)].

542 So. 2d at 1292–93. *See also Rodgers v. State*, 50 Ala. 102 (1874). "An averment in an indictment charging the use of a particular weapon is substantially proved by evidence that some other instrument was employed that causes a wound of the same kind as the instrument charged and the same consequences naturally follow." 42 C.J.S. Indictments § 286 (2013). "If an indictment alleges the means by which an offense is committed, it must be substantially, though not literally, proven as alleged." *Huckabee v. State*, 159 Ala. 45, 48 So. 796, 797–98 (1909).

Many courts have observed that a hand may be a blunt-force instrument. *See Cunningham v. Conway*, 717 F. Supp. 2d 339, 348 (W.D.N.Y. 2010) ("[The victim's] external examination revealed a laceration behind her right ear with internal hemorrhaging which he attributed to being hit with a hand or blunt object."); *Sanders v. State*, 251 Ga. 70, 72, 303 S.E.2d 13, 15–16 (1983) ("Some of the bruises were lined up as if caused by a blunt instrument with several projections, which would have been consistent with the child having been struck by the knuckles of a hand."); *State v. Smith*, 61 N.C. App. 52, 54, 300 S.E.2d 403, 405 (1983) ("The medical examiner testified that there were bruises on [the victim's] body and that it was his opinion that the cause of death was three sharp blows to her head from a blunt instrument such as a hand."); *Commonwealth v. Kane*, 388 Mass. 128,

134, 445 N.E.2d 598, 602 (1983) ("[D]eath was caused by very severe blows of a blunt instrument such as a fist, a foot, or a board."); *Jones v. State*, 580 P.2d 1150, 1152 (Wyo. 1978) ("[T]he child had three bruises on her head which could have been caused by a hand or other blunt instrument. . . ."); *Haas v. State*, 498 S.W.2d 206, 208 (Tex. Crim. App. 1973) ("The woman died due to severe blows to her head caused by either a blunt instrument or the fist and heels of her assailants."); *People v. Berles*, 30 Mich. App. 716, 722, 186 N.W.2d 852, 855 (1971) ("Such evidence, if believed, would tie defendant to the injuries which medical experts had indicated to be inflicted by a blow delivered by a blunt instrument such as a hand.").

The indictment charged that Boyle caused the death of Savannah by striking her head with a blunt-force object or causing her head to strike a blunt-force object. The State proved that Savannah died from blunt-force trauma to her head and that Boyle struck Savannah and caused her head to strike a wall—a blunt object. "The proof was sufficient to support the offense charged in the indictment." *Johnson v. State*, 584 So. 2d 881, 884 (Ala. Crim. App. 1991). There was no fatal variance between the indictment and the State's proof at trial. Accordingly, we find no error in regard to this claim.

*Boyle*, 154 So. 3d at 219-22 (some citations omitted or edited).

Boyle contends that the state courts' decision was contrary to the rule established in *Berger v. United States* that a variance in proof from an indictment that affects the substantial rights of the accused violates the right to due process secured by the Fourteenth Amendment. *See* 295 U.S. at 82. He also cites *Stirone v. United States*, 361 U.S. 212, 217 (1960) ("[A] court cannot permit a defendant to be tried on charges that are not made in the indictment against him."); *Dunn v. United States*, 442 U.S. 100, 106-07 (1979) ("To uphold a conviction on a charge that was neither

alleged in an indictment nor presented to a jury at trial offends the most basic notions of due process."); *Russell v. United States*, 369 U.S. 749, 763-64 (1962); and *Cole v. State of Arkansas*, 333 U.S. 196, 201 (1948) ("It is as much a violation of due process to send an accused to prison following conviction of a charge on which he was never tried as it would be to convict him upon a charge that was never made."). Boyle contends that one cannot square an indictment that the defendant killed the victim "by striking her head against a blunt object and/or causing her head to strike a blunt object," with evidence that the cause of death was defendant's series of open-handed slaps to the head over an indeterminate period of time.

The state courts' rejection of this claim was not an unreasonable application of federal law. The ACCA reasonably noted that part of the proof in the case was the bathtub incident, i.e., the blunt force object, in addition to repeated slaps to the head over a period of time, and that Boyle was on notice from the beginning, as he had access to the autopsy report and photographs, that the bathtub incident would form part of the evidence. This reasoning falls in line with *Berger*, in which the Court held that a variance is not material where "the allegation and proof substantially correspond, or where the variance was not of a character which could have misled the defendant." 295 U.S. at 83. The ACCA also examined numerous other cases in which courts held that a discrepancy in the means or instrument of death between

the indictment and the evidence proven at trial did not result in a fatal variance. The state courts' determination was neither contrary to nor an unreasonable application of clearly established federal law, nor an unreasonable determination of the facts, and Boyle is due no relief.

**J.    Boyle's claim that the trial court violated his Sixth, Eighth, and Fourteenth Amendment rights by allowing H.D. to testify to events that occurred when she was five**

Boyle contends that the trial court erred by allowing H.D., who was nine years old at the time of trial, to testify to events that occurred around Savannah's death, when H.D. was five, because she was not of sufficient age or mental capacity to understand the difference between truth and fiction and to recall and relate accurately the events she claimed to have seen.

Boyle exhausted this claim on direct appeal. Vol. 21, Tab #R-43, at 60–65; Vol. 24, Tab #R-48, at 46–50. The ACCA found no plain error, explaining as follows:

> Boyle next argues that the circuit court erred in allowing nine-year-old H.D. to testify because, he says, her young age rendered her incapable of distinguishing between telling the truth and telling a lie; therefore, he argues, her testimony was not reliable.

> H.D., the victim's older sister, was nine years old and in the third grade at the time of trial. Before H.D. testified, the circuit court asked her a series of questions in an attempt to discern whether she knew the difference between the truth and a lie. The following occurred:

The Court: I need to talk with you a little bit, [H.D.] before we get started. You know the difference between telling the truth and telling a lie?

[H.D.]: Yes.

The Court: Okay . . . . Do you know that you have to tell the truth today?

[H.D.]: Yes, sir.

The Court: Do you know—what's the difference between a truth and a lie?

[H.D.]: That if you tell the truth, you say—like if you'll— like if you're wearing blue, that's a lie. And you're wearing white, if you are wearing white, it's a lie.

The Court: Right. It's just telling things the way they really are, right?

[H.D.]: (Witness nods head affirmatively.)

The Court: Do you understand that?

[H.D.]: Uh-huh (indicating yes).

The Court: Do you understand that if you—if you don't tell the truth that that's—you know that's wrong?

[H.D.]: Yes, sir.

(R. 1345–46.) At trial, Boyle did not argue that H.D. was not a competent witness. Therefore, we review this claim for plain error. *See* Rule 45A, Ala. R. App. P.

"Every person is competent to be a witness except as otherwise provided in these rules." Rule 601, Ala. R. Evid. "Before testifying,

every witness shall be required to declare that the witness will testify truthfully, by oath or affirmation. . . ." Rule 603, Ala. R. Evid. The Advisory Committee's Notes to Rule 601 recognize:

> "[Rule 601] acknowledges the prevailing sentiment that very few persons are incapable of giving testimony useful to the trier of fact and that historic grounds of incompetency—mental incapacity, conviction, etc.—should go to the credibility of the witness and the weight the trier of fact gives to the witness's testimony."

In addressing the scope of Rule 601 and Rule 603, Ala. R. Evid., as they relate to child witnesses, the Alabama Supreme Court has stated:

> [T]he adoption of Rule 601, Ala. R. Evid., created in essence a presumption of competency for every witness, and it is the burden of the opponent to challenge the admissibility of the witness's testimony on grounds other than Rule 601, Ala. R Evid. *See, e.g.*, Rule 602, Ala. R. Evid., and Rule 403, Ala. R. Evid.

> Brown recognizes that under Rule 601, Ala. R. Evid., all witnesses, including children, are competent to testify. He further recognizes the trial court's duty to determine a child witness's ability to tell the truth. *See* Rule 603, Ala. R. Evid. Brown maintains, however, that, in addition to determining whether a child witness understands his or her responsibility to tell the truth when testifying, the trial court should also determine the reliability of the child witness's testimony. Brown reasons that, because of a child's age, the child witness may be unable to "truly register" the occurrence he or she observed or the child's memory may have eroded over time, may be distorted or a false creation, or may have been influenced by the suggestion of adults. According to Brown, because the child witness believes his or her testimony to be true, despite its being the result of imagination, distortion, or

136

suggestion, the admission of the child witness's testimony without an examination to determine its reliability presents a substantial risk that the testimony will unfairly prejudice the defendant and will mislead the jury.

We decline Brown's invitation to require a trial court to conduct an examination to determine the reliability of a child witness's testimony. The concerns raised by Brown regarding a child witness's testimony are adequately addressed by our Rules of Evidence. . . . If a party has concerns about the reliability of a child witness's testimony, then the party must present his or her concerns in an objection for the trial court based on the Rules of Evidence. Indeed, a trial court's analysis, conducted after a properly presented Rule 403, Ala. R. Evid., objection, adequately balances concerns regarding the probative value of the child witness's testimony against unfair prejudice resulting from the frailty of a child's memories, the tendency of a child to form false memories that he or she believes to be true, and a child's susceptibility to suggestion that may taint the child's memory. . . . Hence, Brown's concerns about the admissibility of a child witness's testimony based on the reliability of the testimony are adequately addressed by our present rules and procedures. *See also Utah v. Fulton*, 742 P.2d 1208, 1218 (Utah 1987) (addressing the effect of Rule 601, Utah R. Evid., which is identical to Rule 601, Ala. R. Evid., on the admissibility of a child's testimony and concluding "that Rule 403[, Utah R. Evid.,] adequately protects a defendant's right to a fair trial and gives him or her an opportunity to raise concerns [with regard to the reliability of a child's testimony] that prior to our adoption of Rule 601, might have been addressed in a competency hearing").

*Ex parte Brown*, 74 So. 3d 1039, 1048–49 (Ala. 2011).

This Court has stated the following concerning Rule 601, Ala. R. Evid.:

> Lewis asks that this Court ignore the general rule of competency set out in Rule 601. Instead, he contends, the trial court should make an initial credibility decision as to a witness's competency to testify, thus depriving the jury of its traditional role in determining witness credibility. Lewis cites no Alabama law, nor can we find any, requiring that, absent some special circumstance, a witness must pass a reliability test before being allowed to testify. Indeed, the cases cited by Lewis all involve special circumstances requiring the trial court to determine the reliability of certain witnesses or evidence before the witness or evidence is presented to the jury.
>
> We see no reason to limit the liberal application of Rule 601. Nor do we see any reason to limit the jury's traditional role in determining witness credibility. *See, e.g., Cumbo v. State*, 368 So. 2d 871, 875–76 (Ala. Crim. App. 1978), cert. denied, 368 So. 2d 877 (Ala. 1979) (recognizing that the jury has the responsibility of assessing the credibility of each witness and weighing all the evidence, whether direct or circumstantial, as they viewed it).

*Lewis v. State*, 24 So. 3d 480, 508–09 (Ala. Crim. App. 2006).

Here, the circuit court correctly determined, through voir dire examination of H.D., that H.D. knew the difference between the truth and a lie. Our review of H.D.'s testimony shows that she was articulate and competent to testify. There is no rule requiring the court to first determine that H.D.'s testimony was reliable. Indeed, that was a question within the exclusive province of the finder of fact—the jury. Accordingly, we find no plain error in regard to this claim.

*Boyle*, 154 So. 3d at 198-200 (some quotation marks omitted).

Boyle claims that the state courts' decision is unreasonable. He points out that the Supreme Court has warned of the dangers of relying upon unreliable child testimony in death penalty cases, citing *Kennedy v. Louisiana*, 554 U.S. 407, 443 (2008). *Kennedy* is not analogous, as the Court there held that the Eighth Amendment barred Louisiana from imposing the death penalty for the rape of a child where the crime did not result, and was not intended to result, in the victim's death. *Id.* at 419. The Court noted that "the problem of unreliable, induced, and even imagined child testimony means there is a 'special risk of wrongful execution'" in some child rape cases. *Id.* at 443 (citing *Atkins v. Virginia*, 536 U.S. 304 (2002)). The Court nowhere held that children cannot be relied upon to testify in other types of cases. Boyle also argues that the court violated his Sixth Amendment right to cross-examine H.D. effectively because she could not remember many details from the incident, citing *Ohio v. Roberts*, 448 U.S. 56, 63-64 (1980); *Crawford v. Washington*, 541 U.S. 36, 42 (2004); and *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 329 (2009). However, Boyle's counsel indeed cross-examined H.D. at length, allowing the jury to draw inferences from the fact that she could not recall many facts about her life as a five-year-old.

Boyle also argues that the ACCA's finding that H.D. was "articulate and competent to testify" was an unreasonable determination of the facts. Boyle

emphasizes that H.D. was the only witness at trial who had witnessed Boyle harming Savannah, but that H.D. had a hard time remembering many facts about the time period surrounding Savannah's death, like whether she went to school that day, her teacher's name, what grade she was in, how she got to the hospital, with whom she spoke, what time of year it was, the identity of the neighbors she went to for help, being interviewed at the Barrie Center the day following the murder, or how old Savannah was when she died. This Court has independently examined the transcript of H.D.'s trial testimony. H.D. described several events that occurred leading up to Savannah's death, such as how Boyle burned Savannah with cigarettes; H.D. was burned trying to stop him; Boyle threw Savannah against the wall in the bathtub; he slapped her in the face many times; he hit her head against the car door as they were getting ready to go to Savannah's birthday party; he dunked her in the bathtub; he laughed while harming Savannah; and he slapped her when she would not go to sleep. H.D. also recalled how Boyle threw her against a wall; how Savannah and H.D. both threw up in the bedroom and H.D. cleaned it up; how, the morning of Savannah's death, she could not wake up her sister; how she unsuccessfully tried to wake her mother for help; and how she thus went to the neighbors for help. The Court easily concludes that the ACCA was not unreasonable in ruling that there was no error in the trial court's allowing H.D. to testify. The jury was in the best position to judge

H.D.'s credibility and memory capabilities, taking into consideration that she was five years old at the time of the murder and nine years old during trial.

The state courts' determination was neither contrary to nor an unreasonable application of clearly established federal law, nor an unreasonable determination of the facts, and Boyle is due no relief.

### K.   Boyle's claim that the trial court erroneously precluded the defense from calling H.D.'s counselor to testify to H.D.'s alleged history of making untruthful statements

Boyle claims that the trial court should have allowed the defense to call Layla Padgett, H.D.'s counselor at the Barrie Center, to testify as to her personal experience with H.D.'s character for untruthfulness. Boyle emphasizes that Ms. Padgett had personally investigated a 2007 claim of sexual abuse made by H.D. against her natural father. Ms. Padgett prepared a forensic evaluation report finding that H.D. was not a credible witness.  Vol. 13, Tab #R-20, at TR. 2003-08.

Boyle exhausted this claim on direct appeal. Vol. 21, Tab #R-43, at 57–60; Vol. 24, Tab #R-48, at 43–46. The ACCA found no error, explaining as follows:

> Boyle next argues that the circuit court erred in not allowing Layla Padgett, a counselor at the Barrie Center for Children, to testify concerning H.D.'s "character for untruthfulness." He argues that the circuit court erroneously excluded her testimony "[b]ecause Ms. Padgett could testify only to her personal opinion and not [H.D.'s] reputation in the community . . . ."

The record shows that Boyle informed the State that he intended to call Padgett to testify. The State objected; a lengthy discussion ensued. The circuit court stated:

> Well, let me say this: We've kind of got a—we're kind of seemingly mixing and matching rules of evidence here. Looks like we're—what the defense wants to do is take a [Rule] 608(a)[, Ala. R. Evid.,] approach to attack the credibility of the witness for her reputation for truthfulness, but sort of do it by specific instances of contact, which is impermissible.

> So I guess—and I don't know, we may have to hear from her independently. If she is qualified to give a statement regarding—and I haven't really thought about the issues of her confidentiality, how that would play into it as a counselor.

> But is—I guess she could technically in [Rule] 608(a), if she's qualified as a counselor, not as a friend or acquaintance, get—have an opinion concerning reputation for truthfulness. That, technically, would be, I guess, admissible if she's a competent witness to do that, but certainly not on any specific instance of conduct or any particular—she certainly couldn't testify in any regard—in regard to [Rule] 608(b).

> She may be able to give an opinion for her character for truthfulness or untruthfulness. I think that would be the limit of it.

> . . .

> But I think—you know, I've got to come down on this thing pretty squarely on [Rule] 608(a). And I don't even know—really I'm not convinced in my mind she's that type of witness; that she has an opinion concerning

> [H.D.'s] general reputation in the community for
> truthfulness or untruthfulness.
>
> And that's kind of a stretch to say that [H.D.] has
> got a reputation in the community for truthfulness or
> untruthfulness. But I'm willing to let you put her on the
> stand and ask her about that and see if she has that type of
> knowledge or is competent to testify in that regard.

(R.2009-13.) Boyle's attorneys indicated that they needed to discuss the matter. After a short break, the circuit court asked defense counsel if they intended to make an offer of proof concerning Padgett's testimony. Boyle said that he wished to talk to Padgett when she arrived at the courthouse. Sometime later, the prosecutor stated for the record: "[A]ll the parties concede that the predicate for that testimony could not be laid based on the information [Padgett] relayed and Ms. Padgett has been released by the defense." Boyle acknowledged his agreement with the State's assessment of the issue. Therefore, if any error did occur, it was invited by Boyle's actions. Invited error is waived unless it rises to the level of plain error. *See Saunders v. State*, 10 So. 3d 53, 88 (Ala. Crim. App. 2007).

> Moreover,
>
> [A] foundation must . . . be established before opinion
> testimony about a witness's character for truthfulness is
> admissible. Specifically, before a witness can offer an
> opinion on another witness's truthfulness, it must be
> established that the character witness is "sufficiently
> personally familiar with [the primary witness's] character
> to offer an opinion on the subject." . . .
>
> While "[t]he reputation witness must have sufficient
> acquaintance with the principal witness in his community
> in order to ensure that the testimony accurately reflects
> the community's assessment, . . . the opinion witness is
> not relating community feelings." *United States v. Watson*,
> 669 F.2d [1374] at 1382 [ (11th Cir. 1982)]. Instead, the

143

opinion witness testifies from personal knowledge and relates a personal impression of the primary witness's character for truthfulness. *United States v. Watson*, 669 F.2d at 1383. *See also* Tenn. R. Evid. 602. Therefore, to establish admissibility of opinion testimony, it is necessary to demonstrate "that the opinion is rationally based on the perception of the witness and would be helpful to the jury in determining the fact of credibility." *United States v. Dotson*, 799 F.2d 189, 193 (5th Cir. 1986).

*State v. Dutton*, 896 S.W.2d 114, 118 (Tenn. 1995).

The witness must qualify to give an opinion by showing such acquaintance with the defendant, the community in which he [or she] has lived and the circles in which he [or she] has moved, as to speak with authority of the terms in which generally he [or she] is regarded.

*Michelson v. United States*, 335 U.S. 469, 478 (1948).

The record affirmatively shows that a proper foundation could not be established for the admission of Padgett's opinion testimony concerning H.D.'s character for untruthfulness. Accordingly, we find no error, much less plain error, in regard to this claim.

*Boyle*, 154 So. 3d at 202-04 (some citations and quotation marks omitted or edited).

Boyle contends that the state court's decision is unreasonable. As an initial matter, Boyle argues that the ACCA's ruling was contrary to Alabama law, which allowed, at the time of Boyle's trial, not only opinion testimony as to a person's general reputation in the community for untruthfulness or truthfulness but also opinion testimony as to a person's untruthfulness or truthfulness based upon the witness's own experience with the person. *See Williams v. State*, 783 So. 2d 108, 125

(Ala. Crim. App. 2000) (noting that opinion testimony now permitted under Rule 608). However, this argument cannot be considered within a federal habeas court's review of a state court conviction. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("We have stated many times that federal habeas corpus relief does not lie for errors of state law. Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.") (cleaned up).

Boyle also argues that ACCA's opinion was contrary to *Holmes v. South Carolina*, which discusses a criminal defendant's right to present a complete defense by confronting and cross-examining witnesses. 547 U.S. at 324. He contends that, had the trial court allowed him to present Ms. Padgett's testimony, she would have rebutted H.D.'s testimony tying him to the murder. However, Boyle simply has not demonstrated that the state courts' determination was contrary to or an unreasonable application of *Holmes* or any other clearly established federal law. Boyle is due no relief on this claim.

### L.   Boyle's claim that the trial court violated his Sixth and Fourteenth Amendment rights by denying and failing to inquire into Boyle's requests for substitute counsel

Boyle contends that the trial court erred by denying his three *pro se* requests

for substitute counsel without conducting further inquiry.

Boyle exhausted this claim on direct appeal. Vol. 21, Tab #R-43, at 82–85; Vol.

24, Tab #R-48, at 70–73. The ACCA found no error, explaining as follows:

> Boyle next argues that the circuit court erred in failing to conduct
> any inquiry into Boyle's pro se request to substitute counsel and that
> this failure resulted in a violation of his right to counsel.
>
> The record reflects that in November 2005 Scott Stewart was
> appointed to represent Boyle on the capital-murder charge. In January
> 2006, Mac Downs was appointed as [co-counsel] for the capital-murder
> charge. In August 2007, Boyle wrote a letter to Judge David Kimberley
> stating that he had met with attorneys Stewart and Downs and that
> Downs told him that he no longer wanted to represent Boyle. Boyle said
> that he had written numerous times to his attorneys and had gotten no
> responses and that he wanted new counsel. In response to this letter, in
> August 2007 attorney Downs wrote Judge Kimberley and stated that he
> had met with Boyle 11 times since being appointed but that he was
> requesting that he be allowed to withdraw from representing Boyle.
> Judge Kimberley granted Downs's motion to withdraw and appointed
> attorney Walt Buttram to represent Boyle.
>
> Boyle again wrote Judge Kimberley in August 2008, requesting
> that Stewart be removed from his case and that another attorney be
> substituted in his place. This letter contains a handwritten note that the
> motion was denied on August 19, 2008. In August 2008, Boyle also
> wrote Judge Kimberley and asked that he be allowed to meet with the
> judge in chambers if Stewart was allowed to continue to represent him.
> This request was denied.
>
> In November 2008, Boyle again wrote Judge Kimberley and
> stated that Stewart had spoken to two inmates about his case and that
> he wanted a new attorney appointed. The record is unclear as to what
> occurred as a result of this letter. However, at a December 2008 pretrial

hearing Stewart asked that he be allowed to consult with Boyle before the hearing concluded. Nothing in the record of this hearing or anything subsequent to this hearing suggests that Boyle was dissatisfied with Stewart's representation.

The record also shows that in July 2009 Boyle wrote Judge Kimberley and said that he had had a meeting with Stewart and that they had discussed important evidence in his case. This letter contained no indication that Boyle was upset with Stewart's representation or that he wanted Stewart to be removed. Moreover, at no time did Boyle express any dissatisfaction with his second attorney—Walt Buttram.

> While an indigent defendant may have the right to be represented by counsel, he has no absolute right to be represented by any particular counsel or by counsel of his choice. *Briggs v. State*, 549 So. 2d 155 (Ala. Crim. App. 1989). The essential aim of the Sixth Amendment is to guarantee an effective advocate, not counsel preferred by the defendant. *Wheat v. United States*, 486 U.S. 153 (1988). The Sixth Amendment does not guarantee a defendant a meaningful relationship, rapport, or even confidence in court-appointed counsel. *Morris v. Slappy*, 461 U.S. 1 (1983); *Siers v. Ryan*, 773 F.2d 37 (3d Cir. 1985), cert. denied, 490 U.S. 1025 (1989).

> The decision to substitute or to remove court-appointed counsel and to appoint new counsel for an accused rests within the sound discretion of the trial court. *Boldin v. State*, 585 So. 2d 218 (Ala. Cr. App. 1991); *Cox v. State*, 489 So. 2d 612 (Ala. Cr. App. 1985). In order to prevail on a motion for substitution of counsel, the accused must show a demonstrated conflict of interest or the existence of an irreconcilable conflict so great that it has resulted in a total lack of communication that will prevent the preparation of an adequate defense. *Boldin v. State; Cox v. State.*

*Snell v. State*, 723 So. 2d 105, 107 (Ala. Crim. App. 1998).

Alabama has little law on the circumstances that warrant a hearing on a defendant's request to substitute counsel, so we have looked to other courts for guidance. The Florida Supreme Court, in what appears to be the prevailing view, stated:

> This Court has consistently found a . . . hearing unwarranted where a defendant presents general complaints about defense counsel's trial strategy and no formal allegations of incompetence have been made. Similarly, a trial court does not err in failing to conduct a[n] . . . inquiry where the defendant merely expresses dissatisfaction with his attorney.

*Sexton v. State*, 775 So. 2d 923, 931 (Fla. 2000). The Supreme Court of Nebraska has stated:

> Mere distrust of, or dissatisfaction with, appointed counsel is not enough to secure the appointment of substitute counsel. At the hearing on Wabashaw's second motion, he stated that trial counsel had not given him materials to prepare "live questions" for the witnesses. For this reason—and other similar dissatisfactions with trial counsel's conduct—Wabashaw sought to have the court discharge counsel and appoint substitute counsel. Wabashaw did not have the right to choose counsel, and his dissatisfaction with trial counsel was insufficient to secure substitute counsel. Because Wabashaw's asserted grounds for discharging counsel and appointing new counsel were insufficient, there was no reason for the court to conduct an evidentiary hearing.

*State v. Wabashaw*, 274 Neb. 394, 403, 740 N.W.2d 583, 593 (2007). The Connecticut Supreme Court has stated:

> The defendant contends that even if the trial court was not required to appoint new counsel, it was at the very least required to inquire into the defendant's request. We are

> unpersuaded. "Where a defendant voices a 'seemingly substantial complaint about counsel,' the court should inquire into the reasons for dissatisfaction." *McKee v. Harris*, [649 F.2d 927], 933 [(2d Cir. 1981)], quoting *United States v. Calabro*, 467 F.2d 973, 986 (2d Cir. 1972), cert. denied, 410 U.S. 926, 93 S. Ct. 1358, 35 L. Ed. 2d 587, reh. denied, 411 U.S. 941, 93 S. Ct. 1891, 36 L. Ed. 2d 404 (1973).

*State v. Gonzalez*, 205 Conn. 673, 685, 535 A.2d 345, 352 (1987). The Texas Court of Criminal Appeals has stated:

> [A]ppellant maintains that the failure of the court to hold a hearing on his motion to dismiss counsel denied his procedural and substantive due process rights. We disagree. We have found no case law mandating the trial court to sua sponte hold a hearing on this matter.

*Malcom v. State*, 628 S.W.2d 790, 792 (Tex. Crim. App. 1982). *See United States v. Smith*, 282 F.3d 758, 764 (9th Cir. 2002) ("[T]he failure to conduct a hearing [on the motion to substitute counsel] is not itself an abuse of discretion."); *United States v. Calabro*, 467 F.2d 973, 986 (2d Cir. 1972) ("If a court refuses to inquire into a seemingly substantial complaint about counsel when he has no reason to suspect the bona fides of the defendant, or if on discovering justifiable dissatisfaction a court refuses to replace the attorney, the defendant may then properly claim denial of his Sixth Amendment right."). *See also* Carl T. Drechsler, Withdrawal, Discharge, or Substitution of Counsel in Criminal Case as Ground for Continuance, 73 A.L.R.3d 725 (1976).

Boyle's complaint was not that counsel was incompetent but that counsel had talked to several inmates about his case. Based on the record we cannot say that the circuit court erred in not holding a hearing on Boyle's second request to remove one of his attorneys. *See Sexton*, *supra*. Moreover, Boyle never expressed any dissatisfaction with his second attorney—Walt Buttram. Accordingly, we find no error in regard to this claim.

*Boyle*, 154 So. 3d at 190-92 (some citations omitted or edited).

Boyle contends that the state courts' decision is unreasonable, relying upon decisions that instruct courts to initiate an inquiry when a defendant requests substitution of counsel. *See Thomas v. Wainwright*, 767 F.2d 738, 741 (11th Cir. 1985) ("[w]here the accused voices objections to appointed counsel, the trial court should inquire into the reasons for the dissatisfaction"); *Cuyler v. Sullivan*, 446 U.S. at 347 (when trial court "knows or reasonably should know that a particular conflict exists," court must initiate an inquiry); *Holloway v. Arkansas*, 435 U.S. 475, 487 (1978); *Martel v. Clair*, 565 U.S. 648, 664 (2012) ("As all Circuits agree, courts cannot properly resolve substitution motions without probing why a defendant wants a new lawyer."). These cases do not mandate that a hearing must be conducted in every circumstance. Indeed, *Sullivan* and *Holloway*, *supra*, concerned multiple representation, an issue not present here. In *Thomas*, the Eleventh Circuit noted that "the inquiry need only be as comprehensive as the circumstances permit." 767 F.2d at 741. In *Martel*, the Supreme Court held that a court did not abuse its discretion in denying a defendant/petitioner's second request for substitution of counsel, when the court had learned that the parties had worked through their dispute after the defendant filed his first letter complaining about counsel. 565 U.S. at 664-66.

Of course, an indigent criminal defendant has an absolute right to be represented by counsel, but he does not have a right to have a particular lawyer represent him. *See Morris v. Slappy*, 461 U.S. 1 (1983). Here, although Boyle requested that Stewart be replaced on two separate occasions, on the third occasion he explained that he was making such a request because Stewart had spoken to two other inmates about him, saying nothing about alleged incompetence. Subsequently, Boyle wrote again to the trial judge about Stewart but expressed no dissatisfaction about his performance. Additionally, Boyle never expressed dissatisfaction with his other counsel, Buttram. Under these facts, the Court cannot conclude that it was an unreasonable application of federal law for the state courts to have concluded that the trial court was not required to conduct further inquiry.

The state courts' determination was neither contrary to nor an unreasonable application of clearly established federal law, nor an unreasonable determination of the facts, and Boyle is due no relief.

### M.   Boyle's claim that the trial court violated his Fifth, Sixth, Eighth, and Fourteenth Amendment rights by giving an improper instruction on reasonable doubt

Boyle contends that the trial court gave an incorrect instruction on reasonable doubt, thereby lowering the State's burden of proof in violation of *Cage v. Louisiana*, 498 U.S. 39 (1990), which disapproved of describing reasonable doubt as requiring

an "actual substantial doubt," "such doubt as would give rise to a grave uncertainty," and doubt amounting to "a moral certainty" because these terms as "commonly understood, suggest a higher degree of doubt than is required for acquittal under the reasonable doubt standard." *Id.* at 41.

Boyle exhausted this claim on direct appeal. Vol. 21, Tab #R-43, at 124–26; Vol. 24, Tab #R-48, at 112–14. The ACCA found no plain error:

> Boyle argues that the circuit court's jury instructions on reasonable doubt violated the United States Supreme Court's decision in *Cage v. Louisiana*, 498 U.S. 39, 111 S. Ct. 328, 112 L.Ed.2d 339 (1990), because, he argues, the charge allowed the jury to convict him on a lesser degree of proof than is required by law.

> The circuit court gave the following charge on reasonable doubt:

>> The term "reasonable doubt" means a doubt which has some good reason for it, arising out of the evidence or lack of evidence in the case. Such a doubt as you are able to find in the evidence a reason for. It means an actual and substantial doubt, growing out of the unsatisfactory nature of the evidence. It does not mean a doubt which arises from some mere whim or from any groundless surmise or guess.

>> . . .

>> So, ladies and gentlemen, by reasonable doubt is not meant absolute certainty. There is no such thing as absolute certainty in human affairs. . . .

>> Ladies and gentlemen of the jury, the Court charges you the burden of proof is upon the State and it is the duty of the State to show beyond a reasonable doubt to the exclusion of every other reasonable hypothesis and

circumstance to show the defendant is guilty. And unless the State has done that in this case, it is your duty to render a verdict of not guilty.

(R.2203-04.) After the circuit court completed its jury instructions, Boyle stated that he had no objection. Accordingly, we review this claim for plain error. *See* Rule 45A, Ala. R. App. P.

In *Cage v. Louisiana*, the United States Supreme Court held that use of the terms "grave uncertainty, actual substantial doubt, and moral certainty" when defining reasonable doubt allowed a juror to find guilt "based on a degree of proof below that required by the Due Process Clause." 498 U.S. at 41. "[I]t was not the use of any one of these terms, but rather the combination of all three, that rendered the charge unconstitutional in *Cage.*" *Haney v. State*, 603 So. 2d 368, 411 (Ala. Crim. App. 1991). In discussing the evolution of the law subsequent *Cage*, the Alabama Supreme Court has stated:

In *Estelle v. McGuire*, 502 U.S. 62, 72 and n.4 (1991), the United States Supreme Court made clear that the proper inquiry was whether there is a reasonable likelihood that the jury did apply the instruction in an unconstitutional manner, not whether it could have applied it in an unconstitutional manner. In *Victor* [*v. Nebraska*, 511 U.S. 1 (1994)], the United States Supreme Court emphasized that "[t]he constitutional question . . . is whether there is a reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet the *Winship* standard." 511 U.S. at 6. In discussing one of the jury instructions challenged in *Victor*, the United States Supreme Court recognized that it had stated that "[p]roof to a 'moral certainty' is an equivalent phrase with 'beyond a reasonable doubt.'" *Fidelity Mut. Life Ass'n v. Mettler*, 185 U.S. 308, 317 (1902) (approving reasonable doubt instruction cast in terms of moral certainty). 511 U.S. at 12. The United States Supreme Court acknowledged that historically the phrase "moral certainty" in a jury instruction meant "the highest degree

153

of certitude based on [the] evidence" but that the term may have lost its historical meaning over time. 511 U.S. at 11. The United States Supreme Court, however, concluded that when an instruction equated moral certainty with proof beyond a reasonable doubt the instruction satisfied the requirements of the Due Process Clause and was constitutionally sufficient. The United States Supreme Court emphasized that, although it did not condone the use of the phrase "moral certainty," if the jury was instructed that its decision was to be based on the evidence in the case, then the jury understood that moral certainty was associated with the evidence of the case and no constitutional error occurred. Additionally, the United States Supreme Court addressed the use of the phrase "substantial doubt" and emphasized that when that phrase was used in context to convey the existence rather than the magnitude of doubt there was no likelihood that jury applied the charge unconstitutionally.

*Ex parte Brown*, 74 So. 3d 1039, 1052–53 (Ala. 2011). "Use of some but not all of the terminology found offensive in *Cage* does not automatically constitute reversible error." *Dobyne v. State*, 672 So. 2d 1319, 1343 (Ala. Crim. App. 1994).

The circuit court's instruction on reasonable doubt did not combine the three phrases the United States Supreme Court found offensive in *Cage v. Louisiana* and could not reasonably be interpreted to lessen the State's burden of proof. Accordingly, we find no plain error in regard to this claim.

*Boyle*, 154 So. 3d at 217-18 (some citations omitted or edited).

Boyle contends that the state courts' decision is contrary to *Cage* because the trial court's instruction defined reasonable doubt as "an actual and substantial doubt," in contravention of that decision. 498 U.S. at 41. The ACCA reviewed this

issue and found no error because the trial court had not *also* defined reasonable doubt as doubt amounting to a "moral certainty," in its instructions on reasonable doubt. *Boyle*, 154 So. 3d at 217-18. The ACCA stated that under Alabama law, a violation of *Cage* required the trial court to have used all three prohibited terms—"grave uncertainty, actual substantial doubt, and moral certainty"—in its instruction on reasonable doubt. Using fewer than all three terms to define reasonable doubt did not constitute error: "The circuit court's instruction on reasonable doubt did not combine the three phrases the United States Supreme Court found offensive in *Cage v. Louisiana* and could not reasonably be interpreted to lessen the State's burden of proof." *Id.*

Boyle argues that the ACCA was wrong in requiring all three terms in a reasonable doubt instruction to find a *Cage* violation. However, he does not come forth with any clearly established federal law saying so. He relies upon *Felker v. Turpin*, 83 F.3d 1303 (11th Cir. 1996), in support, but in that case, the trial court also used only one of the three phrases—"moral certainty"—and the Eleventh Circuit ultimately held that any potential constitutional harm caused by references to that phrase were "eradicated by the language in the rest of the charge, which grounded the definition of reasonable doubt in the evidence." *Id.* at 1309. *See also Victor v. Nebraska*, 511 U.S. 1, 21-22 (1994) (the trial court's reference in the charge to "an

abiding conviction . . . of the guilt of the accused" did "much to alleviate any concerns that the phrase moral certainty might be misunderstood in the abstract"). The same can be said here.

The state courts' determination was neither contrary to nor an unreasonable application of clearly established federal law, nor an unreasonable determination of the facts, and Boyle is due no relief.

### N. Boyle's claim that the State violated his rights under the Eighth and Fourteenth Amendments by improperly vouching for the appropriateness of its decision to seek the death penalty

Boyle contends that the State violated his constitutional rights by vouching for the appropriateness of its decision to seek the death penalty in his case. Some of the comments that Boyle takes issue with are as follows. In closing argument in the penalty phase of Boyle's trial, the prosecutor told the jury, "Capital murder cases are tough. I don't know if I have the words to express how much. Folks seated at this table know and appreciate what y'all are going through. But let me just tell you: It's tough for us, too." Vol. 17, Tab #R-32, at TR. at 2631. He continued: "And to say that I and Marcus and Carol have not struggled with this would be a lie. And I try hard not to lie. Real hard." *Id.* at TR. 2635. Boyle contends that the implication of these statements is that because the decision to seek the death penalty is so "tough" for the prosecutors, they are asking for it only after extended deliberations

leading them to conclude that this is the exceptional case for which death is particularly appropriate. The prosecutor further stated that this decision "needs to be hard and it needs to be well thought out and it needs to be reasoned and it needs to be the right thing to do." *Id.* at TR. 2636. After asking "what right do I have to get up and ask for y'all to impose the death penalty on this young man sitting over here," he said to the jury, "the State has all these stops and procedures and things to make sure we get it right, …. Each and every one of us; me, Marcus, Carol, folks in our office … would think hard and long before you would take another human life." *Id.* at TR. 2636-37.

This Court addressed Boyle's claim that his defense counsel was ineffective in failing to make this argument in section IV. B. 2., *supra.*

Boyle exhausted this claim on direct appeal. Vol. 21, Tab #R-43, at 78–80; Vol. 24, Tab #R-48, at 65–68. The ACCA found no plain error, explaining as follows:

> Boyle next argues that the prosecutor's argument in the penalty phase was erroneous because, he says, it implied that the State had made a judgment that death was the appropriate punishment in this case.
>
> The prosecutor made the following comments in closing at the penalty phase:
>
> > Every one—every time the State or an individual is going to make a decision as to whether or not someone—another human being should lose their life, it needs to be hard and it needs to be well thought out and it needs to be reasoned

and it needs to be the right thing to do. That's the bottom line. The right thing to do.

And I'm sitting here thinking, or have been over the last week or so, especially since y'all's first verdict, what right do I have to get up and ask for y'all to impose the death penalty on this young man sitting over here?

Because it—you know, not only the State has all these stops and procedures and things to make sure we get it right, but we, individually—and this is what occurred to me: Each and every one of us; me, Marcus, Carol, folks in our office—and I now y'all; every good, decent, thinking human being with a conscience on the face of this earth would think hard and long before you would take another human life. There's nothing good about it. Nothing. Got to.

(R.2636-37.)

Boyle did not object to the above argument; therefore, we review this claim for plain error. *See* Rule 45A, Ala. R. App. P. "While this failure to object does not preclude review in a capital case, it does weigh against any claim of prejudice." *Ex parte Kennedy*, 472 So. 2d 1106, 1111 (Ala. 1985).

In a similar case, the prosecutor argued to the jury that the death penalty is not applied in every case, that each case was evaluated on its merits, and that the State had examined the egregiousness of the murders and the defendant's backgrounds before deciding to seek the death penalty. In finding no error, the Florida Supreme Court stated:

The focus of the prosecutor's remarks was on the responsibility of the jury to weigh the relevant factors, and the prosecutor did not invoke a direct, unambiguous appeal for the jurors to give weight to the fact that the State had decided to seek the death penalty. In the portion of the comments for which the objection was overruled, the

prosecutor's statement that "[t]he death penalty is not applied to every murder case" is reasonably understood as a reference to the legal framework governing imposition of the death penalty, rather than to the State's determination whether to seek the death penalty. We thus conclude that the trial court did not abuse its discretion in overruling the objection to that portion of the argument.

*Braddy v. State*, 111 So. 3d 810, 848 (Fla. 2012). *See also State v. Black*, 50 S.W.3d 778, 792 (Mo. 2001) (prosecutor's argument that "'I realize the magnitude of the decision that you have to make, because I had to make it first,'" did not amount to plain error requiring reversal).

In *Vanpelt v. State*, 74 So. 3d 32 (Ala. Crim. App. 2009), we considered an argument the prosecutor made in the penalty phase of a capital-murder trial that his office did not lightly seek the death penalty. In finding no error, this Court stated:

> [T]he prosecutor's comment that his office does not seek a death sentence lightly was not an improper request for the jury to ignore its penalty-phase duty. Instead, this comment merely reminded the jury of the gravity of its penalty-phase decision by informing the jury that in making its penalty phase decision it has an awesome responsibility—one that the State does not lightly ask a jury to shoulder. Cf. *Fox v. Ward*, 200 F.3d 1286, 1300 (10th Cir. 2000) (holding that a "prosecutor'[s] [comment to] the jury that he did not undertake the decision to seek the death penalty lightly, and pointed to the different elements that went into making his decision[, was] a permissible line of commentary").

74 So. 3d at 92.

Moreover, to constitute reversible error a prosecutor's comment must have "so infected the trial with unfairness as to make the resulting [verdict] a denial of due process." *Darden v. Wainwright*, 477 U.S. 168,

181 (1986). That standard was not satisfied in this case. For the foregoing reasons, we find no plain error in the prosecutor's argument.

*Boyle*, 154 So. 3d at 231-32 (some citations omitted or edited).

Boyle contends that the state courts' decision is contrary to clearly established Supreme Court precedent, namely *Berger v. United States*, 295 U.S. at 88, and *United States v. Young*, 470 U.S. at 18-19, and he also relies upon the Eleventh Circuit cases of *Brooks v. Kemp*, 762 F.2d at 1410, and *Tucker v. Kemp*, 762 F.2d at 1501. This Court distinguished *Brooks* and *Tucker* from Boyle's case in section IV. B. 2, *supra*, as part of its discussion as to why Boyle's counsel was not ineffective for failing to raise the argument that the State was improperly vouching for the death penalty. The same analysis applies here. Additionally, neither *Berger* nor *Young* addressed prosecutorial vouching for the death penalty, but instead addressed other types of improper statements made by prosecutors. Boyle has not demonstrated that it was unreasonable for the state courts to have reached the conclusion that the prosecutor's comments did not so infect the trial with unfairness to result in a denial of due process.

**O.    Boyle's claim that the trial court violated his rights under the Eighth and Fourteenth Amendments by requiring that the mitigation outweigh the aggravation to justify a sentence of life without parole rather than death**

Boyle alleges that the trial court, in sentencing him to death, incorrectly found that the mitigating circumstances would have to outweigh the aggravating circumstances to justify a sentence of life without parole. He finds fault with a statement in the trial court's sentencing order, which says in part, "The Court further finds that the statutory and nonstatutory mitigating circumstances presented in this cause are insufficient to outweigh the aggravating circumstances in this case." Vol. 1, Tab #R-2, at C. 168. According to Boyle, this statement meant that the trial court applied a presumption that once an aggravating circumstance had been shown, the death penalty should be imposed unless the mitigating circumstances outweigh the aggravating circumstances. Boyle points out that such a presumption is contrary to Alabama law, which provides that the death penalty may be imposed only where the aggravating circumstances outweigh the mitigating circumstances. *See Ex parte Bryant*, 951 So. 2d 724, 728 (Ala. 2002); Ala. Code §§ 13A-5-46 to 47. Under Alabama law, if the mitigating circumstances are equal to the aggravating circumstances, then the sentence must be life in prison without parole. *Ex parte Bryant*, 951 So. 2d at 728; *Ex parte Melson*, 775 So. 2d 904, 907 (Ala. 2000). Boyle asserts that this incorrect standard shifted the burden to Boyle to prove that his mitigation evidence outweighed the single aggravating factor relied on by the court,

that his offense "was especially heinous, atrocious or cruel compared to other capital offenses."

Boyle exhausted this claim on direct appeal. Vol. 21, Tab #R-43, at 96–98; Vol. 24, Tab #R-48, at 81–83. The ACCA deemed the error harmless, explaining as follows:

> Boyle next argues that a defect in the circuit court's sentencing order shows that the court required that the mitigating circumstances outweigh the aggravating circumstances. Specifically, the circuit court's order states, in part: "The Court further finds that the statutory and nonstatutory mitigating circumstances presented in this cause are insufficient to outweigh the aggravating circumstances in this case." (C.R.168.)

> In addressing an identical statement in a circuit court's sentencing order, the Alabama Supreme Court, finding the error harmless, stated:

>> The trial judge sentenced the defendant to death upon a finding "that the mitigating circumstances heretofore enumerated are insufficient to outweigh the aggravating circumstance." [*Melson v. State*,] 775 So. 2d [857,] 901 [(Ala. 2000)]. To support the imposition of the death penalty, the law requires that the aggravating circumstance or circumstances outweigh the mitigating circumstance or circumstances. *See* § 13A–5–47(d) and (e), Ala. Code 1975; *Ex parte Jones*, 456 So. 2d 380, 382 (Ala. 1984).

>> On this point, the Court of Criminal Appeals cited *Weaver v. State*, 678 So. 2d 260 (Ala. Crim. App. 1995), rev'd on other grounds, 678 So. 2d 284 (Ala. 1996), and other cases for the proposition that this defect was a "technical" defect or error, and correctly concluded that

the error was harmless in this particular case, but the error should not be minimized as a mere technicality. A trial court is to impose a sentence of death only after finding that the aggravating circumstance or circumstances outweigh the mitigating circumstance or circumstances. But we conclude in this case, as did the Court of Criminal Appeals, that the "error in the trial court's sentencing order was error without injury." *See* 775 So. 2d at 902. Certainly, the better practice would be to strictly follow the mandates of the statute when imposing death sentences.

*Ex parte Melson*, 775 So. 2d 904, 907 (Ala. 2000). *See also Reynolds v. State*, 114 So. 3d 61 (Ala. Crim. App. 2010).

Here, the court instructed the jury, several times, that before the jury could vote for the death penalty the aggravating circumstance must outweigh the mitigating circumstances and that the weighing process was not a numerical tallying. It is clear that the circuit court was aware of the appropriate legal standard to apply when determining Boyle's sentence. For these reasons, we find that the error in the sentencing order was error without injury.

*Boyle*, 154 So. 3d at 244-45 (some citations omitted or edited).

Boyle has not shown that the state courts' decision was unreasonable in relation to federal law. Boyle states that in order to impose the death penalty, the Supreme Court has required courts to make an individualized determination with regard to the particular defendant with due consideration to all non-statutory mitigating circumstances, citing *Eddings v. Oklahoma*, 455 U.S. 104, 105, 112-16 (1982), and *Lockett v. Ohio*, 438 U.S. at 604-05. He also quotes the Supreme Court's statement that "the penalty of death may not be imposed under sentencing

procedures that create a substantial risk that the punishment will be inflicted in an arbitrary and capricious manner," quoting *Godfrey v. Georgia*, 446 U.S. 420, 427 (1980), and citing *Furman v. Georgia*, 408 U.S. 238, 256 (1972). Yet, Boyle does not demonstrate how the state courts' ruling in this case is contrary to these established rules. To the contrary, the ACCA reasonably described the lone statement in the trial court's sentencing order as a "defect" and discounted it as harmless because it was abundantly clear that the trial court not only knew the correct standard but also instructed the jury repeatedly on the correct standard. The state courts' determination was neither contrary to nor an unreasonable application of clearly established federal law, nor an unreasonable determination of the facts, and Boyle is due no relief.

### P.    Boyle's claim that the "heinous, atrocious, or cruel" aggravating circumstance is unconstitutionally vague as applied in this case

Here, Boyle contends that the "heinous, atrocious, or cruel" aggravating circumstance was applied unconstitutionally in his case.

Boyle exhausted this claim on direct appeal. Vol. 21, Tab #R-43, at 104–09; Vol. 24, Tab #R-48, at 90–95. The ACCA rejected the claim, explaining as follows:

> Boyle next argues that the aggravating circumstance that the murder was especially heinous, atrocious, or cruel when compared to other capital offenses, § 13A–5–49(8), Ala. Code 1975, was erroneously applied in this case. . . .

Boyle asserts that there was not sufficient evidence to apply this aggravating circumstance. Specifically, he argues that there was not sufficient evidence to satisfy the requirements for this aggravating circumstance set out in *Norris v. State*, 793 So. 2d 847 (Ala. Crim. App. 1999).

In regard to this aggravating circumstance, the circuit court stated:

> The jury voted unanimously (12–0) that the State had proven beyond a reasonable doubt that the capital offense was especially heinous, atrocious or cruel compared to other capital offenses, in accordance with § 13A-5-49(8), Code of Alabama (1975). This Court has carefully reviewed all of the relevant evidence submitted for consideration in the sentencing phase of the trial, and has similarly concluded that the evidence supports the jury's determination beyond a reasonable doubt that the capital offense in the case at bar was in fact especially heinous, atrocious or cruel compared to other capital offenses and so finds. Specifically, the testimony in the case proved that the 2 year old victim in the case was terrified of [Boyle] during the weeks leading up to her brutal murder at the hands of [Boyle], and that testimony to this effect is corroborated by the videotape of the child's birthday party which occurred two days before she suffered the fatal injury. The evidence supports the conclusion that [Boyle] physically abused the victim for at least a week prior to the fatal injury, and that the abuse included holding a lit cigarette to various parts of the child's body and burning her. The physical abuse included forcefully striking the child's head against a car door on at least one occasion, forcefully striking her head against the bathtub on at least one occasion, and striking her head with his open hand on more than one occasion. It is very clear that the pattern of physical abuse caused the victim to suffer great and intense physical pain, as attested by forensic pathologist Dr. James Lauridson, but also caused this child to suffer

psychological anguish and torture. It is apparent from the evidence that she lived in fear of [Boyle], powerless to stop his assaults and unable to remove herself from his presence. [Boyle's] actions in the brutal murder of this helpless child clearly fit within the parameters of the aggravating circumstance found by the jury to exist in this case.

(C.R.166-67.)

This Court has stated the following concerning the application of this aggravating circumstance:

The especially heinous, atrocious, or cruel aggravating circumstance "appl[ies] to only those conscienceless or pitiless homicides which are unnecessarily torturous to the victim." *Ex parte Kyzer*, 399 So. 2d 330, 334 (Ala. 1981), citing *State v. Dixon*, 283 So. 2d 1 (Fla. 1973).

There are three factors generally recognized as indicating that a capital offense is especially heinous, atrocious, or cruel: (1) the infliction on the victim of physical violence beyond that necessary or sufficient to cause death; (2) appreciable suffering by the victim after the assault that ultimately resulted in death; and (3) the infliction of psychological torture on the victim.

[*Saunders v. State*, 10 So. 3d 53, 108 (Ala. Crim. App. 2007).]

*Stanley v. State*, 143 So. 3d 230, 312 (Ala. Crim. App. 2011).

"Alabama appellate courts have repeatedly held that severe beatings that result in death are beyond the violence necessary to inflict death; therefore, that manner of homicide is especially heinous, or cruel as compared to other capital murders." *McGowan v. State*, 990 So. 2d

931, 1004 (Ala. Crim. App. 2003). *See also Blackmon v. State*, 7 So. 3d 397, 421 (Ala. Crim. App. 2005).

Other states have also held that beatings that result in death are especially heinous murders.

Courts frequently have concluded that aggravating circumstances similar to Connecticut's cruel, heinous and depraved factor were sufficiently proven in cases in which a victim was killed by beating or bludgeoning, even when the attack is not especially prolonged and the victim's loss of consciousness and death occur rather quickly. *See, e.g., State v. Colon*, *supra*, 272 Conn. [106,] at 337–38, 864 A.2d 666 [ (2004) ] (defendant repeatedly slammed two year old victim's head into shower wall); *see also United States v. Agofsky*, 458 F.3d 369, 374–75 (5th Cir. 2006) (defendant stomped fellow inmate's head and neck into concrete floor approximately eleven times), cert. denied, 549 U.S. 1182, 127 S. Ct. 1149, 166 L.Ed.2d 998 (2007); *United States v. Battle*, 264 F. Supp. 2d 1088, 1199–1200 (N.D. Ga. 2003) (defendant struck victim in head three times with hammer); *McGowan v. State*, 990 So. 2d 931 (Ala. Crim. App. 2005) (defendant bludgeoned elderly couple with hammer), cert. denied, 555 U.S. 861, 129 S. Ct. 136, 172 L.Ed.2d 104 (2008); *State v. Kiles*, 222 Ariz. 25, 30, 39, 213 P.3d 174 (2009) (defendant beat female victim with tire jack), cert. denied, 560 U.S. 907, 130 S. Ct. 3274, 176 L.Ed.2d 1188 (2010); *Roberts v. State*, 510 So. 2d 885, 894 (Fla. 1987) (defendant killed victim by numerous blows to back of head with baseball bat), cert. denied, 485 U.S. 943, 108 S. Ct. 1123, 99 L.Ed.2d 284 (1988); *Atkins v. State*, 497 So. 2d 1200, 1202 (Fla. 1986) (defendant beat six year old child in head and neck with steel rod); *Salvatore v. State*, 366 So. 2d 745, 747 (Fla. 1978) (defendant bludgeoned victim in head and face with pipe), cert. denied, 444 U.S. 885, 100 S. Ct. 177, 62 L.Ed.2d 115 (1979); *State v. Brooks*, 960 S.W.2d 479, 486, 496 (Mo. 1997) (defendant beat child victim in head with bed slat), cert. denied, 524 U.S.

957, 118 S. Ct. 2379, 141 L.Ed.2d 746 (1998); *State v. Barden*, 356 N.C. 316, 371–72, 572 S.E.2d 108 (2002) (defendant beat victim in head fourteen times with small sledgehammer and other weapon), cert. denied, 538 U.S. 1040, 123 S. Ct. 2087, 155 L.Ed.2d 1074 (2003); , 947 P.2d 1074, 1085 (Okla. Crim. App. 1997) (defendant punched and kicked female victim in face and slammed her head into wall). In such cases, given the extremely violent and brutal nature of the defendant's chosen method of killing, relatively brief periods of intense physical and psychological suffering generally are sufficient to establish the gratuitous cruelty contemplated by the statutory aggravator.

*State v. Rizzo*, 303 Conn. 71, 153–54, 31 A.3d 1094, 1146 (2011).

Dr. Lauridson testified that Savannah had injuries around the entire circumference of her head. The injuries, he said, could not have occurred from a single blow but must have occurred from repeated blows. The new blows to her head, Dr. Lauridson said, would have caused her great pain. Dr. Lauridson said that the cigarette burn was not consistent with an accidental burn but was consistent with the cigarette having been held on the child's body for a period. We agree with the circuit court that the murder was especially heinous, atrocious, or cruel as compared to other capital murders.

*Boyle*, 154 So. 3d at 242–44 (some citations omitted or edited).

Boyle contends that the state courts' decision is unreasonable. He begins with

the Supreme Court's statement that "an ordinary person could honestly believe that

every unjustified, intentional taking of human life is 'especially heinous.'" *Maynard*

*v. Cartwright*, 486 U.S. 356, 364 (1988). He thus emphasizes that, for this aggravating

circumstance to support a death sentence, there must be a "principled way to

distinguish this case, in which the death penalty was imposed, from the many cases in which it was not." *Id.* Boyle contends that his actions did not fall into any of the three categories that Alabama law has recognized to determine whether a capital offense is especially heinous, atrocious, or cruel compared to other capital offenses. His argument is belied by the record.

The first factor is "the infliction on the victim of physical violence beyond that necessary or sufficient to cause death." *Norris v. State*, 793 So. 2d 847, 854 (Ala. Crim. App. 1999). Boyle questions whether open handed slaps, which Dr. Lauridson opined led to Savannahs' death, are sufficient to cause death. However, there was also evidence that Boyle repeatedly thrust Savannah against blunt objects. The second factor is "whether a victim experienced appreciable suffering after a swift assault that ultimately resulted in death." *Id.* at 859. Boyle questions whether Savannah was conscious and aware for an appreciable length of time after being assaulted. Yet the evidence shows that he physically assaulted her repeatedly in the weeks leading up to her death. The third factor is the infliction of psychological torture. *Id.* This factor requires evidence that the "victim[] w[as] in intense fear and w[as] aware of, but helpless to prevent, impending death." *Id.* at 860. Boyle asserts that this factor cannot apply in this case because there was no evidence that a two-year-old is capable of understanding or being aware of impending death. Yet a video

of Savannah's birthday party several days prior to her death showcased her fear of Boyle.

In sum, the trial court found that Boyle's murder of Savannah White was especially heinous, atrocious and cruel. The ACCA reviewed the facts of this case and compared the case with other similar cases. As the ACCA noted, the death penalty for this type of murder is consistent with cases of murder which could be described as especially heinous, atrocious and cruel. The Court finds that the ACCA carefully considered Boyle's case to determine if the trial court properly sentenced him and if the death penalty in this case was consistent with penalties in other cases. While the Court need go no further, the Court has also reviewed the record in this case. The murder in this case is not one in which the victim was unaware or in which the murder was non-violent. There was evidence that Boyle repeatedly physically tortured a helpless child victim in the weeks leading up to her death and that the victim lived in fear of Boyle. Therefore, the evidence supports the existence of the "especially heinous, atrocious and cruel" aggravating factor in this case. Thus, this factor is not unconstitutional as applied to the facts in this case. *See Profitt v. Wainwright*, 685 F.2d 1227, 1263–65 (11th Cir. 1982), cert. denied, 464 U.S. 1002 (1983). Thus, the Court will deny habeas relief on Boyle's claim.

**Q.    Boyle's claim that the trial court erroneously instructed the jury that it could find Savannah's murder to be especially heinous, atrocious, or cruel because of psychological torture**

Boyle argues that the trial court gave an improper instruction regarding torture that allowed the jury to find Savannah's murder particularly heinous, atrocious, or cruel.[4]

Boyle exhausted this claim on direct appeal. Vol. 21, Tab #R-43, at 99–101; Vol. 24, Tab #R-48, at 84–88. The ACCA examined the issue in detail and found any error harmless:

> First, Boyle argues that the circuit court's instructions on the aggravating circumstance that the murder was especially heinous, atrocious, or cruel were erroneous. Specifically, he argues that the circuit court failed to instruct the jury that psychological torture had to be present for an appreciable period in order for the aggravating circumstance to apply.
>
> The record reflects that at the charge conference the State requested an instruction on the length of time necessary to prove this aggravating circumstance. Boyle objected. The circuit court gave the following instruction on this aggravating circumstance:
>
> > For a capital offense to be especially heinous or atrocious, any brutality that is involved in it must exceed that which is normally present in any capital offense.
> >
> > For a capital offense to be especially cruel, it must be a pitiless crime that is unnecessarily torturous to the victim, either physically or psychologically.

---

[4]    Although he raised this claim in his petition, Boyle's reply brief omits a discussion of this claim. The omission might be inadvertent. In any event, the Court will discuss the claim.

All capital offenses are heinous, atrocious and cruel to some extent. What is intended to be covered by this aggravating circumstance is only those cases in which the degree of heinousness, atrociousness or cruelty exceeds that which will always exist when a capital offense is committed.

There are three factors generally recognized as indicating the capital offense is especially heinous, atrocious or cruel. One, the infliction on the victim of violence beyond that necessarily or sufficient to cause death.

Two, appreciable suffering by the victim after the assault that resulted in the death.

And three, infliction of psychological torture of the victim.

Psychological torture can be inflicted when the victim is in intense fear and is aware of, but helpless to prevent, impending death. Such torture must have been present for an appreciable lapse of time sufficient to cause prolonged or appreciable suffering to be considered as an aggravating circumstance.

. . . .

Evidence as to the fear experienced by the victim before death is a significant factor in determining the existence of an aggravating circumstance that the murder was especially heinous, atrocious or cruel. This circumstance may be found, even though the victim lost consciousness or died with wounds inflicted within a few seconds or minutes or otherwise without a time lapse deemed significant.

(R.2680-82.) Boyle did not object to the above instruction at the conclusion of the circuit court's oral charges to the jury. Thus, we review this claim for plain error. *See* Rule 45A, Ala. R. App. P.

The Pattern Jury Instructions for Use in Capital Cases, as amended by the Alabama Supreme Court in November 2007, do not contain the detailed instructions on the aggravating circumstance the circuit court gave in this case. The pattern jury instructions recommend the following instruction:

> The capital offense was especially heinous, atrocious, or cruel compared to other capital offenses;

> The term "heinous" means extremely wicked or shockingly evil. The term "atrocious" means outrageously wicked or violent. The term "cruel" means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering of others.

> What is intended to be included in this aggravating circumstance is those cases where the actual commission of the capital offense is accompanied by such additional acts as to set the crime apart from the norm of capital offenses.

> For a capital offense to be especially heinous or atrocious, any brutality that is involved in it must exceed that which is normally present in any capital offense.

> For a capital offense to be especially cruel, it must be a pitiless crime that is unnecessarily torturous to the victim, either physically or psychologically.

> All capital offenses are heinous, atrocious, and cruel to some extent. What is intended to be covered by this aggravating circumstance is only those cases in which the degree of heinousness, atrociousness, or cruelty exceeds

that which will always exist when a capital offense is committed.

The instruction given in this case was a correct statement of Alabama law. In *Norris v. State*, 793 So. 2d 847 (Ala. Crim. App. 1999), this Court discussed the three factors necessary for a finding that a murder was especially heinous, atrocious, or cruel—(1) the infliction on the victim of violence beyond that necessarily or sufficient to cause death; (2) appreciable suffering by the victim after the assault that resulted in the death; and (3) the infliction of psychological torture. In examining the third factor, this Court in *Norris* stated:

> "[E]vidence as to the fear experienced by the victim before death is a significant factor in determining the existence of the aggravating circumstance that the murder was especially heinous, atrocious, or cruel." *Ex parte Rieber*, 663 So. 2d 999, 1003 (Ala.), cert. denied, 516 U.S. 995 (1995).

>> [G]enerally reasoning that the victims were already fearful for their lives when the fatal injuries were inflicted . . . , the courts in many cases have held the proof sufficient to establish as a statutory aggravating circumstance that the murder was especially heinous, cruel, depraved, or the like, even though the victim lost consciousness or died from gunshot . . . wounds instantly, within a few seconds or minutes, or otherwise without a time lapse deemed significant by the court, and without suffering other physical injury.

> [Thomas M.] Fleming, [*Sufficiency of Evidence, for Purposes of Death Penalty, to Establish Statutory Aggravating Circumstance that Murder was Heinous, Cruel, Depraved, or the Like—Post* Gregg *Cases*, 63 A.L.R. 4th 478 (1988)] at § 2[a], at 489–90.

174

793 So. 2d at 860. Immediately following the quote from the article cited in the quote above, the text of this article continues: "Similarly, although the victims lost consciousness or died almost immediately from blows to the head, the courts in several cases have held that the murders were especially heinous, cruel, depraved, or the like, due to the number and severity of the blows. . . ."

The Connecticut Supreme Court in *State v. Rizzo*, 303 Conn. 71, 31 A.3d 1094 (2011), stated, when considering a similar claim:

> The defendant argues . . . that the evidence did not establish the heinousness, cruelty and depravity of his acts in murdering the victim because the attack was unanticipated, the victim's death likely was swift and, accordingly, the victim simply did not suffer enough either physically or psychologically. We are not persuaded. Courts frequently have concluded that aggravating circumstances similar to Connecticut's cruel, heinous and depraved factor were sufficiently proven in cases in which a victim was killed by beating or bludgeoning, even when the attack is not especially prolonged and the victim's loss of consciousness and death occur rather quickly.

303 Conn. at 153–54, 31 A.3d at 1145–46.

Boyle failed to object to the circuit court's instructions on this aggravating circumstance. Thus,

> [i]n setting out the standard for plain error review of jury instructions, the court in *United States v. Chandler*, 996 F.2d 1073, 1085, 1097 (11th Cir. 1993), cited *Boyde v. California*, 494 U.S. 370, 380 (1990), for the proposition that "an error occurs only when there is a reasonable likelihood that the jury applied the instruction in an improper manner." . . .

*Pilley v. State*, 789 So. 2d 870, 882–83 (Ala. Crim. App. 1998). There is no "reasonable likelihood" that the jurors applied the instruction in an

improper manner. Accordingly, we find no plain error in regard to the court's instruction on the heinous, atrocious, or cruel aggravating circumstance.

Moreover, if any error did occur in regard to the jury instruction on the especially heinous, atrocious, or cruel aggravating circumstance, the error was harmless beyond a reasonable doubt. This Court in *Lawhorn v. State*, 581 So. 2d 1159 (Ala. Crim. App. 1990), stated the following when determining whether a jury instruction is harmless in the penalty phase of a capital-murder trial:

> To determine whether the trial court's failure to instruct properly was harmless error, the *Clemons* [*v. Mississippi*, 494 U.S. 738 (1990)] Court suggests one of two inquiries: (1) whether beyond reasonable doubt the sentence would have been the same had the "especially heinous" circumstance not been considered by the jury at all, or (2) whether beyond reasonable doubt the result would have been the same had the circumstance been properly defined in the jury instructions. *See also Henry v. Wainwright*, 721 F.2d 990, 995 (5th Cir. 1983), cert. denied, 466 U.S. 993 (1984) (wherein the court, in holding harmless the trial court's failure to instruct that aggravating circumstances must be found beyond a reasonable doubt, stated that "[f]or the failure to give the instruction to be harmless, the evidence must be so overwhelming that the omission beyond a reasonable doubt did not contribute to the verdict").

For purposes of our review of this case, we employ the second *Clemons* inquiry. There is no question, at all, that, had the jury been properly instructed, it would still have returned a recommendation of death because the facts presented to the jury established, beyond any doubt, that this crime was especially heinous, atrocious, or cruel when compared to other capital offenses. The evidence of this circumstance is overwhelming; the facts so conclusively establish it, that no rational jury, properly instructed,

could have found otherwise. The evidence is unconflicting that appellant directly participated in a conscienceless, pitiless, and torturous murder. Berry's last minutes were obviously filled with terror, fear, and knowledge that his death was imminent, and he experienced a high degree of prolonged pain before his death. All of this was accomplished by appellant with complete indifference— complete indifference to Berry's pain and terror and complete indifference to the value of human life, which he found to be worth $50. Clearly, this evidence sets this crime apart, for the degree of heinousness, atrociousness, and cruelty of this offense exceeds that which would be common to all capital offenses. By any standard acceptable to civilized society, this crime was outrageously wicked and shockingly evil. In fact, appellant admitted, during the sentencing phase, that as the victim lay entangled in the underbrush and unable to talk, but gurgling, he repeatedly shot the victim and, at the time, did not care whether the victim died or not.

We note that this situation does not involve the jury's consideration of misleading, inaccurate, or illegal information or evidence. Rather, it is a case where the aggravating circumstance, overwhelmingly supported by admissible evidence, was rendered invalid because it was unconstitutionally presented to the jury. We find that the jury's improper consideration of this aggravating circumstance and possibly improper consideration by the trial court did not render appellant's sentencing fundamentally unfair. It is unnecessary to vacate appellant's sentence because we are convinced beyond a reasonable doubt that, had the circumstances been properly narrowed, the jury would have recommended the same sentence and the trial court would have imposed the same sentence. We hold this, even in the face of our recognition of the utmost importance of insuring that a death sentence not be based on arbitrary and capricious action. While we, in theory, would be very hesitant to find

> harmless error in the submission to the jury of an
> unconstitutionally defined aggravating circumstance, we
> find that the facts of this case support such an application
> beyond a reasonable doubt.

581 So. 2d at 1176–77.

As the Florida Supreme Court stated in *Jennings v. State*, 782 So.
2d 853 (Fla. 2001):

> With respect to the HAC [heinous, atrocious, or cruel]
> instruction, this Court has found that a constitutionally
> vague HAC instruction may be found harmless where the
> facts of the murder support finding the aggravator beyond
> a reasonable doubt. *See Doyle v. Singletary*, 655 So. 2d 1120,
> 1121 (Fla. 1995) (explaining that error concerning
> constitutionally vague HAC instruction was subject to
> harmless error analysis under *State v. DiGuilio*, 491 So. 2d
> 1129 (Fla. 1986)); *Johnston v. Singletary*, 640 So. 2d 1102,
> 1104–05 (Fla. 1994) (explaining that the "jury would have
> found Johnston's brutal stabbing and strangulation of the
> eighty-four-year-old victim, who undoubtedly suffered
> great terror and pain before she died, heinous, atrocious,
> or cruel, even with the limiting instruction"); *but see
> Hitchcock v. State*, 614 So. 2d 483, 484 (Fla. 1993) (vacating
> sentence based on unconstitutional HAC instructional
> error without conducting a harmless error analysis, on
> facts similar to those in the instant case). Here, the
> constitutionally vague pre-*Espinosa v. Florida*, 505 U.S.
> 1079, 112 S. Ct. 2926, 120 L.Ed.2d 854 (1992), HAC
> instruction constitutes harmless error.

782 So. 2d at 862–63.

Dr. Lauridson testified concerning the numerous injuries that
had been inflicted on Savannah, injuries, he said, that spanned the
entire circumference of her head. He said that the injuries would have
caused her pain. H.D. testified that Savannah threw up, a symptom,

Dr. Lauridson said, that was consistent with head trauma. The murder was especially heinous, atrocious, or cruel when compared to other capital murders. Accordingly, if any error did occur in the jury instructions, the error was harmless beyond a reasonable doubt.

*Boyle*, 154 So. 3d at 233-37 (some quotation marks and citations omitted or edited).

Boyle's argument is that the trial court's instruction with regard to psychological torture of the victim was erroneous because the jury was instructed both that the torture "must have been present for an appreciable lapse of time sufficient to cause prolonged or appreciable suffering" and that the victim could have "lost consciousness or died with wounds inflicted within a few seconds or minutes or otherwise without a time lapse deemed significant." The ACCA rejected the argument, explaining that the two are not mutually exclusive. The victim could have experienced fear of death for a period of time and yet have been killed instantly by the murder weapon. In such circumstances the victim still suffered psychological torture sufficient for the heinous, atrocious, and cruel aggravating factor to apply. The ACCA reasonably found that the trial court's jury instruction on psychological torture contained no inherent conflict. As such, the Supreme Court cases that Boyle cites for the rule that a verdict cannot stand when a court gives conflicting jury instructions do not apply. *See, e.g., Francis v. Franklin*, 471 U.S. 307, 322 (1985). Boyle is due no relief on this claim.

**R.      Boyle's claim that the trial court erroneously refused to instruct the jury that Savannah's age was not an aggravating circumstance**

Boyle wanted the trial court to instruct the jury that the age of the victim could not be an aggravating circumstance. Boyle argues that the trial court's failure to do so violated his Eighth and Fourteenth Amendment rights.

Boyle exhausted this claim on direct appeal. Vol. 21, Tab #R-43, at 101–04; Vol. 24, Tab #R-48, at 88–90. The ACCA found no error, explaining:

> Boyle next argues that the circuit court erred in refusing to instruct the jury that the age of the victim was not an aggravating circumstance.

> At the charge conference, the State objected to Boyle's proposed instruction that the age of the victim was not an aggravating circumstance. It asserted that it was not an accurate statement of the law because the age of the victim could be considered when determining whether the murder was especially heinous, atrocious, or cruel. After a lengthy discussion, the circuit court denied Boyle's request to charge the jury on the victim's age. At the conclusion of the court's instructions, Boyle did not object to the court's failure to give this instruction.

> The court instructed the jury on the aggravating circumstance that it could consider. There is no requirement that the circuit court instruct the jury on all the evidence that is not aggravating. *See People v. Rogers*, 39 Cal. 4th 826, 897, 48 Cal. Rptr. 3d 1, 63, 141 P.3d 135, 187 (2006) ("The trial court also need not instruct that the absence of a mitigating factor is not aggravating."); *Edwards v. State*, 737 So. 2d 275 (Miss. 1999) (instruction that capital murder was not an aggravating circumstance was cumulative and repetitious because the court had instructed the jury what aggravating circumstances could be considered).

The circuit court committed no error in declining to instruct the jury that the age of the victim was not an aggravating circumstance.

*Boyle*, 154 So. 3d at 237–38 (record citations omitted).

Boyle contends that the state courts' decision is unreasonable. Boyle is correct that under Alabama law, the victim's age cannot be considered as an aggravating factor. *See Scott v. State*, 937 So. 2d 1065, 1087 (Ala. Crim. App. 2005). However, it can certainly be considered in determining whether an offense is especially heinous, atrocious, or cruel. Boyle acknowledges that there is no requirement that a trial court instruct the jury on all the evidence that is not aggravating, but he claims that under his circumstances, where the State's entire argument for death was based on the age of the victim, it was error not to give defense counsel's requested instruction that the jury could not consider Savannah's age as an aggravating circumstance. Boyle has not demonstrated that the state courts' decision was unreasonable or violated federal law. Although he cites Supreme Court cases discussing that the death penalty is only appropriate once statutory aggravating circumstances have been defined with sufficient specificity, *Godfrey*, 446 U.S. at 428, he simply has not shown that the state courts committed an error lacking in any justification.

The state courts' determination was neither contrary to nor an unreasonable application of clearly established federal law, nor an unreasonable determination of the facts, and Boyle is due no relief.

**S.    Boyle's claim that the trial court erroneously refused to instruct the jury on specific examples of non-statutory mitigating circumstances**

At trial, Boyle submitted a proposed jury instruction setting forth specific non-statutory mitigating factors the jury could consider, including, for example, "his lack of maturity for his age with regard to his intelligence level, his mother's mental illness and drug addiction that led to he [sic] and his sister being placed in a series of foster homes at a terribly young age, some of which were physically and sexually abusive." Vol. 1 at C. 140. Boyle faults the trial court for failing to give the defense's requested instruction providing specific examples of non-statutory mitigating circumstances.

Boyle exhausted this claim on direct appeal. Vol. 21, Tab #R-43, at 118–19; Vol. 24, Tab #R-48, at 103–05. The ACCA found no error, explaining:

> Boyle next argues that the circuit court erred in refusing to give examples of nonstatutory mitigating evidence in its instructions to the jury.

> At the charge conference, Boyle requested that the circuit court list examples of nonstatutory mitigating evidence when giving its instructions to the jury. The circuit court said that it would instruct the jury that anything could be considered as nonstatutory mitigation but that it would not give examples of such evidence.

> > "This Court has held that the trial court does not have to instruct the jury from a list of specific nonstatutory mitigating circumstances provided by the defendant." *Brown v. State*, 686 So. 2d 385, 403 (Ala. Crim. App. 1995),

aff'd, 686 So. 2d 409 (Ala. 1996), cert. denied, *Brown v. Alabama*, 520 U.S. 1199 (1997). *See also Albarran v. State*, [96 So. 3d 131] (Ala. Crim. App. 2011); *James v. State*, 61 So. 3d 357 (Ala. Crim. App. 2010).

*Whatley v. State*, 146 So. 3d 437, 494 (Ala. Crim. App. 2010). Courts in other states have reached this same conclusion. *See Gillett v. State*, 56 So. 3d 469, 511 (Miss. 2010) ("This Court has held that '[s]pecific instructions on non-statutory circumstances need not be given, so long as a "catch-all" instruction is included that instructs the jury that they may consider any factors that they may deem mitigating in th[eir] deliberations.'"); *Belcher v. State*, 851 So. 2d 678, 685 (Fla. 2003) ("We find that the trial court did not abuse its discretion by giving a 'catch-all' jury instruction about mitigation instead of giving [the defendant's] list of nonstatutory mitigators."); *Henry v. State*, 265 Ga. 732, 741, 462 S.E.2d 737, 746 (1995) ("[The appellant] contends that the trial court erred by refusing to charge the jury in the sentencing phase of the trial on specific examples of mitigation. The trial court was not required to illustrate possible mitigating circumstances for the jury.").

The circuit court instructed the jury that anything could be considered in mitigation—this was all the court was required to do. There is no requirement that the court give examples of mitigation evidence when giving its charge to the jury in the penalty phase. Accordingly, we find no error in regard to this claim.

*Boyle*, 154 So. 3d at 238 (record citations omitted).

Boyle contends that the state courts' decision is unreasonable. He cites Supreme Court cases standing for the proposition that a jury weighing the imposition of a death sentence may not be precluded from weighing any aspect of a defendant's character or record. *See Lockett*, 438 U.S. at 604; *Eddings*, 455 U.S. at 113-14. But these opinions do not mandate that a jury be offered specific examples of

nonstatutory mitigation circumstances. The state courts' determination was neither

contrary to nor an unreasonable application of clearly established federal law, nor an

unreasonable determination of the facts, and Boyle is due no relief.

**T.    Boyle's claim that the trial court erroneously failed to instruct the jury that it did not have to unanimously find the existence of mitigating circumstances**

Boyle claims that the trial court erred by failing to instruct the jury that a

finding of a mitigating circumstance did not have to be unanimous before it could be

considered in mitigation.

Boyle exhausted this claim on direct appeal. Vol. 21, Tab #R-43, at 120–21;

Vol. 24, Tab #R-48, at 105–06. The ACCA reviewed the claim for plain error, finding

as follows:

> Boyle next argues that the circuit court erred in failing to instruct the jury that the finding of a mitigating circumstance did not have to be unanimous before it could be considered as mitigation.
>
> Boyle did not request this instruction nor did he object at the conclusion of the instructions when the court failed to give this instruction. Thus, we review this claim for plain error. *See* Rule 45A, Ala. R. App. P.
>
> The circuit court gave the following instruction on mitigation evidence, in pertinent part:
>
> > The defendant is allowed to offer any evidence in mitigation; that is, evidence that indicates or tends to indicate that the defendant should be sentenced to life

imprisonment without the eligibility for parole instead of death.

The defendant does not bear a burden of proof in this regard. All the defendant must do is simply present the evidence.

. . . .

The laws of this state further provide that mitigating circumstances shall not be limited to those I just listed, but shall also include any aspect of the defendant's character or background, any circumstances surrounding the offense, and any other relevant mitigating evidence that the defendant offers as support for a sentence of life imprisonment without parole instead of death.

. . . .

Your determination concerning the existence of mitigating circumstances should not, however, be influenced by passion, prejudice or other arbitrary factors. Your determination should be based solely on evidence presented and the laws as I have explained to you.

The weight each of you give to any particular mitigating circumstance is a matter solely for your individual discretion and judgement.

(R.2685-87.) The court further instructed the jury that in regard to the aggravating circumstance the jury had to unanimously find it to exist beyond a reasonable doubt. The circuit court's instructions on mitigating circumstances were substantially similar to the instructions contained in the *Pattern Jury Instructions for Use in Capital Cases*.

Here, nothing in the instructions implied that the jury's findings on mitigation had to be unanimous. In fact, the court instructed the jury that "[i]f you are personally

persuaded that a mitigating factor exists then you may consider that factor while weighing the evidence." Accordingly, this Court holds that no error, much less plain error, resulted from the court's instructions. *See Williams* [*v. State*], 710 So. 2d [1276] at 1307 [(Ala. Crim. App. 1996)].

*Albarran v. State*, 96 So. 3d 131, 212 (Ala. Crim. App. 2011).

Here, nothing in the instructions implied that the jury's findings on mitigation had to be unanimous. To the contrary, the instructions clearly stated that the findings as to mitigation were to be individual determinations. The circuit court's instructions on mitigating circumstances did not constitute error, and certainly not plain error.

*Boyle*, 154 So. 3d at 238–39 (some record citations omitted).

Boyle contends that the state courts' decision is unreasonable. However, Boyle cannot prevail because the ACCA's decision on the adequacy of the instructions was not contrary to or an unreasonable application of the Supreme Court precedents he cites, *Mills v. Maryland*, 486 U.S. 367 (1988), and *McKoy v. North Carolina*, 494 U.S. 433 (1990).

In *Mills*, a prisoner sentenced to death challenged his sentence because the jury instructions and verdict form used by the Maryland trial court had prohibited jurors from considering mitigating evidence unless the entire jury unanimously found that a mitigating factor existed. The verdict form stated: "Based upon the evidence we unanimously find that each of the following mitigating circumstances which is marked 'yes' has been proven to exist by a preponderance of the evidence

and each mitigating circumstance marked 'no' has not been proven by a preponderance of the evidence." 486 U.S. at 387. The Supreme Court held that "the sentencer must be permitted to consider all mitigating evidence," regardless of whether a factor was found unanimously. *Id.* at 384. The Court vacated the death sentence in *Mills* because the jury instructions and verdict form created "a substantial probability that reasonable jurors . . . well may have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance." *Id.*

Two years later in *McKoy*, the Supreme Court applied *Mills* to strike down a North Carolina unanimity requirement that prevented a capital jury from considering any mitigating factor it did not unanimously find. 494 U.S. at 436. The judge had instructed the jury: "If you do not unanimously find [a] mitigating circumstance by a preponderance of the evidence, so indicate by having your foreman write, 'No,' in that space." *Id.* Similarly, the verdict form read: "In the space after each mitigating circumstance, write 'Yes,' if you unanimously find that mitigating circumstance by a preponderance of the evidence. Write, 'No,' if you do not unanimously find that mitigating circumstance by a preponderance of the evidence." *Id.* The Supreme Court held that, under *Mills*, "North Carolina's

unanimity requirement violates the Constitution by preventing the sentencer from considering all mitigating evidence." *Id.* at 435.

Here, the trial court's jury instructions and verdict form contained no statement that reasonably could be read by jurors to require unanimity on mitigating factors. And Boyle can point us to no Supreme Court precedent clearly establishing that an affirmative instruction must be given when the trial court has not otherwise suggested that unanimity is mandatory. Unlike in *Mills* and *McKoy*, there was no danger that a reasonable juror would have felt compelled to vote for death if she were moved by a mitigating factor not found by another juror. The ACCA did not contradict or unreasonably apply these cases in denying relief.

### U.   Boyle's claim that evolving standards of decency have rendered Alabama's method of execution unconstitutional

Boyle contends that his death sentence constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. In support, he asserts that Alabama's undeveloped procedures for administering lethal injection pose a substantial risk of inflicting unnecessary pain and therefore violate evolving standards of decency. He relies upon the Supreme Court's 2008 decision in *Baze v. Rees*, in which the Court noted that the Eighth Amendment prohibits the use of execution methods that pose a "substantial risk of serious harm." 128 S. Ct. 1520, 1532 (2008). He acknowledges that the Supreme Court in *Baze* upheld Kentucky's

lethal injection protocol, but he contends that Alabama's protocol is not "substantially similar" to Kentucky's. *See id.* at 1537.

Boyle did not exhaust this specific claim in the state courts. Boyle did raise and exhaust an "evolving standards of decency" claim on direct appeal. Vol. 21, Tab #R-43, at 127–28; Vol. 24, Tab #R-48, at 115–17. The ACCA rejected the claim as foreclosed by the Alabama Supreme Court's decision in *Ex parte Belisle*, 11 So. 3d 323 (Ala. 2008), upholding the constitutionality of Alabama's method of execution. *Boyle*, 154 So. 3d at 229. However, the lethal injection protocol at the time of Boyle's direct appeal is not the protocol currently used. On September 10, 2014, the Alabama Department of Corrections amended the protocol to use midazolam as the first of three drugs. Boyle never raised a claim concerning the current three-drug midazolam protocol. In any event, the Supreme Court approved this protocol in *Glossip v. Gross*, 135 S. Ct 2726 (2015). Thus, this claim is not exhausted, is defaulted, and cannot be reviewed by this Court.

In the alternative, Alabama's current three-drug lethal injection protocol has been upheld as constitutional by the Eleventh Circuit Court of Appeals. *See Arthur v. Comm'r, Ala. Dep't of Corrs.*, 840 F.3d 1268, 1303–04 (11th Cir. 2016) (citing *Glossip*, 135 S. Ct. 2726); *see, e.g., Price v. Comm'r, Ala. Dep't of Corrs.*, 752 F. App'x

701, 702-03 (11th Cir. 2018) (*Arthur* remains binding precedent). Therefore, Boyle is due no relief on this claim.

## V.    Boyle's claim that the State committed a *Brady* violation

Boyle claims that the State violated *Brady v. Maryland*, 373 U.S. 83 (1963), by withholding exculpatory evidence concerning Savannah's mother, Melissa Burk White. According to Boyle, Ms. White initially gave a true statement exculpating him, but was then coerced into giving a false statement and not testifying on his behalf.

Boyle exhausted this claim on state postconviction review. Vol. 27–28, Tab #R-54, at C. 398–403; Vol. 35, Tab #R-57, at 91–98; Vol. 38, Tab #R-63, at 88–96. The ACCA found that the claim was meritless, explaining as follows:

> Boyle argues that the circuit court erred in summarily dismissing his claim that the State withheld favorable or exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). This exculpatory evidence, Boyle says, included statements that Melissa Burk White, Savannah's mother, made shortly after the child's death that, Boyle says, exonerated him. According to Boyle, White was coerced into giving a false statement to police about what happened to Savannah and into not testifying at Boyle's trial. Because the State intentionally suppressed exculpatory evidence, Boyle says, he is entitled to relief on this claim.

> Due to the nature of Boyle's claim, a brief recitation of the facts surrounding this claim is necessary here. During Boyle's trial, White was called as a defense witness, but declined to testify after asserting her Fifth Amendment right. The State made repeated representations during trial that White was not receiving favorable treatment and that

she would be prosecuted for aggravated child abuse and possession of a controlled substance. According to Exhibit J(4) attached to Boyle's amended petition, White gave two written statements in the days following Savannah's death. The first, dated October 31, 2005, reads:

> Sunday, Oct. 23rd was Savannah's birthday party. She had already been sick, but was trying to cheer up from the party Sunday night. Tim[']s sister rode home with us. She kept the kids for us so I could drive because he said that his licenses weren't any good. We had went to pick up some roxys that he said he was going to buy to sell for someone. When we got back, Daniel took his sister home because I asked him to because the kids were sick and he just had got there before we got home, I gave the kids a bath and put them to bed. I layed [sic] down with them until they went to sleep.

> Monday came around. Savannah and [H.D.] wasn't feeling good still, so I have them a dose of Tylenol daytime. That night I gave them a dose of Tylenol night[t]ime then got them ready for bed. Tuesday morning, I let [H.D.] stayed [sic] out of school because she wasn't feeling good. She had a little cold like Savannah so I didn't want to let [H.D.] to get other kids sick. Well, when I woke up, I noticed that [H.D.] had opened a bottle of Tylenol nitetime [sic] for children, I noticed when I got up that the lid was off the bottle and I asked [H.D.] if she gave her any and she said no. I told her to tell me if she did because it could make her sick. And she said no and I checked Savannah out and she was okay. She was playing with her sister, I kept a close eye on her to make sure. Later on, Monday, Tim asked if he could give the girls a bath. So I said okay because I was going to fold clothes out of the dryer. Well, I heard a bang noise I heard Savannah cry. So I ran in there to see what had happened he said he told [H.D.] to let the water out she wouldn't made her fall. So I grabbed her dried her off and told [H.D.] to get out. I went in the living room with them asked her if she was

okay. She shook her head yes. And she looked okay. Tim came in the room and said he would get her ready while I get the beds ready. So, he took them to brush there [sic] teeth and I got them in the bed.

Tuesday night we had some company over Savannah started getting sick. So I petted her to make her feel better, I didn't want to give her any more medicine just in case [H.D.] did give her any. Her throat was a little horse [sic] from the cold. I fixed the girls some cream of chicken soup. They ate I gave them a bath. She was fine in the bathtub. She was playing in the water with her sister so, I thought she was feeling better. So, I put them to bed. I always put a pillow beside Savannah after they went to sleep to make her feel comfort. They were asleep so I asked Tim to watch them while I went to the grocery store to get a WIC filled. So I got back got ready for bed around 2:00 in the morning.

Wednesday morning, I woke up around 6:30 that morning and noticed the kids['] bedroom light was on. So I said, Tim what are you doing! Because I didn't hear anything going on. He ran to the bedroom said. Savannah won't wake up. I said, what? He told me again. And I thought he meant that she was sleeping. He said, he heard her crying went in there the cover was wrapped around her neck. I said bring her to me because I was still half asleep. He brought her in there she was limber wouldn't wake up. So I was shocked started panicking [sic] I told him to rush her to the hospital [sic] because I was shook up I didn't know what was going on. So, I called my mom to come get me at the said time because I thought that when I got [H.D.] up that she would be there so that she could go to school. So I took [H.D.] to a neighbor[']s house to wait on the bus at the same time my mom pulled up to get me. He did have a temper. I don't know what goes on when I'm not there. But if he did do this, I hope he pays for what he did to my baby! Monday night when Tim was giving them

a bath, Tim was in there when he said Savannah slipped fell.

(C. 1063-68.)

White's second statement, which was attached as Exhibit J(5) to Boyle's amended petition, was given on November 4, 2005, and reads:

> I met Tim Boyle sometime around the 1st of August at the store (Jet Pep) on S. 11th St. Me my daughter was there to buy some candy. He was in the store offered to buy her candy I said no. He foiled [sic] me out to my car asked for my # I said yes. He called me later that day. He asked if he could see me I said no because I'm going to Bingo. He showed up anyway. I had a boyfriend named Anthony. We were together for a year. I decided to start seeing Tim I told Anthony. A couple of weeks went by. Tim started staying with me. He seemed like a nice guy. 3 or 4 weeks went by. I caught him doing crack with his cousin Scott. Later on, he'd started being mean to me my kids, I tried to make him leave 2 or 3 times but he wouldn't go. [One] time he broke the back window open. Then I let him back in. I told him he wasn't being right to me my kids he told me, he loved us couldn't live without us. To please let him come back that he wouldn't be mean anymore.

> The end of Sept, or the 1st of Oct. when he didn't have his drugs, he started hitting me and the kids. He'd call me a Bitch, whore, if I told anybody, that he would beat mine the kids['] ass or call the DHR have my kids taking [sic] away. He'd hit me in the stomach, shoulder, slapped me in the face threatening [sic] to kill me.

> Around the 1st of Sept., he'd start hitting Savannah on the side of her head back of her head. He'd sometimes hit her so hard that he'd knock her down, if I told him to stop, he'd start threatening [sic] me by saying he'd call the cops tell them I did it. Once when we were getting out of

the car. Savannah was crying for me he put his cigarette [sic] to her leg burned her because she wouldn't stop crying. I confront him he would grab my arm tell me to shut the fuck up. I saw him do it. Another time, we'd been arguing about something, he was mad because he didn't have any pills. He hurried out the car all pissed off jerked Savannah out of the car bumped her head. He did it on purpose because he was mad at me.

He kept getting meaner up until time for the birthday party (Sun. 23rd) Oct. '04. The party was at the park in Attalla it went okay. Later, Tim made me ride with him to go get some pills. Because he had no license. The guy gave him some crack. He said I couldn't leave until I smoked some with him. After we got home, my brother was there. I asked him to take her home. Because he'd grabbed me by the neck said I wasn't going no fucking where then threw me on the floor in the bedroom. After that, I did what he told me. I gave the kids a bath that night. Put the kids in bed we stayed up smoking crack all night.

(Mon. 24th) Tim got up before I did I heard Savannah crying, I asked him what he did he said, Fuck you whore went in the bedroom took some pills (Roxys). He came in the living room about 30 mins. Later, like he wasn't in his right head. He was pissed about some dope that he'd already smoked. He threw the remote control, kicked over the coffee table, punched a hole in the hallway way [sic]. Later that night, he asked if he could give the girls a bath, I said that I can do it. He got mad jerked Savannah up and told me to shut my mouth that he was going to be there [sic] fucking father tonight that I need to be the bitch like I was do laundry, get the kids['] things ready for bed. So, I was folding clothes, I heard him saying something smart to the kids. I peaked [sic] around the corner of the bathroom door I seen him holding her under the arms he called her a fucking brat slammed her down in the bath tub. I walked in he snatched her back up with the

towel I asked him what happened. And he ran in the living room with her while I was getting [H.D.] out I heard him threaten to beat everyone[']s ass in the house if that [sic] didn't quit accussing [sic] him. He layed [sic] down with the kids until they went to sleep then he got in the bed with me.

(Tues 25th) Savannah didn't seem like she felt good all day. That evening, she through [sic] up on the couch. I knew she'd already had a cold. After the kids went to sleep me Tim smoked crack until 4 or 5 that morning. I layed [sic] down I woke up I seen the bedroom light on. The door was barely cracked, so I peaked [sic] in a little seen Tim leaning over the bed where Savannah was. I ran back in my bedroom said Tim, what are you doing. He said Savannah won't wake up. I said [bring] her to me. He brought her layed [sic] her on the bed he started pacing back in [sic] forth like he was scared, I said oh my God! I need to call 911! He ran over there tried to give CPR. She wouldn't wake up. I said, she needs help. He said you're not going anywhere you fucking bitch, I'll have her to the hospital before they get here. You don't talk to no fucking body until you hear from me. He left. I called my mom told her to come get me now. I got [H.D.] up ready took her to a neighbor. My mom step-dad got there we went straight to the hospital.

(C. 1070-77.)

On July 13, 2010, several months after Boyle was sentenced, White pleaded guilty to aggravated child abuse and possession of a controlled substance. She also pleaded guilty to charges of third-degree burglary and third-degree theft of property—crimes she committed in May 2009 while she was on bail. White was sentenced to 20 years' incarceration for the child-abuse conviction and given concurrent sentences on the other charges.

In an affidavit submitted with Boyle's amended petition, Daniel R. Shulman, Boyle's postconviction counsel, stated that, when he met with Boyle in September 2016, Boyle gave him two letters that White had written to Boyle in 2012 and 2013 while she was incarcerated in Tutwiler Prison. The first letter, dated September 16, 2012, read, in relevant part:

> I knew from the beginning that [H.D.] was being brainwashed. I believed a lot of it had to do with Connie [Burk]. So why would you feel it would do any good for me to talk to your lawyer? If any of that shit gets twisted from what's already been done, then I'm fucked. Do you want me gone for the rest of my life? Cause that's exactly what I did, it would be me & you sitting on D.R.! That's really some fuck shit. You know I'm no expert at legal shit, but if I had the money, I would get myself a dam [sic] good lawyer right now! I would let them take over my case cause I know Dani B. fucked me over every way possible. I never "touched" the kids and they know this, but still charged w/ "Aggravated" [sic]. Agg. Means "<u>physically.</u>" How can that be with evidence? I could be wrong, but I just don't have no understanding and I probably never will . . .
>
> [. . .] I still remember the 1st day we met. I took [H.D.] to the Jet Pep on S. 11th St. to get her some candy and there you stood offering to pay but I said no. you were determining [sic] to find me and you did when you showed up at my apartment. I really do miss you so much. Why did all this have to happen? I knew you used pills but no, I didn't know you were shooting oxys. You knew I didn't like that shit. Why did you hide it from me? I would've tried to help you if it was possible. If you knew Scott was the problem, why didn't you stayed [sic] away from him? Well, the past is the past. We have to look toward the future.

(C. 1080-81.) The second letter, dated January 19, 2013, read in relevant part:

Of course I want you to keep it 100 with me. I keep it 100 with you too. So, you wanna [sic] hear the truth? I did tell them folks the truth. Over & over again. They humiliated me. Called me a liar, and said I was just taking up for you, babe. I took the plead [sic] because—(like I already said) Dani said the D.A. wanted to point fingers at me and charge me with you. What was I suppose [sic] to do? I thought Dani would "Help" me. He was a dam [sic] good paid lawyer. He let me and my family down. What you said about the 30 day thang [sic], I told you I'm dumbfounded when it comes to legal shit like that. I've never had to do anything like that before. Hell, I've never been in any trouble before, feel me? I tried talkin [sic] to Dani at the county when I first got locked up, but he said he was through with me once I got sentenced. That's some fuck shit. I asked him before I signed anything, how long will I have to do, and he says,"a year, possibly 2." So I'm like, aight [sic], i can handle that. Come to find out. I'm stuck w/a 20 yr. sentence (medium) w/a "R" (Restricted) by my name until however long they want it I guess.

(R. 1086-87.)

After receiving those letters, Shulman retained a private investigator, Billy Ware, and asked him to speak with White. In an affidavit submitted with Boyle's amended Rule 32 petition, Ware explains that, during his interview with White, White told him that she had never seen Boyle physically abuse her daughters, though Savannah had fallen in the bath. She told Ware that she told this to law enforcement, but no one believed her. Finally, White told Ware that she signed a false statement incriminating Boyle because she thought she would be detained until she did so and because she had been threatened with a capital charge if she did not. Ware concluded that when he asked White if the State told her that if she testified at Boyle's trial, she would be charged with capital murder, White "was evasive concerning this, but did not deny it." (C. 650.)

In light of the circumstances discussed above, the circuit court summarily dismissed Boyle's *Brady* claim for two reasons. First, the circuit court found that Boyle's claim was precluded under Rules 32.2(a) (3) and (a) (5), Ala. R. Crim. P., because it could have been or should have been raised at trial or on direct appeal. Specifically, the circuit court found that:

> [t]he State never "hid" White from Boyle, and as her letter make[s] apparent, she and Boyle remained in communication after they were incarcerated. If Boyle or his counsel had wished to speak with White, they could have done so at any time, depending upon her willingness to talk. These letters allegedly showing that White gave a false statement were mailed to Boyle in 2012, and the Court of Criminal Appeals did not affirm his conviction and sentence until March 2013. Therefore, Boyle was aware of White's supposed falsehoods during the pendency of his appeal—the letter of September 16 even suggests that Boyle had asked White to speak to his appellate counsel. If Boyle truly had evidence of a *Brady* violation, then he could have made a supplemental filing concerning this claim in the Court of Criminal Appeals or raised the issue in the Alabama Supreme Court. He failed to do so, and therefore, this claim is now precluded and dismissed.

(C. 1486-87.) Second, the circuit court found that, even if Boyle's *Brady* claim were not precluded, as pleaded, it was without merit. Specifically, the circuit court held:

> Boyle's claim that the State withheld material, exculpatory evidence is based on nothing more than two love letters and an interview given eleven years after White's statements were taken. His only evidence that White refused to testify for fear of being charged with capital murder is the investigator's statement that she "was evasive concerning this, but did not deny it." The inconclusive statement of a felon concerning her boyfriend

does not constitute evidence of government coercion or suppression.

It is also revealing that White's second statement, which she now repudiates, contains indicia of reliability when considered along with the evidence presented at trial. In her statement, she references Boyle's use of pills and crack cocaine, which was reflected in the evidence found in the master bedroom. White also stated that he punched a hole in the hallway wall, and law enforcement found corresponding damage. She stated that Boyle had burned Savannah with a cigarette and hit her in the head, injuries noted by H.D., Kim Parr, Claude Burk, and the nurses. White claimed in her second statement that she saw Boyle slam Savannah in the bathtub, as H.D. later testified. Finally, White's statement and her letter of September 26 contain similar material, such as references to Boyle's drug use with his cousin Scott and to how Boyle met White.

(C. 1487-88.) We agree with the circuit court that, as pleaded, the claim is without merit.

We further find that the circuit court correctly dismissed this claim based on the preclusionary grounds found in Rule 32.2(a), Ala. R. Crim. P. Although the Alabama Supreme Court in *Beckworth v. State*, 190 So. 3d 571 (Ala. 2013), held that Beckworth's Rule 32 petition should not have been dismissed on the ground that his claim for relief under Rule 32.1(a), Ala. R. Crim. P., lacked allegations negating the preclusive bars of Rule 32.2(a) (3) and (a) (5), Ala. R. Crim. P., this holding was based on the Court's finding that the circuit court dismissed Beckworth's petition only three days after the State had asserted preclusionary grounds in its answer without affording Beckworth the opportunity to address the State's pleaded grounds of preclusion. Such is not the case here.

In the present case, the State filed its answer to Boyle's amended Rule 32 petition on February 2, 2017. In its response, the State expressly

argued that Boyle's claim was procedurally barred under Rules 32.2(a) (3) and (a) (5), Ala. R. Crim. P. It does not appear from the record that Boyle ever filed a reply to the State's answer. The circuit court issued its summary dismissal on March 7, 2017. Unlike the defendant in *Beckworth*, Boyle, having nearly a month to file his reply to the State's answer, never addressed the State's preclusionary grounds. In addressing the holding in *Beckworth*, this Court has previously stated that, in that case, the Alabama Supreme Court did not reverse long-established law that a claim may be summarily dismissed after the State pleads a ground of preclusion and that preclusion ground is not addressed by the petitioner in his response to the State's assertions. *See Spencer v. State*, 201 So. 3d 573, 621 (Ala. Crim. App. 2015). Here, Boyle pleaded certain claims and the State asserted grounds of preclusion related to those claims, but Boyle did not answer the State's preclusion arguments. The circuit court summarily dismissed those claims based on the preclusion grounds of Rule 32.2(a), Ala. R. Crim. P. Such a dismissal under those circumstances was proper. Thus, Boyle is not entitled to relief on this claim.

Vol. 37, Tab #R-61, at 62–71 (some record citations omitted).

Boyle contends that the state courts' decision is unreasonable and in contravention of *Brady*, which holds that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. According to Boyle, the information that the State did not provide to the defense prior to trial was that the State actually coerced Ms. White into giving her second statement inculpating Boyle and threatened to charge her with capital murder if she testified at Boyle's trial. He gleans this "information" from two letters written by Ms. White to Boyle while she

was in prison well after his trial, and an interview conducted in 2016 by an investigator hired by Boyle in an effort to obtain relief in the state postconviction proceedings. As highlighted by the ACCA, Ms. White's second, more detailed statement to law enforcement is corroborated by numerous pieces of trial evidence (like her references to Boyle's use of pills and crack cocaine, which was reflected in the evidence found in the master bedroom; her statement that he punched a hole in the hallway wall, and law enforcement found corresponding damage; her statement that Boyle had burned Savannah with a cigarette and hit her in the head, injuries noted by H.D., the neighbor Kim Parr, Savannah's grandfather Claude Burk, and the nurses; and her statement that she saw Boyle slam Savannah in the bathtub, as H.D. later testified). Despite this, eleven years after the trial, Ms. White stated that she lied to inculpate Boyle and thus save herself. Additionally, when asked directly by the investigator if the State threatened Ms. White with a capital murder charge if she testified, she was "evasive." This new "information" is simply not sufficient to demonstrate that a *Brady* violation actually occurred in this case, and the state courts reasonably concluded as much. Boyle also fails to provide a clearly established Supreme Court decision establishing that the state courts wrongly decided his *Brady* claim. The state courts' determination was neither contrary to nor an unreasonable

application of clearly established federal law, nor an unreasonable determination of the facts, and Boyle is due no relief.

## W.   Boyle's claim that the cumulative effect of the alleged errors warrants habeas relief

Boyle's final claim is that the cumulative effect of the alleged errors set forth above warrants habeas corpus relief regardless of whether each error standing alone is sufficient to warrant habeas corpus relief, because the cumulative effect violated his Fourteenth Amendment Due Process guarantee of fundamental fairness at trial and on appeal.

This claim is not exhausted. While Boyle raised a "cumulative effect" claim in his direct appeal brief to the ACCA, *see* Vol. 21, Tab #R-43, at 128, and the ACCA rejected it, finding that "Boyle's substantial rights have not been injuriously affected. . . .," *Boyle*, 154 So. 3d at 239, he did not raise this claim in his petition for certiorari in the Alabama Supreme Court. In his Rule 32 proceedings, Boyle raised claims of cumulative error as to guilt-phase ineffective assistance, *see* Vol. 27, Tab #R-54, at C. 353–54, and penalty-phase ineffective assistance, *see id.* at C. 378, in the circuit court, but he abandoned these claims before the ACCA. As the component elements of this claim are not exhausted, the claim is defaulted and not properly before this Court.

If this Court could review the claim, it would nonetheless be due to be denied. "The cumulative error doctrine provides that an aggregation of non-reversible errors (i.e., plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal." *United States v. Baker*, 432 F.3d 1189, 1223 (11th Cir. 2005) (quotation omitted). However, "[w]ithout harmful errors, there can be no cumulative effect compelling reversal." *United States v. Barshov*, 733 F.2d 842, 852 (11th Cir. 1984); *see also United States v. Gamory*, 635 F.3d 480, 497 (11th Cir. 2011) ("Where there is no error or only a single error, there can be no cumulative error."). Here, Boyle's individual claims of error are meritless, and the supposed errors, even considered in the aggregate, did not affect his substantial rights or undermine confidence in the state proceedings. Therefore, Boyle is not entitled to relief on this claim.

## V.    CONCLUSION

For all of the reasons set forth herein, Boyle's petition for writ of habeas corpus is due to be dismissed, or in the alternative denied.

Rule 11(a) of the Rules Governing Section 2254 Cases requires the district court to issue or deny a certificate of appealability when it enters a final order adverse to the applicant. This Court may issue a certificate of appealability "only if the applicant has a made a substantial showing of the denial of a constitutional right."

28 U.S.C. § 2253(c)(2). To make such a showing, a "petitioner must demonstrate that reasonable jurist would find the district court's assessment of the constitutional claims debatable and wrong," *Slack v. McDaniel*, 529 U.S. 473, 484 (2000), or that "the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (internal quotations omitted). This Court finds Boyle's claims do not satisfy either standard. Accordingly, a motion for a certificate of appealability is due to be denied.

A separate order in accordance with this opinion will be issued.

**DONE** and **ORDERED** on March 30, 2022.

_____
L. Scott Coogler
United States District Judge

160704